UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MEMPHIS STREET ACADEMY CHARTER  SCHOOL AT J.P. JONES; | : | |
| | : | |
| | : | |
| PATRICE ROGERS, on her own behalf, and on behalf of her minor child GR; | : | CIVIL ACTION |
| | : | |
| | : | |
| NICAURIS ESTEVES, on her own behalf, and on behalf of her minor child EE; and | : | NO.  2:22-cv-02760-CFK |
| | : | |
| | : | |
| JENNIFER BERMUDEZ, on her own behalf, and on behalf of her minor child SF | : | JURY TRIAL DEMANDED |
| | : | |
| PLAINTIFFS | : | |
| vs. | : | |
| | : | |
| SCHOOL DISTRICT OF PHILADELPHIA; | : | |
| | : | |
| TONY B. WATLINGTON, Superintendent of the School District of Philadelphia, in his official and individual capacity; | : | |
| | : | |
| | : | |
| | : | |
| JOYCE WILKERSON, President of the Philadelphia Board of Education, in her official and individual capacity; | : | |
| | : | |
| | : | |
| | : | |
| LETICIA EGEA-HINTON, Vice-President of the Philadelphia Board of Education, in her official and individual capacity; | : | |
| | : | |
| | : | |
| | : | |
| SARAH ASHLEY-ANDREWS, member of the Philadelphia Board of Education, in her official and individual capacity; | : | |
| | : | |
| | : | |
| | : | |
| JULIA DANZY, member of the Philadelphia Board of Education, in her official and individual capacity; | : | |
| | : | |
| | : | |
| | : | |
| CHAU WING LAM, member of the Philadelphia Board of Education, in her official and individual capacity; | : | |
| | : | |

| | |
|---|---|
| MALLORY FIX LOPEZ, member of the Philadelphia Board of Education in her official and individual capacity; | : |
| | : |
| | : |
| LISA SALLEY, member of the Philadelphia Board of Education in her official and individual capacity; | : |
| | : |
| | : |
| | : |
| REGINALD STREATER, member of the Philadelphia Board of Education in his official and individual capacity; | : |
| | : |
| | : |
| | : |
| CECELIA THOMPSON, member of the Philadelphia Board of Education in his official and individual capacity; and | : |
| | : |
| | : |
| | : |
| PENG CHAO, Acting Chief of the School District of Philadelphia's Charter Schools Office, in his official and individual capacity, | : |
| | : |
| | : |
| | : |
| DEFENDANTS | : |
| | : |
| | : |

## FIRST AMENDED COMPLAINT

Plaintiffs, by and through their undersigned counsel, bring this action against Defendant, and aver as follows:

## I.   PRELIMINARY STATEMENT

1.      Defendant, the School District of Philadelphia and the individually named Defendants ("SDP"), have initiated action to terminate the charter of Plaintiff, Memphis Street Academy Charter School at J.P. Jones ("MSA") and compel MSA to close.

2.      If it were to occur, such action would violate Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 200d; Every Student Succeeds Act, 20 U.S.C. ch. 28 §§ 1001, *et seq*; the Due Process and

Equal Protection Clauses of the Fourteenth Amendment of the United States Constitution; 42 U.S.C. § 1983; Article I, Sections 11, 14, 26, 29 of the Pennsylvania Constitution, Pa. Const. art. I, §§ 11, 14, 26, and 29, and Pennsylvania state law.

3.      Additionally, the individually named Defendants, acting  under color of Pennsylvania law, have subjected Plaintiffs to unlawful discrimination and deprived Plaintiffs of rights protected by the due process and equal protection clauses of the Fourteenth Amendment of the United States Constitution and the Pennsylvania Constitution.

4.      Plaintiffs, therefore, bring this action for injunctive and declaratory relief seeking to prevent SDP from taking action to terminate MSA's charter and close MSA.

## II.   <u>JURISDICTION AND VENUE</u>

5.      This Court has jurisdiction over these proceedings under 28 U.S.C. §1331, which provides for original jurisdiction in the United States District Courts for civil actions arising under the Constitution or laws of the United States. This action arises under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d; and the Fourteenth Amendment of the United States Constitution, U.S. Const. amend. XIV.  This action additionally involves a federal question as to SDP's threatened and impending violation of the Every Student Succeeds Act, 20 U.S.C. ch. 28 §§ 1001, *et seq*.

6.      Pursuant to 28 US.C. § 1367, this Court has supplemental jurisdiction over all other claims herein as they are so related to the claims in the original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

7.      Venue is proper in this district under 28 U.S.C. §1391(b)(2) because the events giving rise to the claims herein, or a substantial part thereof, occurred in this judicial district. Venue is also

proper in this judicial district under 28 U.S.C. §1391(c) because both parties may be found in this district.

### III.  **PARTIES**

8.      Plaintiff, Memphis Street Academy Charter School at J.P. Jones, is a Pennsylvania nonprofit corporation that operates a charter school in Philadelphia, Pennsylvania pursuant to the Pennsylvania Charter School Law, 24 P.S. §§ 17-1701-A, *et seq* (the "CSL").

9.      Plaintiff Patrice Rogers ("Rogers") brings this action on her behalf and on behalf of her minor child, "GR", whom Rogers chose to enroll at MSA, rather than the School District of Philadelphia. Rogers and GR are African Americans. Rogers desires that GR continue to be educated at MSA because MSA provides a higher quality of education in a safer and more orderly environment than that which would otherwise be provided by the School District of Philadelphia.

10.     Plaintiff Nicauris Esteves ("Esteves") brings this action on her behalf and on behalf of her minor child, "EE", whom Esteves chose to enroll  at MSA, rather than the School District of Philadelphia. Esteves and EE are Hispanic Americans whose primary language is Spanish. MSA has designated EE as an "English Language Learner". Esteves desires that EE continue to be educated at MSA because MSA provides a higher quality of education in a safer and more orderly environment than that which would otherwise be provided by the School District of Philadelphia.

11.     Plaintiff Jennifer Bermudez ("Bermudez") brings this action on her behalf and on behalf of her minor child, "SF", whom Bermudez chose to enroll  at MSA, rather than the School District of Philadelphia. Bermudez is Caucasian and SF is Multiracial/Hispanic. Bermudez desires that SF continue to be educated at MSA because MSA provides a higher quality of education in a safer and

more orderly environment than that which would otherwise be provided by the School District of Philadelphia.

12.     Defendant, School District of Philadelphia , is a public school district organized and existing under the Pennsylvania Public School Code, 24 P.S. §§ 1-101, *et seq.*

13.     Defendant, Tony B. Watlington is the current Superintendent of the School District of Philadelphia.  As Superintendent, Defendant Watlington is responsible for the administration of SDP. At all times material hereto, Superintendent Tony B. Watlington, pursuant to SDP Policy 002.2, is "responsible for the implementation of all actions of the Board," and "the administration and operation of the schools subject to the policies of the Board", which would include the School District of Philadelphia's adverse action against MSA.

14.     Defendant, Joyce Wilkerson, is the President of the School District of Philadelphia's governing Board of Education (the "BOE").

15.     Defendant, Leticia Egea-Hinton, is the Vice-President of the BOE.

16.     Defendant, Sarah Ashley-Andrews, is a member of the BOE.

17.     Defendant, Chau Wing Lam, is a member of the BOE.

18.     Defendant, Julia Danzy, is a member of the BOE.

19.     Defendant, Mallory Fix Lopez, is a member of the BOE.

20.     Defendant, Lisa Salley, is a member of the BOE.

21.     Defendant, Reginald Streater, is a member of the BOE.

22.     Defendant, Cecelia Thomspon, is a member of the BOE.

23.     Defendant, Peng Chao, is Acting Chief of the School District of Philadelphia's Charter Schools Office ("CSO"). At all times material hereto, as Acting Chief of the CSO, Defendant Chao, had a responsibility under SDP policy to render a recommendation to the BOE regarding whether MSA's charter should be renewed or nonrenewed.

## IV.     STATEMENT OF FACTS

### A.   General Background

24.     MSA operates as a public charter school pursuant to a written charter agreement between MSA and SDP.  A copy of MSA's current and operative charter agreement is attached hereto as Exhibit A.

25.     Under the CSL, a charter school's charter exists for a specified term of years and may be either renewed for one or more additional terms or may be revoked or nonrenewed by a local school district for causes enumerated under the CSL.

26.     Under the CSL, the school district in which a charter school operates is required to annually assess the charter school's performance and perform a comprehensive review prior to granting a charter renewal.

27.     The CSO is an office of the School District of Philadelphia, which SDP has designated with responsibility for monitoring charter schools to support SDP's charter school oversight responsibilities.

28.     Pursuant to SDP policy, the CSO is responsible for conducting performance reviews of charter schools in order to recommend to the BOE whether a given charter school's charter should be

renewed or nonrenewed at the end of its term, and whether any conditions should be imposed on a charter renewal.

29.     Pursuant to SDP policy, the CSO is directed to make a recommendation regarding charter renewals based upon the charter school's cumulative academic performance, operational compliance, and financial health over the charter term.

30.     In order to render its recommendations, the CSO has developed a framework to evaluate the performance of each Philadelphia charter school (the "Renewal Framework").

31.     The CSO's Renewal Framework consists of three domains: academic success, organizational compliance and viability, and financial health and sustainability.

32.     Pursuant to the CSO's Renewal Framework, a charter school that approaches or meets the standard in the three domains will be recommended for a five-year renewal, while schools that do not meet the standard in one of more domains may be considered for nonrenewal.

33.     For reasons discussed at length below, the academic success domain of the Renewal Framework is heavily biased against certain racial minority and English Language Learners groups.

34.     The CSO's application of the Renewal Framework has consistently and disproportionately harmed charter schools which have served higher than average rates of students from certain racial minorities and English Language Learners groups.

35.     The Renewal Framework is thus devised in a manner that is biased against charter schools which serve disproportionately high percentages of these students.

36.     In the case of MSA, the CSO's application of the Renewal Framework has subjected MSA to unfair and unrealistic charter conditions and ultimately the current BOE approved threat of closure.

**B.   Procedural Background**

37.     In 2012, SDP granted MSA an initial charter to operate a charter school to educate students in Grades 5-8.

38.     Since opening, MSA's charter has required MSA to enroll its students from the surrounding neighborhood, which contains high rates of poverty and a population that predominantly consists of members of certain racial minorities, many of whom are English Language Learners.

39.     As a result of this enrollment restriction and MSA's grade configuration, a significantly high percentage of students who have enrolled at MSA since it opened have matriculated with substantial learning deficits and have entered MSA performing below grade level.

40.     Upon information and belief, SDP knows that a substantial number of students leaving from Philip Sheridan Elementary School and Francis E. Willard Elementary School (the "SDP Feeder Schools")–both SDP run schools–to attend MSA in Grade 5, are performing below grade level when they enroll at MSA.

41.     In 2017, MSA applied for renewal of its charter agreement.

42.     On or around 2018, the CSO applied the Renewal Framework to evaluate MSA's renewal application and determined that MSA failed to meet standards for the academic success domain.

43.     Thereafter, SDP threatened to nonrenew MSA's charter unless it signed a new charter containing a Surrender Clause and certain academic performance conditions that, if violated, would trigger the Surrender Clause.

44.     The Surrender Clause provides:

> The Charter School acknowledges and agrees that if any of the academic conditions including specific performance targets, set forth in Article I, Section I are not met fully by the Charter School, the Charter School will surrender and forfeit its charter and will close on or before June 30, 2022. The Charter School will dissolve without protest and without recourse to the State Charter School Appeal Board or to any court of competent jurisdiction. The Charter Schools Office will make a determination on whether any of the academic targets set forth above are not met fully by the Charter School once data for 2020-21 school year are available and made public.

45.     In 2018, under threat of nonrenewal, MSA acquiesced and executed a charter agreement containing these conditions.  That charter is MSA's current and operative charter.

46.     The academic conditions referenced in the Surrender Clause called for MSA to substantially improve the academic performance of its students over the five years of the charter term.

47.     Upon information and belief, few, if any, SDP or Philadelphia charter schools would have met the same academic conditions placed upon MSA during the relevant period of time.

48.     Upon information and belief, SDP knew, based on the Renewal Framework, that MSA was unlikely to meet the academic conditions placed upon it in the 2017 Charter.

49.     At the time that the charter was executed, the academic conditions imposed upon MSA in its current charter were unrealistic and unreasonable due to  the substantial academic deficits and demographic characteristics of students entering MSA.

50.     Thus, the SDP leveraged MSA's failure to meet standards for the academic success domain on the Renewal Framework and the threat of nonrenewal to impose upon MSA unrealistic charter conditions and a Surrender Clause which would be triggered upon MSA's eventual failure to meet such conditions.

51.     MSA's current charter agreement expired June 30, 2022 and has thereafter continued by operation of law.

52.     In 2021, MSA submitted an application to the CSO for renewal of its charter.

53.     During the course of the CSO's renewal evaluation of MSA:

a.  The CSO informed MSA of its intent to recommend renewal of MSA's charter; and

b.  The CSO requested that MSA not make any formal comment or protest regarding its subsequently issued  Renewal Recommendation Report, which was privately published to MSA by the CSO. The CSO informed MSA that formal comment or protest was unwarranted because the CSO intended to render a renewal recommendation.

54.     Yet, on May 26, 2022, the CSO publicly reported to BOE  that MSA failed to meet the standard for academic success for the Renewal Framework and that MSA was in violation of conditions that would trigger the Surrender Clause.

55.     Furthermore, the CSO failed to make any recommendation concerning MSA's request for renewal to BOE, in violation of SDP policy.

56.     On or about June 23, 2022, BOE approved Action Item No. 89, whereby it invoked the Surrender Clause contained in MSA's charter and thereby: (i) demanded that MSA surrender and

forfeit its charter and close by June 30, 2023; and (ii) directed that MSA notify SDP by July 15, 2022

whether it will comply with such demand.  A true and correct copy of Action Item No. 89 is attached

hereto as Exhibit B.

### C.  Racial Discrimination

57.     The CSO's Renewal Framework discriminatorily targets for closure charter schools

which serve disproportionately high percentages of students from certain racial minorities.

58.     Thus, as further described below, in imposing conditions upon MSA and now

demanding that MSA surrender its charter and close, SDP has demonstrated an intent to employ

against MSA accountability data and metrics that systemically target for school closure charter schools

with disproportionately high percentages of students who are members of certain racial minorities.

59.     According to the CSO's 2021-22 report of MSA during the 2021-22 school year,

approximately 56% of the school's student population consisted of students who were Hispanic and

34% of the student population consisted of students who were African American or Black, for a

combined total of 90%, while 4% of the student population was White and 0% of the student

population was Asian.

60.     In comparison, according to the CSO's 2021-22 report of MSA, during the 2021-22

school year, approximately 24% of the overall student population of the SDP consisted of Hispanic

students and 47% of the overall student population consisted of African American or Black students,

for a combined total of 71%, while 15% of the student population consisted of White students and

10% of the student population consisted of Asian students.

61.     Upon information and belief, the foregoing racial demographics of MSA and SDP have remained relatively consistent since MSA opened in 2012.

62.     With respect to charter schools that operate in Philadelphia, the SDP's sole authority to seek and initiate the nonrenewal or revocation of a charter school's charter for causes is enumerated in 24 P.S. § 17-1719-A(a).

63.     If a charter school presents the cause for nonrenewal or revocation pursuant to 24 P.S. § 17-1719-A(a), it is discretionary on the part of SDP whether or not to pursue nonrenewal or revocation of the school's charter.

64.     Over the past several years, SDP has consistently and disproportionately nonrenewed and/or revoked the charters of charter schools which have served student populations with higher percentages of students from certain racial minorities than the overall student population of SDP, causing real and substantial harm to their students.

65.     In closing these schools, SDP has caused real and substantial harm to their students. Charter schools are schools of choice, meaning that parents and guardians, including Plaintiffs Rogers, Esteves, and Bermudez, opt for their children to attend charter schools to the exclusion of other options.

66.     Thus, in closing charter schools, SDP has deprived students of the opportunity to attend the school of their parents' or guardians' choosing.

67.     Furthermore, upon information and belief, SDP's recent closure of charter schools has had a disruptive and harmful effect on the schools' students.

68.     SDP's recent history of closing charter schools, which has disproportionately harmed students from certain racial minorities, has been predicated upon the CSO's application of the Renewal Framework, which disproportionately targets charter schools that serve a disproportionately high percentage of African American and Hispanic students, and disproportionately low percentage of White and Asian students.

69.     The Renewal Framework is heavily weighted by data and metrics for which Hispanic and African American students materially underperform other student groups. The Renewal Framework is thus biased against charter schools which educate high proportions of Hispanic and African American students.

70.     For instance, African American and Hispanic students have historically underperformed other racial demographics, namely White and Asian students, on academic assessments pertinent to the Renewal Framework such as PSSA proficiency scores and attendance rates.

71.     In comparing PSSA data of a school with a higher percentage of Black and/or Hispanic Student, but lower percentage of White and/or Asian students, with another school with a lower percentage of Black and/or Hispanic students, but higher percentage of White and/or Asian students, the statistical probable outcome is that the latter school will outperform the former school.

72.     Upon information and belief, SDP is aware that certain racial groups historically outperform other racial groups on standards pertaining to the academic success domain of the Renewal Framework.

73.     The Academic Framework for academic success does not consider the racial demographics of a school.

74.     By not considering racial demographics, the academic success domain of the Renewal Framework directly compares a charter school with other schools who have dissimilar racial demographics.

75.     Upon information and belief, SDP intentionally did not include racial demographics as a factor under the academic success domain of the Renewal Framework in order to target for closure schools which serve disproportionately high percentages of Black and/or Hispanic students.

76.     Further, the Renewal Framework fails to give proper weight to the academic deficits that many MSA students have when they enter MSA.

77.     Upon information and belief, the majority African American and Hispanic students arriving from SDP Feeder Schools to MSA in Grade 5 are performing below grade level.

78.     Upon information and belief, SDP knows that the majority African American and Hispanic students departing from SDP Feeder Schools to enroll at MSA in Grade 5 are performing below grade level.

79.     SDP has failed to educate the majority of African American and Hispanic students from SDP Feeder Schools to perform at grade level.

80.     Although it is not realistic to expect MSA to simply erase the academic deficits of incoming students, MSA has demonstrated significant success in helping students achieve academic growth.

81.     However, because of how the Renewal Framework allocates of points towards PSSA proficiency, by not properly educating these students from SDP Feeder Schools, SDP has set up MSA to underperform on the Renewal Framework's proficiency standard despite MSA performing well on the Renewal Framework's growth standard.

82.     Ultimately, because the Renewal Framework is heavily weighted by raw PSSA scores, and because a high percentage of MSA's enrollment consists of students entering MSA in Grades 5-8 with significant academic deficits, the Renewal Framework by design skews unfairly and unreasonably against MSA.

83.     Upon information and belief, SDP is fully aware that the Renewal Framework is materially skewed against charter schools which serve disproportionately high percentages of Hispanic and African American students.  The Renewal Framework relies heavily upon PSSA data and other measures upon which Hispanic and African American students historically underperform.

84.     Over the past several years, as in the case of MSA, SDP has additionally used its discriminatory Renewal Framework to justify the imposition of conditions upon the charters of charter schools that serve populations of Hispanic and/or African American students that are disproportionately larger than the SDP.

85.     For several years, charter schools and various other stakeholders have protested the discriminatory impact that SDP's Renewal Framework has had on charter schools that disproportionately serve Hispanic and/or African American students.

86.     Upon information and belief, SDP is fully aware that its use and reliance upon the Renewal Framework has disproportionately harmed charter schools that have served Hispanic and/or

African American students; and that SDP has thus disproportionately harmed the students that those schools have served.

87.     In nonetheless continuing to use and rely upon its discriminatory Renewal Framework, SDP has thus made a deliberate choice to disproportionately harm charter schools that have served Hispanic and/or African American students and has thereby exhibited deliberate indifference to discriminatory treatment that these charter schools and their students have been subjected to.

88.     After years of public complaints, on or around December 2021, SDP engaged a law firm to conduct an internal investigation regarding racial bias allegations in charter school authorizations (the "SDP Discrimination Investigation").

89.     The SDP Discrimination Investigation is still ongoing.

90.     For SDP to seek or compel the closure of MSA while the SDP Discrimination Investigation remains pending further contributes to SDP's willful indifference as to the discriminatory effect of SDP's Renewal Framework.

### D.  Linguistic Discrimination

91.     At present and at all times material hereto, MSA has educated a higher percentage of English Language Learners ("ELLs") than SDP.

92.     The Renewal Framework is heavily weighted by data and metrics for which ELLs materially underperform other student groups.  The Renewal Framework is thus biased against schools which educate high proportions of ELL students.

93.     Upon information and belief, SDP is fully aware that the Renewal Framework is materially skewed against charter schools which serve disproportionately high percentages of ELL students.

94.     In employing the Renewal Framework against MSA, SDP thereby discriminated against ELL students.

### E.   Discrimination re: Students With Disabilities

95.     At present and at all times material hereto, MSA has educated a higher percentage of students with disabilities than SDP.

96.     The Renewal Framework is heavily weighted by data and metrics for which students with disabilities materially underperform other student groups.  The Renewal Framework is thus biased against schools which educate high proportions of students with disabilities.

97.     Upon information and belief, SDP is fully aware that the Renewal Framework is materially skewed against charter schools which serve disproportionately high percentages of students with disabilities.

### F.   Every Student Succeeds Act

98.     Even beyond its discriminatory impact, SDP's closure of MSA would violate and/or undermine several express requirements of the Every Student Succeeds Act (the "ESSA"), 20 U.S.C. ch. 28 §§ 1001, *et seq*.

99.     Pennsylvania is a recipient of ESSA funds and is therefore subject to the requirements of the ESSA.

100.    With respect to states that receive federal funding under the ESSA, the ESSA expressly

requires that:

a.    The State Education Agency ("SEA") of the state shall develop a plan for the

implementation of ESSA requirements, 20 U.S.C. § 6311(a)(1), and that such plan

shall remain in effect for the duration of the state's participation in the ESSA.  20

U.S.C. § 6311(a)(6)(A)(i).  A state plan shall contain assurances that the SEA will assist

each local educational agency ("LEA") and school affected by the State plan to meet the

requirements of the ESSA.  20 U.S.C. § 6311(g)(2)(C).

b.    The SEA of the state shall identify schools in need of comprehensive support and

improvement ("CSI schools").  20 U.S.C. § 6311(c)(4).  The Local Education Agency

("LEA") of any such school shall work in partnership with stakeholders to develop and

implement a comprehensive support and improvement plan for the school to improve

student outcomes, that, *inter alia*,  includes evidence-based interventions. 20 U.S.C. §

6311(d)(1).

c.    The SEA shall additionally identify schools in need of targeted support and

improvement ("TSI schools") and the LEA of any such school shall work in

partnership with stakeholders to develop and implement a school-level targeted

support and improvement plan to improve student outcomes that, *inter alia*, includes

evidence-based interventions.  20 U.S.C. § 6311(d)(2).

d.    The SEA shall establish statewide exit criteria for CSI schools and TSI schools in need

of additional support ("A-TSI schools").  20 U.S.C. § 6311(d)(3)(A)(i).

101.     For a CSI school, failure to meet the exit criteria within a prescribed number of years shall result in more rigorous State-determined action, such as the implementation of interventions (which may include addressing school-level operations).  20 U.S.C. § 6311(d)(3)(A)(i)(I).

102.     For an A-TSI school, failure to meet the exit criteria within a State-determined number of years shall result in identification of the school by the State as a CSI school.  20 U.S.C. § 6311(d)(3)(A)(i)(II).

103.     The foregoing statutory regime for the support and intervention of TSI, A-TSI, and CSI schools is mandatory and binding upon states that receive funding through the ESSA.  An SEA or LEA seeking to get around the ESSA's requirements with respect to these requirements would need to apply to the Secretary of the U.S. Department of Education for a waiver, through which the applicant would be required to demonstrate, *inter alia*, how the waiver would advance student academic achievement.  20 U.S.C. § 7861.  Congress thereby demonstrated its intent to ensure that any deviation from the ESSA provisions does not occur in an unapproved or haphazard manner.

104.     Neither the Pennsylvania Department of Education ("PDE") nor SDP has applied for or sought any waiver that would permit SDP to disregard the ESSA provisions regarding the support and improvement of TSI, A-TSI, or CSI schools.

105.     As the SEA of Pennsylvania under the ESSA, PDE has promulgated the "Pennsylvania Consolidated State Plan" (the "State Plan") pursuant to 20 U.S.C. § 6311(a)(1).

106.     Under the State Plan, a TSI designation serves as a "precursor for more intensive accountability cycles."  A TSI school that fails to meet certain performance thresholds for three (3) consecutive years will be designated as an A-TSI school.  If an A-TSI school is unable to meet exit

criteria after four (4) years, it will then be designated as a CSI school.  If a CSI school fails to exit CSI status after four (4) years, it will then be subject to additional intervention, which might only then finally entail closure.

107.    Thus, Pennsylvania complies with the ESSA by mandating a closed system of review and incremental support for certain public schools including criteria by which schools may exit ESSA designated support status.

108.    MSA is currently designated by PDE as a TSI, which is two steps removed from CSI status.

109.    Closure of MSA while in TSI status would thus violate and materially undermine PDE's State Plan and, in turn, ESSA.

110.    The ESSA's mandatory process for the support and improvement of TSI, A-TSI, and CSI schools reflects a clear policy decision to support and improve schools rather than simply closing them.

111.    Accordingly, it would be directly inconsistent with both the letter and spirit of the ESSA for a charter school designated as a TSI school to be forced or compelled, under color of law, to close before exhaustion of ESSA's mandatory process for support and intervention.  SDP's intended closure of MSA would therefore violate and/or materially undermine the ESSA.

112.    Additionally, SDP's threatened closure of MSA would violate several provisions of the CSL and thus violate the express requirement of the ESSA that "[t]he accountability provisions under this chapter shall be overseen for charter schools in accordance with State charter school law."  20 U.S.C. § 6311(c)(E).

113.    Specifically, SDP's threatened closure of MSA would violate the CSL and the ESSA in the following respects: through enforcement of conditions within MSA's charter that are unenforceable under the CSL, by considering factors that are irrelevant to whether a charter school should be renewed, and by illegally employing a charter school performance framework that discriminates against schools with high percentages of racial minorities and/or English language learners.

### G. Violation of Public Interest

114.    Article III, Section 14 of the Pennsylvania Constitution requires that the Pennsylvania General Assembly shall provide for the maintenance and support of a thorough and efficient system of public education to serve the needs of the Commonwealth.

115.    Accordingly, the decisions of school boards must be based solely on consideration for the people's interest in a thorough and efficient system of education.

116.    SDP's threatened closure of MSA would violate such public interest by being premised upon a discriminatory charter school performance framework and constituting part of a discriminatory pattern of SDP through which charter schools serving disproportionately high rates of students from minority groups, ELL students, and/or students with disabilities have been subject to closure based upon a flawed Renewal Rubric.

117.    Furthermore, upon information and belief, SDP lacks a plan for MSA's students in the event of MSA's closure.

118.    SDP's threatened closure of MSA would thus violate the public interest insofar as SDP lacks a plan for MSA's students in the event of MSA's closure.

119.     SDP's threatened closure of MSA would also violate the public interest insofar as SDP would lack a rational basis for closing MSA.  MSA educates students in Grades 5-8.  MSA's academic performance data is not reflective of deficiencies with MSA but is instead substantially reflective of the prior education of its students that matriculated to MSA from SDP schools, as well as a multitude of socioeconomic factors.  Closing MSA would not favorably impact any of those barriers but would instead merely serve pretextual grounds.

120.     SDP's threatened closure of MSA would also violate the public interest insofar as it would be premised upon incomplete data.  The COVID pandemic severely limited school operations and has thereby significantly limited the data upon which SDP can properly evaluate MSA's performance.

### H.  Illegal Charter Conditions

121.     In seeking to initiate closure of MSA, SDP seeks to invoke charter conditions that are illegal and unenforceable.

122.     The CSL does not permit the imposition of charter conditions which are inconsistent with the statutory provisions of the CSL.

123.     In seeking to compel MSA to close, SDP has invoked the Surrender Clause that is contained in MSA's charter.  The Surrender Clause is inconsistent with the CSL.  Whereas the CSL expressly prescribes that a charter school shall be entitled to due process before its charter is nonrenewed or revoked, the "Surrender Clause," which is set forth in Art. I, Section I Paragraph 15 of the 2017 Charter, states that MSA waives those rights and shall immediately surrender its charter upon

a finding by SDP that it has violated any of the academic performance conditions set forth in its charter.

124.    Furthermore, these academic performance conditions, which are set forth in Art. I, § I of the 2017 Charter, are themselves inconsistent with the CSL insofar as they impose unreasonable and unrealistic academic performance requirements.

**V.    CLAIMS**

## COUNT 1. INJUNCTIVE RELIEF RE: DISCRIMINATION

125.    SDP's use of the discriminatory Renewal Framework to evaluate MSA's charter renewal, as well as SDP's closure of MSA, would violate Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, 34 C.F.R. Part 100; the Fourteenth Amendment of the United States Constitution; 42 U.S.C. § 1983; Article I, Section 26 of the Pennsylvania Constitution, Pa. Const. art. I, § 26; and Article I, Section 29 of the Pennsylvania Constitution, Pa. Const. art. I, § 29, as it subjects MSA and the students it serves to discriminatory policies and practices that disparately mistreat and impact Philadelphia charter schools with student populations that disproportionately consist of racial minorities, English language learners, and students with disabilities, as well as their students.  Upon information and belief, SDP has acted with knowledge and deliberate indifference as to the discriminatory effect that such policies and practices have had on MSA, other similarly situated Philadelphia charter schools, and the student populations they serve.

126.    If permitted to occur, the foregoing acts of discrimination and violations of law would cause irreparable harm to MSA and its students, which harm could not be compensated through the

remedies available at law.  If closed, MSA would cease to exist and would have no ability to seek

monetary relief.  Meanwhile, MSA's students would be subjected to unfair treatment on account of

their racial, national origin, and/or disability status and suffer harm to their education which cannot be

compensated through money damages.

127.    Equity therefore compels that this Court exercise its authority to prohibit SDP from

applying its discriminatory Renewal Framework to MSA or otherwise taking action to revoke,

nonrenew, terminate, or compel the surrender of MSA's charter as a result of SDP's discriminatory use

of the Renewal Framework.

128.    Such relief would promote the public interest by prohibiting unlawful discrimination

and by upholding federal and state law.

129.    Regardless of perceived expediency, it is not in SDP's interest to close MSA through a

discriminatory process.

130.    The public interest would be strongly served by prohibiting the discriminatory

practices that SDP has imposed upon MSA and which SDP now seeks to exploit as a means of closing

MSA.

**COUNT 2. INJUNCTIVE RELIEF RE: VIOLATION OF EDUCATION CLAUSE**

131.    SDP's intended closure of MSA and its continued application of the discriminatory

Renewal Framework would additionally violate Article III, Section 14 of the Pennsylvania

Constitution, Pa. Const. art. III, § 14, on account of violating the people's interest in a thorough and

efficient system of education.

132.     This Court has the power and duty to require that action by SDP conform with the public interest.

133.     For reasons set forth at length above, SDP's intended closure of MSA would not promote the public interest since it is premised upon discriminatory action, SDP lacks a rational basis for closing MSA, and MSA lacks a plan for MSA's students in the event of MSA's closure.

134.     Such closure of MSA would thus violate Article III, Section 14 of the Pennsylvania Constitution and cause irreparable harm to MSA and its students.  For reasons set forth at length above, if MSA is compelled by SDP to close, MSA and its students would lack a remedy available at law.

135.     Prohibiting SDP from carrying out its plan of closing MSA would not cause undue harm or hardship to SDP, since doing so would merely require that SDP conform with the public interest rather than carry out haphazard and irrational plans to close MSA.

**COUNT 3. INJUNCTIVE RELIEF RE: VIOLATION OF ESSA**

136.     SDP's intended closure of MSA would violate the Supremacy Clause of the United States Constitution, U.S. Const. Art. VI,  42 U.S.C. § 1983, and federal law by directly contradicting and/or undermining several requirements of the ESSA.

137.     Whereas the ESSA and PDE's State Plan expressly requires that a TSI school such as MSA must be supported through a delineated process, SDP's intended closure of MSA would directly violate and undermine the process set forth in the ESSA and PDE's State Plan.

138.     SDP's intended closure of MSA would also violate and/or undermine the waiver process of the ESSA, which reflects an intent that any deviation from the provisions of the ESSA

require approval of a waiver by the Secretary of the U.S. Department of Education upon a showing that such waiver would advance student achievement.  SDP's plan to deviate from the ESSA and close MSA without a rational basis for such closure or existing plans for MSA's students would plainly violate both the letter and spirit of the ESSA's waiver process.

139.    SDP's intended closure of MSA would additionally violate the requirement that the accountability provisions of the ESSA shall be overseen for charter schools in compliance with a state's CSL.  For reasons discussed above, the threatened closure of MSA would violate several provisions of the CSL, and thus violate the ESSA.

140.    The ESSA provides Plaintiffs with a statutorily implied cause of action, for which an injunction is an appropriate remedy.

141.    Moreover, notwithstanding any statutorily implied cause of action within ESSA, equity further compels this Court to exercise its authority to prohibit SDP from violating the ESSA by closing MSA while it is in TSI status without an appropriate waiver from the Secretary of the U.S. Department of Education.

142.    In addition to reasons set forth above, such relief would promote the public interest by ensuring compliance with federal law and by ensuring that SDP act in a manner which promotes academic achievement.

143.    Compelling SDP to comply with the ESSA would not harm or unduly burden SDP. SDP is bound to follow the ESSA, and doing so will ensure that SDP acts appropriately to promote academic achievement.

**COUNT 4. INJUNCTIVE RELIEF RE: SURRENDER CLAUSE**

144.    SDP's closure of MSA through the Surrender Clause would violate Federal and Commonwealth of Pennsylvania Constitutional due process and the CSL.

145.    Closure of MSA through the Surrender Clause would violate due process since it was unfairly imposed upon MSA and since it has lapsed.

146.    The Surrender Clause also violates the CSL, which specifically provides that a charter school shall be entitled to due process in the event that a school district decides to nonrenew or revoke its charter.

147.    Equity therefore compels that this Court exercise its authority to prohibit SDP from enforcing the illegal and unenforceable Surrender Clause.

148.    In addition to reasons set forth above, such relief would promote the public interest by ensuring due process.

149.    Compelling SDP to comply with the ESSA would not harm or unduly burden SDP. Providing MSA with due process is simply a matter of basic fairness and does not pose any unfair obstacle or impediment to SDP.  If MSA ultimately should be closed, that should be determined through a fair process and not through SDP's exercise of a "surrender clause" that was unfairly imposed upon MSA, violates the CSL, and which has lapsed.

### COUNT 5. DECLARATORY RELIEF: CHARTER CONDITIONS

150.    SDP seeks to compel MSA to close by invoking the Surrender Clause in MSA's charter.

151.    Such action is premised upon SDP's finding that MSA failed to meet academic conditions set forth in its 2017 Charter.

152.    Both the Surrender Clause and the academic conditions referenced in the Surrender

Clause are illegal and unenforceable on account of being inconsistent with the CSL.

153.    MSA therefore seeks declaratory relief to confirm that the Surrender Clause and the

academic performance conditions set forth in MSA's charter are illegal and unenforceable.

154.    SDP's act of invoking the Surrender Clause presents a substantial and concrete

controversy with respect to the question of whether the Surrender Clause and the academic conditions

set forth in MSA's charter are illegal and unenforceable.

## COUNT 6. DECLARATORY RELIEF: THE SURRENDER CLAUSE IS UNENFORCEABLE

155.    For SDP to compel MSA to close by invoking the Surrender Clause in MSA's charter

would violate due process.

156.    The Surrender Clause and academic conditions referenced therein were unfairly

imposed upon MSA and was thus not agreed upon voluntarily.

157.    Furthermore, the acts contemplated by SDP through Action Item No. 89 exceed the

scope of the Surrender Clause.  By its terms, the Surrender Clause has lapsed and thus cannot be

invoked to deprive MSA of its due process rights.

158.    MSA therefore seeks declaratory relief to confirm that due process does not permit

SDP to compel MSA to surrender its charter and close pursuant to the Surrender Clause.

159.    MSA additionally seeks declaratory relief to confirm that the Surrender Clause has

lapsed and is therefore unenforceable.

## COUNT 7. DECLARATORY RELIEF: EVERY STUDENT SUCCEEDS ACT

160.     Given MSA's designation under the ESSA as a TSI school, it would be inconsistent with the ESSA for SDP to carry out its threat of compelling the closure of MSA.

161.     Contrary to permitting the closure of a TSI school, the ESSA prescribes specific procedures that are designed to support (rather than close) such a school.  It would be inconsistent with the ESSA for a TSI school to be forced or compelled to close.

162.     MSA therefore seeks declaratory relief to confirm that the ESSA prohibits SDP from causing or compelling MSA to close while it remains designated as a TSI school.

163.     SDP's threat of taking action to close MSA presents a substantial and concrete controversy with respect to the question of whether such action would violate the ESSA.

## VI.    **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs prays for relief as follows:

1.   With respect to COUNT 1, seeking injunctive relief with respect to discrimination, an Order:

   a.   Prohibiting SDP from applying the Renewal Framework to evaluate whether action should be taken by SDP to close MSA;

   b.   Prohibiting SDP from taking action to close MSA based upon SDP's application of the Renewal Framework;

   c.   Prohibiting SDP from taking action to compel MSA to close pursuant to the Surrender Clause; and

   d.   Providing such other relief as this Honorable Court deems just and proper.

2.  With respect to COUNT 2, seeking injunctive relief with respect to violation of the

Education Clause of the Pennsylvania Constitution, an Order:

   a.  Prohibiting SDP from applying the Renewal Framework to evaluate whether

   action should be taken by SDP to close MSA;

   b.  Prohibiting SDP from compelling MSA to comply with Action Item No. 89;

   c.  Prohibiting SDP from taking action to close MSA unless and until it puts

   forth an evidence-based plan for MSA's students in the event of MSA's closure

   and a rational basis for seeking to close MSA; and

   d.  Providing such other relief as this Honorable Court deems just and proper.

3.  With respect to COUNT 3, seeking injunctive relief with respect to violation of the

ESSA, an Order:

   a.  Prohibiting SDP from taking action to close MSA while MSA is designated

   under the ESSA as a school entitled to support and improvement, unless and

   until PDE or SDP obtains a waiver from the Secretary of the U.S. Department

   of Education authorizing it to do so; and

   b.  Providing such other relief as this Honorable Court deems just and proper.

4.  With respect to COUNT 4, seeking injunctive relief with respect to the Surrender

Clause, an Order:

   a.  Prohibiting SDP from compelling MSA to surrender its charter and waive its

   due process rights pursuant to the Surrender Clause; and

   b.  Providing such other relief as this Honorable Court deems just and proper.

5.  With respect to COUNT 5, seeking declaratory relief with respect to charter

conditions, an Order:

    a.  Declaring that the Surrender Clause contained in MSA's charter is illegal and

        unenforceable;

    b.  Declaring that the academic conditions referenced in the Surrender Clause

        contained in MSA's charter are illegal and unenforceable; and

    c.  Providing such other relief as this Honorable Court deems just and proper.

6.  With respect to COUNT 6, seeking declaratory relief that the Surrender Clause is

unenforceable, an Order:

    a.  Declaring that it would violate due process for SDP to take action to enforce

        Action Item No. 89 to compel MSA to close;

    b.  Declaring that the Surrender Clause has lapsed and is therefore unenforceable;

        and

    c.  Providing such other relief as this Honorable Court deems just and proper.

7.  With respect to COUNT 7, seeking declaratory relief with respect to the Every Student

Succeeds Act, an Order:

    a.  Declaring that SDP may not take action to close MSA while MSA is designated

        under the ESSA as a targeted support and improvement school, unless and

        until PDE or SDP obtains a waiver from the Secretary of the U.S. Department

        of Education authorizing it to do so; and

    b.  Providing such other relief as this Honorable Court deems just and proper.

8.  Plaintiffs seek the award of reasonable attorneys' fees and costs.


Respectfully submitted,


Dated: <u>August 11, 2022</u>                    _____

SAND & SAIDEL, P.C.
David Annecharico, Esq. (PA Bar No. 91122)
David Hussey, Esq. (PA Bar No. 314814)
113 South 21st Street
Philadelphia, PA 19103
Tel: (215) 851-0200
Fax: (215) 851-9990
Email: <u>dannecharico@sandsaidel.com</u>
Email: <u>dhussey@sandsaidel.com</u>
Counsel for Plaintiffs