Contract No.   227/F19

School Reform Commission
Resolution No.  SRC-10
June 21, 2018

CHARTER FOR

**MEMPHIS STREET ACADEMY CHARTER SCHOOL AT J.P. JONES**

This Charter (the "Charter") is made and entered into as of July 1, 2017 (the "Effective Date"), by and between THE SCHOOL DISTRICT OF PHILADELPHIA (the "School District"), acting by and through the School Reform Commission (the "SRC"),[1] with its principal place of business at 440 North Broad Street, Philadelphia, Pennsylvania 19130, and the **MEMPHIS STREET ACADEMY CHARTER SCHOOL AT J.P. JONES**, a Pennsylvania nonprofit corporation (the "Charter School" or "Memphis Street") acting through and by its Board of Trustees (the "Charter Board"), with its principal place of business at 2950 MEMPHIS ST., PHILADELPHIA, PENNSYLVANIA 19124.  The School District and the Charter School together are referred to as "the Parties" or separately as a "Party".

RECITALS

**WHEREAS**, on December 21, 2001, pursuant to the authority granted under Section 6-691(c) of the Public School Code of 1949, 24 P.S. § 1-101 et seq., as amended (the "School Code"), the Secretary of Education of the Commonwealth of Pennsylvania (the "Secretary") issued a certificate declaring the School District to be in distress, and the SRC was appointed pursuant to Section 6-696 of the School Code, 24 P.S. §6-696, as amended by Act 2001, Oct. 30, P.L. 828, No. 83 ("Act 83"); and

**WHEREAS**, pursuant to Section 6-696 of the School Code, the SRC (i) is responsible for the operation, management and educational program of the School District; (ii) is vested with all powers and duties granted to the board of school directors (the "Board of Education") of the School District; and (iii) is authorized, inter alia, to grant charters and to enter into agreements for the operation of charter schools in accordance with the Charter School Law, 24 P.S. §17-1701-A, et seq. (the "Charter School Law") and Act 83; and

**WHEREAS**, by Resolution No. SRC-36, dated January 20, 2010, the SRC adopted the Renaissance Schools Initiative Policy ("Renaissance Schools Policy"), which authorized the SRC to grant Renaissance charters as part of the School District's Renaissance Schools Initiative; and

---

[1] References to the SRC in this Charter shall mean the SRC or any other governing body of the School District.

**WHEREAS,** the School District designated certain chronically underperforming School District schools to be Renaissance Schools ("Renaissance Schools"); and

**WHEREAS,** American Paradigm Schools ("Turnaround Team") was selected to be a turnaround team as a result of its response to Request for Proposals No. 317, Renaissance Schools Initiative – Year III ("RFP No. 317") to turnaround one or more Renaissance Schools; and

**WHEREAS,** by Resolution No. SRC-10, dated April 19, 2012, the SRC selected the Turnaround Team to turnaround the John Paul Jones Middle School ("Jones School"); and

**WHEREAS,** the Turnaround Team submitted to the School District a Renaissance Schools Charter Application to operate the Jones Middle School as a charter school; and

**WHEREAS,** on May 16, 2012, the SRC authorized the issuance of a Charter to the Charter Board for a term of five years commencing on July 1, 2012; and

**WHEREAS,** on or about August 2016, the Charter Board filed its application for renewal of its charter with the School District; and

**WHEREAS,** on June 21, 2018, the SRC adopted Resolution SRC-10, attached hereto as Exhibit A and made a part hereof, which authorized the grant of this Charter for the Charter School upon meeting the condition(s) set forth in the Resolutions; and

**WHEREAS,** the Charter Board is authorized to sign this Charter;

**NOW THEREFORE,** in consideration of the promises and the mutual covenants and agreements set forth herein, the School District and the Charter School intending to be legally bound, hereby mutually agree to the above Recitals and the following:

## ARTICLE I.
## LEGAL REQUIREMENTS, REPRESENTATIONS AND WARRANTIES; GRANT

A.     **School Reform Commission Resolution.** Resolution No. SRC-10, dated June 21, 2018 ("Resolution") is attached hereto as Exhibit A and is made a part hereof. The Parties acknowledge and agree that the Charter School has signed this Charter prior to the SRC approving the Resolution renewing this Charter and authorizing the School District, by and through the Chair of the SRC, to execute this Charter. The Parties acknowledge and agree that the Resolution shall not include provisions contrary to or materially different from the provisions in this Charter.

B.     **Grant of the Charter.** Subject to all of the terms and conditions set forth in this Charter, the School District grants to the Charter Board this Charter to operate the Charter School as a public school under and pursuant to the Charter School Law and all other Applicable Laws (as hereinafter defined).

C.     **Legal Requirements Associated With Grant of the Charter**. Prior to the execution of this Charter by the School District, the Charter School has provided the following documentation ("Required Documentation") to the Charter Schools Office of the School District, in accordance with Applicable Laws (as defined in Article II, Section A.1):

     1.     a certified copy of the Articles of Incorporation of the Charter School, and any amendments thereto, certified by the Secretary of State of the Commonwealth of Pennsylvania as of a date reasonably proximate to the Effective Date;

     2.     a good standing certificate for the Charter School issued by the Secretary of State of the Commonwealth of Pennsylvania, dated a date reasonably proximate to the Effective Date;

     3.     a duly approved Charter Board Resolution, certified by the Secretary of the Charter Board (i) authorizing the execution and delivery of this Charter and the performance of the transactions contemplated hereby, (ii) stating that no members of the Charter Board or their immediate family, as defined under the Pennsylvania Public Official and Employee Ethics Act ("Ethics Act"), will have business dealings with the Charter School, and that the Charter Board will comply with the Ethics Act; and (iii) providing the names and addresses (including email addresses) of the officers of the Charter Board and stating that such persons are authorized to execute and request payments under the Charter;

     4.     Statements of Financial Interests for calendar year 2017 and current resumes for each current member of the Charter Board dated within the fiscal year in which the charter is being renewed;

     5.     a copy of the Charter School's current bylaws. Such bylaws shall state the required number of Board members and the method for replacing Board members and officers, shall specify term limits for Board members, shall specify the minimum required number of regular Board meetings each fiscal year, and shall incorporate the requirements set forth in the "Required Management Organization of the Board of Trustees and Requirements for Bylaws", attached hereto as <u>Exhibit B</u> and incorporated herein;

     6.     a copy of the determination letter issued by the Internal Revenue Service ("IRS") stating that the Charter School is a federally tax exempt entity as described in Section 501(c)(3) of the Internal Revenue Code;

     7.     an affidavit signed by the chair of the Board of Trustees, indicating that a level of staff that is both compliant with state and federal requirements and guidelines as well as sufficient to support the Charter School's educational program, with complete and appropriate criminal and child abuse records checks, mandatory school employee training and all necessary certifications as required by this Charter and Applicable Laws (as hereinafter defined), have been hired to serve the actual enrollment of the Charter School;

8.      a copy of the Charter School's Student Records Policy for the collection, maintenance, and dissemination of student records as required by 22 Pa. Code Chapter 12;

9.      a copy of the charter management, cost-sharing or services agreement for the Term (as defined herein) of the Charter, if applicable;

10.     a copy of the signed lease or recorded deed for each facility the Charter School shall utilize during the Term (as defined herein) of the Charter;

11.     a valid Certificate of Occupancy or memorandum that a new Certificate of Occupancy is not required for use as a school, issued by the City of Philadelphia Office of Licenses and Inspections for each facility the Charter School shall utilize during the Term of the Charter;

12.     a Certificate of Insurance evidencing all required insurance coverages, in the form required in Article XIV herein and satisfactory to the School District's Office of Risk Management;

13.     the Statement of Assurances, and all Application appendices and attachments referred to therein (collectively, the "Statement of Assurances"), attached hereto as Exhibit C;

14.     a Dissolution Plan and Policy for the charter school that minimally specifies requirements for (i) the designation of a Dissolution Manager, (ii) a process for identifying and paying off liabilities and establishing an escrow account, (iii) provisions for a final financial audit of the Charter School, and (iv) plans to make business, employee and student records of the Charter School accessible if necessary and appropriate; and

15.     any contracts for the provision of management, consulting or similar services to the Charter School.

D.      **License Agreement for Use of the Jones School**. The Charter School acknowledges and agrees that it shall enter into a license agreement in the form satisfactory to the School District for the Charter School's use of the Jones School building during the Term of the Charter for the period commencing July 1, 2017 and ending on June 30, 2022. In the event that the Charter School does not execute the license agreement in the form satisfactory to the School District, this Charter shall be null and void.

E.      **Renaissance Charter Application of the Charter School.** The Renaissance Charter Application, the renewal application or any amendments, and the representations, certifications and assurances set forth therein (collectively, the "Application"), are hereby incorporated in this Charter as if set forth herein in full. The Charter Board represents and warrants that the information provided to the School District in the Application was true, correct and complete when submitted to the School District and remains true, correct and complete as of the Effective Date. To the extent that the Charter Board has modified the Application between the date

4

submitted to the School District and the Effective Date or that the Application is not a current and complete representation of the Charter School, such modifications are (a) reflected in the body of the original Application, or in an amendment to its original Application, and (b) have been duly approved in writing by the School District. The Application may not be modified after the Effective Date except by an amendment to this Charter duly authorized, executed and delivered by the Parties. The Parties acknowledge and agree that the Application sets forth the overall goals, standards and general operational policies of the Charter Board relating to the Charter School, and that the Application is not a complete statement of each detail of the Charter Board's operation of the Charter School. To the extent that the Charter Board determines to implement specific policies, procedures or other specific terms of operation that supplement or otherwise differ from those set forth in the Application, the Charter Board shall have the right to implement such policies, procedures and specific terms of operation, provided that such policies, procedures and terms of operation are (i) not otherwise prohibited or circumscribed by any Applicable Laws (as hereinafter defined) or this Charter, and (ii) not materially different from those set forth in the Application (see Exhibit G for list of material amendments). To the extent any conflict exists or arises between the terms of this Charter and the terms of the Application, the terms of this Charter shall govern and control. The Charter Board shall operate the Charter School in conformity with the mission statement set forth in the Application.

F.      **Current Charter School Records**. In accordance with the Applicable Laws, the Charter School shall maintain on-site at its facility for inspection by the Charter Schools Office and its representatives and agents all of certain current Charter School records ("Current Charter School Records") as set forth on Exhibit D attached hereto and made a part hereof.

G.      **Representations and Warranties**. The Charter Board represents and warrants to the SRC and the School District that:

1.      It has the power and authority to enter into and perform this Charter; and

2.      This Charter, when executed and delivered, shall be a valid and binding obligation of the Charter School, enforceable in accordance with its terms.

3.      There is no claim, action, suit, proceeding, investigation or inquiry pending before any federal, state or other court or governmental or administrative agency, or to the knowledge of the Charter Board or the Charter School, threatened against the Charter Board, the Charter School or charter management organization, or any of the Charter School's or the Charter Board's properties, assets, operations or businesses, that might prevent or delay the consummation of the transactions contemplated by this Charter.

4.      The execution, delivery and performance by the Charter Board and the Charter School of their obligations under this Charter will not (with or without the giving of notice or the lapse of time, or both) (i) violate any provision of the Articles of Incorporation or Bylaws of the Charter School; (ii) violate, or require any consent, authorization, or approval of, or exemption by, or filing under any provision of any law, statute, rule or regulation to which the Charter Board or the Charter School is subject; (iii) violate any judgment, order, writ or decree of any court applicable to the Charter Board or the Charter School; (iv) conflict with, result in a breach of, constitute a default

5

under, or require any consent, authorization, or approval under any contract, agreement or instrument to which the Charter Board or the Charter School is a party, or by which any of their assets are bound; or (v) result in the creation or imposition of any encumbrance upon the assets of the Charter Board or the Charter School.

H.     **Performance Requirements.**  As set forth in the Resolution, the Charter School has agreed to comply with certain performance requirements (the "Performance Requirements") as outlined in this Subparagraph.  Failure to comply with the Performance Requirements may be a basis for revocation or nonrenewal of the Charter School's Charter.

1.     The Board of Trustees shall ensure that all trustees, officers, administrators, and the immediate family of trustees, officers and administrators of the Charter School comply with the Ethics Act and the Pennsylvania Nonprofit Corporation Law of 1988 ("Nonprofit Law"). The Board of Trustees shall adopt a Conflicts of Interest policy that complies with the Ethics Act and the Nonprofit Law.

2.     The Board of Trustees shall elect Board officers, shall hold Board members to established term lengths and limits, shall ensure that the Board has the minimum required number of Board members, and shall fill open Board seats in a timely fashion, in accordance with the Charter School's Bylaws.

3.     The Board of Trustees shall use its best efforts to meet at least once during each full month when the Charter School is in session during the Term of this Charter. Notwithstanding the foregoing, the Board of Trustees shall meet to take action in a timely manner in accordance with this Charter, Applicable Laws (as defined in Article II, Section A.1), and the Charter School's Student Code of Conduct, but no less frequently than necessary to act on student discipline matters within forty-five (45) days after any infraction or hearing as required by Applicable Laws (as defined in Article II, Section A.1).

4.     The Board of Trustees shall adopt an Admissions Policy and Process which complies with the Public School Code and Charter School Law.  Additionally, the Admissions Policy and Process:

a.     shall include provisions on: (i) application deadlines; (ii) enrollment preferences, order and allocation of preferences, and methods by which preferences would be identified; (iii) student recruitment procedures and communications, including details on methods to be used to recruit students Citywide or in an applicable attendance zone, and to monitor any specified enrollment targets; (iv) lottery dates, and (v) communication of lottery results, in a form and with provisions that are acceptable to the Charter Schools Office;

b.     shall provide that the application will be made clearly and plainly available on the Charter School's website in English, Spanish, and any additional language the Charter School deems appropriate without any barriers to enrollment requiring technology;

    c.     shall provide that families have at least four (4) weeks to complete and return enrollment packets post-lottery acceptance; with exceptions made for extenuating circumstances for families with language barriers;

    d.     shall provide that an ordered, up-to-date waitlist be continuously maintained, reflecting at any given time the next eligible student to be offered admission in each grade served by the Charter School, identifying any applicable preference(s) for each student, and indicating the date any student is removed from the waitlist with the reason for removal;

    e.     shall provide that if seats open during the school year for any grade served by the school or between school years for grades served other than the initial grade, the Charter School shall accept new students from the waiting list in appropriate order for particular grades or new applicants if there are no applicants for that grade on the waiting list; and

    f.     shall provide that the Charter School shall provide a copy of its current waiting list at any time during the Term of the Charter within ten (10) business days after request by the Charter Schools Office.

5.    The Board of Trustees shall submit to the School District by August 1st of each year during the Term of the Charter as part of the Charter School's Annual Report, or separately if not included in the Charter School's Annual Report, evidence that all professional staff providing educational services at the Charter School have all necessary licenses, certifications, qualifications and credentials required by this Charter and Applicable Laws, including without limitation the seventy-five percent (75%) certification requirement in accordance with the Charter School Law, and identify the number of all certified special education and English as a Second Language personnel with direct instruction responsibilities.

6.    The Board of Trustees shall ensure that (i) all employees have required federal and state criminal and child abuse background checks during the Term of the Charter; and (ii) copies of such background checks are kept in each employee's personnel file. Preferably, the Charter School's annual financial audit will include an annual review of a sample of employee files for appropriate clearances and background checks.

7.    The Board of Trustees shall ensure that required payments to the Public School Employees' Retirement System ("PSERS") are made timely. If the Charter School fails to make timely payments to PSERS and that results in a reduction of the School District's basic education subsidy, the School District shall withhold such reduction in a future monthly per-pupil payment to the Charter School. Additionally, any failure to make required PSERS payments above a threshold established by the Charter Schools Office or in any amount repeatedly shall result in the issuance of a Notice of Deficiency to the Charter School.

8.    The Board of Trustees shall submit to the Charter Schools Office signed, complete Statements of Financial Interest, pursuant to guidelines established by the

Charter Schools Office. These documents are required by the Ethics Act and the Charter School Law to be completed annually for each trustee on the Board's roster for that school year.

9.     The Board of Trustees shall ensure that the dates, times, and locations of scheduled Board meetings are posted on the Charter School's website and that any updates to the Board meeting schedule are posted timely.  Furthermore, minutes from Board meetings shall be posted on the Charter School's website within two weeks of approval by the Board of Trustees, but not later than after the conclusion of a second consecutive board meeting after each meeting, and shall remain posted for a minimum of one year from date of Board meeting.

10.    The Board of Trustees agree that the Charter School shall participate in the School District's charter school performance framework and monitoring system ("Charter School Performance Framework") as set forth in Article X of this Charter.

11.    The Board of Trustees acknowledges and agrees that through the Renaissance Schools Initiative, the Jones School had been identified as a School District school which needed fundamental change to facilitate a transformation of the learning environment. As the board of a Renaissance charter school, the Board of Trustees is committed to achieving high levels of academic achievement, sound and compliant operations, fiscal responsibility and stewardship, and strong parent, family and community engagement. Therefore, the Board of Trustees acknowledges and agrees that if during the Term of the Charter, the Board of Education approves by resolution the revocation or nonrenewal of the Charter after holding a public hearing on the nonrenewal or revocation of the Charter School's Charter and after completion of a 30-day public comment period pursuant to Section 1729-A(c) of the Charter School Law, the Board of Trustees shall use its best efforts to expedite (i) any appeal of the Board of Education decision to nonrenew or revoke the Charter to the Charter School Appeal Board, to any administrative agency or to any court and (ii) any court actions related to the nonrenewal or revocation of the Charter School's charter or to the charter renewal or revocation process.

I.     **Conditions for Renewal.** Pursuant to the Resolution, the Charter School must comply with certain conditions for renewal ("Conditions for Renewal") based on the comprehensive renewal review as set forth in this Paragraph. Failure to comply with the Conditions for Renewal as set forth below may be a basis for revocation or nonrenewal of the Charter School's Charter.

1.     PSSA proficiency shall be higher than the annual proficiency rate average of the Charter School's Similar Schools Group in at least 2 of 3 tested subjects in the 2017-2018 school year (year 1 of the Charter Term) and in 3 of 3 tested subjects in year 2 (2018-2019 school year), year 3 (2019-2020 school year) and year 4 (2020-2021 school year) of the Charter Term.  The Charter School shall seek to close the proficiency gap with School District averages annually (increasing proficiency trend) by the end of the 2020-2021 school year, year 4 of the Charter Term, in Science and English Language Arts.

8

2.     The Charter School shall have minimally a three (3) percentage point increase in PSSA Math proficiency from both the baseline proficiency rate of 6.43% (2016-17 school year) by the 2018-2019 school year and also from the Charter School's 2018-2019 school year proficiency rate by the end of the 2020-2021 school year; a total of a minimum of six (6) percentage point proficiency rate increase in PSSA Math.

3.     The percentage of students attending 95% or more instructional days shall be higher than Similar Schools Group averages in all instances during the first four years of the Charter Term. Additionally, the Charter School will close the gap in attendance with the School District so that the Charter School's percent of students attending 95% or more days of school exceeds the School District average by the 2020-2021 school year.

4.     The percentage of students attending fewer than 90% of instructional days (chronic absenteeism) shall have minimally a four (4) percentage point decrease from both the baseline chronic absenteeism rate of 34% (2016-2017 school year) by the 2018-2019 school year and also from the Charter School's 2018-2019 school year chronic absenteeism rate by the end of the 2020-2021 school year; a total of a minimum of eight (8) percentage point decrease in chronic absenteeism.

5.     The Charter School shall submit to the Charter Schools Office evidence of Board approval of the Charter School's revised educational plan priorities and focal areas not later than September 15, 2018 or the first day of the 2018-2019 school year, whichever is earlier. This revised educational plan document shall also contain performance targets and measurable and time bound educational plan goals for the Charter School. These goals and targets for performance shall be aligned with the Conditions as set forth in this Charter but will also be evaluated as part of the comprehensive renewal evaluation during the 2021-2022 school year.

6.     The Charter School shall submit to the Charter Schools Office by October 19, 2018 a fully compliant enrollment packet for enrollment in the 2019-2020 school year that clearly outlines the five required documents to enroll and clearly identifies anything that can be optionally requested from families. Additionally, if the Charter School ceases to only use the Philadelphia Standard Application or subsequent online replacement for student applications, any application form must be submitted to the Charter Schools Office at least 45 days in advance of use for approval as to form and substance by the Charter Schools Office.

7.     The Charter School's percent of newly enrolled students residing in the catchment shall not fall below 90% in any year of the Charter Term.

8.     The Charter School will submit to the Charter Schools Office a revised Code of Conduct that is compliant with Applicable Laws and reflects full alignment to the intent of the School District's Code of Conduct including proportionality of consequence to occurrence and reasons for suspension and expulsion by August 3, 2018. The Charter School will update annually, as necessary, its Code of Conduct to ensure continued alignment to the School District's Code of Conduct. Annual revisions to the Charter

School's Code of Conduct, if any, will be submitted to the Charter Schools Office by August 15th of each school year.

9.      The Charter School will within five (5) business days of any Board approved expulsion submit to the Charter Schools Office information regarding the expulsion including the reason for expulsion, the date of the incident, the date of expulsion hearing, the date of final Board action and charges as approved by the Board, an indication as to whether or not the student had an IEP or was in a process for evaluation that could result in an IEP at the time of the alleged offense, and if appropriate, information regarding any manifestation determination.

10.     The Charter School shall reduce the number of students with at least one out-of-school suspension by 10 percent annually from the baseline year (2016-2017 school year) rate of 152 out-of-school suspensions until the total number of students in any school year with at least one out-of-school suspension is fewer than 100.

11.     The Charter School shall submit evidence of staffing and/or contracted services sufficient to provide required annual health screenings and services to all enrolled students in compliance with Chapter 23 of the Pennsylvania Code by August 15, 2018 for the projected enrollment for the 2018-2019 school year.

12.     The Charter School shall submit evidence annually to the Charter Schools Office by June 30th of each prior school year during the charter term that all required student health exams and screenings as outlined in Chapter 23 of the Pennsylvania Code are provided to students in eligible grades.  Annually, the Charter School will ensure that at least 85% of eligible students receive vision screenings, hearing exams, height and weight measurements, and scoliosis screenings.  Annually, the Charter School will increase by 15 percentage points from the baseline rate of 31% (2016-2017 school year) the percent of eligible students receiving a physical exam until an annual rate of 75% or more is reached. Annually, the Charter School will increase by 20 percentage points from the baseline rate of 16% (2016-2017 school year) the percent of eligible students receiving a dental exam until an annual rate of 75% or more is reached.

13.     Beginning in FY19, the Charter School shall not add any funds received from local revenues to the Charter School's fund balance in any year of the Charter Term. Further, beginning in FY19, the Charter School shall not have the sum of the Charter School's committed, assigned and unassigned fund balances be higher than the sum of the same fund balances for FY18. Committed, assigned and unassigned fund balances are defined by GASB 54.

14.     The Charter School  annually shall submit to the Charter Schools Office no later than June 30th of each year, a Board approved rolling five-year budget that reflects the educational plan investments and goals approved by the Board and identifies any prior year variance from budget.

15.     The Charter School acknowledges and agrees that if any of the academic conditions, including specific performance targets, set forth in Article I, Section I are not met fully by the Charter School, the Charter School will surrender and forfeit its charter and will close on or before June 30, 2022  The Charter School will dissolve without protest and without recourse to the State Charter School Appeal Board or to any court of competent jurisdiction.  The Charter Schools Office will make a determination on whether any of the academic targets set forth above are not met fully by the Charter School once data for the 2020-21 school year are available and are made public.

## ARTICLE II.  APPLICABLE LAWS

**A.**     **Compliance with Applicable Laws**:

1.     The Charter School acknowledges and agrees that it shall comply with the Resolution, School District policies and procedures thereunder applicable to charter schools, and all other applicable state, federal and local laws, statutes, codes, ordinances, regulations and guidance in effect during the Term of the Charter (the "Applicable Laws").

2.     The Charter School and the School District acknowledge and agree that the School District policies and procedures thereunder applicable to charter schools referenced in Article II. Paragraph A.1 are those adopted by the School District's governing body and include policies and procedures thereunder:  (i) related to the Charter School's use of the School District's student information system, currently known as Infinite Campus; (ii) related to the Charter School's participation in the School District's charter school payments and processing system; (iii) related to the Charter School's use of School District facilities, if the Charter School leases or licenses School District facilities, including buildings, parts of buildings, or athletic facilities; (iv) for Renaissance charter schools, the Renaissance Schools Initiative Policy; ; (v) related to food services, if the Charter School uses School District food services; and (vii) related to student transportation.  A list of School District policies applicable to charter schools is found at Exhibit E and is made a part hereof.

3.     Any amendments, revisions or changes to the policies identified on Exhibit E or any new policies applicable to charter schools would be adopted by the SRC or the Board of Education through a public process that includes at least one public reading of the policy at a public action meeting and then a final vote at a subsequent public action meeting.  The School District will notify the Charter School of any amendment, revision or change to the policies identified on Exhibit E or any new policies applicable to charter schools at least twenty (20) days prior to the first public reading of the policy.  The Charter School will have the opportunity to provide its comments on the proposed amendment, revision or change or new policy at a public meeting of the SRC or Board of Education prior to any action on the amendment, revision or change or new policy.  The Policy Committee will take into consideration any comments from the Charter School prior to the SRC or Board of Education taking any final action.

4.      Policies which are amended, revised or changed and any new policies will be implemented by the Charter School the later of: (i) the first day of the next school year or (ii) six (6) months after the adoption of the amended, revised or changed policy or new policy; provided, however, that amendments, revisions or changes to policies or new policies which charter schools are mandated by law to follow would become applicable to the Charter School immediately after approval of such amendment, revision or change or new policy by the SRC or Board of Education.

5.      If the Charter School is a Renaissance charter school and objects to an amendment, revision or change to a policy or a new policy which the Charter School is required to follow only because the Charter School is a Renaissance charter school and not because the Charter School is a charter school, the Charter School may seek a waiver to that policy from the Superintendent. The Superintendent shall have the authority to grant the waiver without seeking SRC or Board of Education approval.

6.      In furtherance of and without limitation to the covenants contained herein, the Charter School shall comply with all Applicable Laws prohibiting discrimination on the basis of disability, race, age, creed, color, gender, religion, marital status, veteran status, national origin, ancestry and any other protected category or classification as required by law, and shall not unlawfully discriminate in student admissions, discipline or expulsion, parent or family engagement, employee hiring and operations.  Any reference in this Charter to any statute or ordinance shall mean such statute, as the same may hereafter be duly amended.

## ARTICLE III.  TERM

A.      **Term.**  The term of this Charter shall be for a term of five (5) years and shall commence on July 1, 2017 and shall end on June 30, 2022 ("Term"), unless revoked or not renewed, or surrendered sooner pursuant to the terms of this Charter and Applicable Laws.

## ARTICLE IV.  OPERATIONS AND MANAGEMENT

A.      **Operation of Charter School.**  Subject to 24 P.S. §17-1714-A, the terms of this Charter and Applicable Laws, the Charter Board shall be responsible for the operation of the Charter School and shall decide all matters relating to the Charter School, including but not limited to the following: budgeting, curriculum development, testing, operating procedures, hiring and firing of Charter School staff, student expulsions, contracting with necessary professional and nonprofessional employees and all other powers provided by Applicable Laws.

B.      **School Calendar.**

1.      The School Calendar shall show the dates on which the Charter School is in session, the standard start/stop times for student instruction, the first day of school for staff and students, and the dates of all application deadlines and lotteries, and shall be in compliance with School District requirements and Applicable Laws.

2.      The Charter School shall use its best efforts to provide the Charter Schools Office with the School Calendar for the following academic year by April 30th, but no later than June 30th, of each calendar year in order for School District offices, including without limitation, Transportation and Food Services, if applicable, to schedule for the provision of services for the next academic year.

3.      In accordance with Applicable Laws, including but not limited to the requirements of 24 P.S. §17-1715-A (9), the Charter School shall provide a minimum of one hundred eighty (180) days of instruction or nine hundred (900) hours per year of instruction at the elementary level or nine hundred ninety (990) hours of instruction at the secondary level.

4.      The Charter School shall not remain open for students or staff on Sundays, the Fourth of July, Memorial Day or Christmas Day.

C.      **Legal and Other Documentation. <u>Non-Sectarian Status</u>**. The Charter Board shall operate the Charter School as a public, non-sectarian, nonprofit corporation during the Term of this Charter and any renewals thereof.

D.      **LEA Status.**     The Charter Board shall operate the Charter School as a Local Education Agency ("LEA") with respect to ESEA and any amendments thereto or other subsequent federal regulation, to Child Find pursuant to 22 Pa. Code §711.21, to the provision of special education services under IDEA.

E.      **Transportation.**

1.      The School District shall provide transportation services to students enrolled in the Charter School in accordance with 24 P.S.§ 17-1726-A, any guidance issued by the Pennsylvania Department of Education ("PDE"), and School District policies during the Term of the Charter. Any provision of transportation services to the Charter School which is beyond what is required by section 1726-A, Department guidance or School District policy shall be at the discretion of the School District. The past provision of services beyond Public School Code requirements is not a guarantee of future provision of the same.

2.      Special Education Students with IEPs Enrolled in Renaissance Charter Schools But Not in Regional Program. The School District and the Charter School acknowledge and agree that the Charter School shall be responsible for the following costs related to the transportation of special education students with IEPs enrolled at the Charter School, where such special education students are not in the Regional Program(s) referenced in Paragraph V.B.5:

a.      If at least one student enrolled at the Charter School with an IEP which specifies basic transportation to the Charter School is transported in a certain bus, van or cab, the Charter School shall pay an amount equal to five percent (5%) of the actual annual costs incurred by the School District for the school year for such bus, van or cab, regardless of the number of students transported in such bus, van

or cab. If a student's IEP also specifies a general attendant ("General Attendant"), who is not a 1:1 attendant, on such bus, van or cab, the Charter School shall not pay an additional cost for such General Attendant.

b.     If at least one student enrolled at the Charter School with an IEP which specifies basic transportation to the Charter School, accompanied by a 1:1 attendant ("1:1 Attendant"), is transported in a certain bus, van or cab, the Charter School shall pay an amount equal to: (i) five percent (5%) of the actual annual costs incurred by the School District for the school year for such bus, van or cab, regardless of the number of students transported in such bus, van or cab; and (ii) the actual annual cost of the 1:1 Attendant for the school year.

c.     If a student's IEP specifies basic transportation to an approved private school ("APS") or any school or location other than the Charter School with or without a General Attendant or a 1:1 Attendant, the Charter School shall pay for: (i) the full costs of the basic transportation to the APS or any school or location other than the Charter School; and (ii) the cost for any General Attendant or 1:1 Attendant incurred by the School District for the school year.

3.     Special Education Students with IEPs in Regional Program(s). The School District and the Charter School acknowledge and agree that the Charter School shall be responsible for the following costs related to the transportation of special education students with IEPs enrolled at the Charter School where such special education students are in the Regional Program(s) referenced in Paragraph V.B.5:

a.     For students with IEPs enrolled at the Charter School where such students are in a Regional Program at the Charter School, the School District will pay for the actual annual costs incurred by the School District for the school year for the bus, van or cab to transport such students to the Charter School, regardless of the number of students transported in such bus, van or cab. The School District also will pay for the actual costs for General Attendants or a 1:1 Attendants in connection with such transportation provided to students in the Regional Programs at the Charter School.

b.     If a student in the Regional Program at the Charter School has an IEP which specifies basic transportation to an APS or any school or location other than the Charter School with or without a General Attendant or a 1:1 Attendant, the Charter School shall pay for: (i) the full costs of the basic transportation to the APS or any school or location other than the Charter School; and (ii) the cost for any General Attendant or 1:1 Attendant incurred by the School District for the school year.

c.     In order for the School District to pay for the actual annual costs incurred by the School District for the school year for the bus, van or cab to transport special education students in the Regional Program(s) to the Charter School, the Charter School must submit a list of the special education students in the Regional

14

Program(s), certified by the Chief Executive Officer of the Charter School, to the School District's Transportation Department and Charter Schools Office by November 1st and March 1st during every year during the Term of the Charter.

F.      **Review of Parental/Guardian Complaints.** The Charter School shall establish a procedure for reviewing parental/guardian complaints regarding the operation of the Charter School. This procedure must be reviewed and revised annually by the Charter School and posted on the Charter School's website in a manner that is accessible to the general public including in any translations as appropriate and/or necessary for the enrolled student body.

G.      **Child Accounting Procedures**. The Charter School shall follow the child accounting procedures set forth in 24 P.S. §13-1332.

H.      **Student Accounts.** The Charter Board shall adopt and implement policies and procedures which provide for the handling by the Charter School, as a trustee for the benefit of the Charter School's students for educational purposes, of any funds associated with the activities of the Charter School's student groups, associations or organizations.

I.      **Health Service**. The Charter School shall adopt and implement a plan for providing school health services that complies with 24 P.S. §14-1401 *et seq.* of the Public School Code and other Applicable Laws. The health services to be provided to students at no cost shall be publicized to students and families in the Charter School's student/family handbook and/or published on the Charter School's website in a manner that is accessible to the general public.

J.      **Management Contracts.** The Charter School shall submit to the Charter Schools Office copies of management agreements that are in effect or have been executed as of the Effective Date of this Charter for the management or operation of all or substantially all of the Charter School's functions, or all or substantially all of the Charter School's instructional, curricular and senior administrative functions. If during the Term, the Charter School engages a new entity for the management or operation of all or substantially all of the Charter School's functions, or all or substantially all of the Charter School's instructional, curricular and senior administrative functions, the Charter School shall submit copies of any amendments to existing agreements or new management agreements to the Charter Schools Office no less than twenty (20) business days prior to the Board of Trustees taking action on such proposed changes to the management or operation of the Charter School, and no fewer than forty-five (45) calendar days prior to the anticipated effective date of the amendment or new agreement, for review by the Charter Schools Office in accordance with Applicable Laws.

K.      **Charter Board Membership, Meetings.**

1.      The Charter Board shall post and maintain in a public or common area of the Charter School, a true, correct and current list of the names of the individual members of the Charter School Board of Trustees. If the Charter School maintains a website, this list as well as at least one email address that is directed to one or more Board members shall also be posted on this website in a manner that is accessible to the general public. The Board of Trustees shall promptly and regularly revise such list to reflect any changes in

the membership of the Board of Trustees. The term "regularly" means within thirty (30) calendar days after any change in membership approved by the Board of Trustees. The Board of Trustees shall provide annually, pursuant to Charter Schools Office guidance (as provided in Section XVIII.M. below), the names, addresses (including email addresses), and a detailed resume of the individual members of the Board of Trustees serving during the current school year.

2.      The Charter Board shall prior to the commencement of the academic year of the Charter School (i) adopt and duly publish in accordance with Applicable Laws the schedule for regular meetings of the Charter Board; (ii) conspicuously post or cause to be posted in a public or common area of the Charter School a true, correct and complete copy of its duly adopted schedule of regular meetings for such academic year; and (iii) give notice to the Charter Schools Office of its duly adopted schedule of regular meetings for such academic year. The Charter Board shall immediately upon the approval or calling of any special or emergency meeting of the Charter Board, conspicuously post or cause to be posted in a public or common area of the Charter School a true, correct and complete copy of all notices or other acts scheduling any such special or emergency meeting of the Charter Board. If the Charter School maintains a website, the schedule of Board meetings as well as any changes to that schedule, shall be posted in a manner that is accessible to the general public.

L.      **Charter School Facilities.**

1.      The Charter School shall operate a charter school only at the following location: John Paul Jones Middle School, 2950 Memphis St., Philadelphia, PA 19124 . The Charter School shall not suspend nor terminate operations, nor relocate from the premises at which the Charter School proposes to operate as set forth in the Application without the prior written consent of the Charter Schools Office and if appropriate, approval by the SRC by resolution. The Charter School shall properly maintain the Charter School facility in compliance with all Applicable Laws.

2.      The Charter School is expected to obtain and retain either a valid Certificate of Occupancy or a certification that a Certificate of Occupancy (e.g. due to date of facility construction) is not required from the City of Philadelphia's License and Inspections division certifying that the facility may be used as a public school.

3.      The Charter School acknowledges and agrees that it shall permit the Charter Schools Office, or a designated staff member of the School District, to perform a site visit to ensure that any new or renovated Charter School facility is in compliance with Applicable Laws governing the health, safety and operations of the facility.

M.      **Confidential and Proprietary Information**. The Charter School shall keep in strictest confidence all information acquired in connection with or as a result of this Charter as required by Applicable Laws.

N.      **Publication Rights**. The Charter School agrees with regard to publication of reports, studies, or other works, if any, developed during the Term of this Charter, or as a result thereof,

that the publication thereof will not contain information supplied to the Charter School by the School District which is confidential, or which identifies students, employees or officers of the School District by name without first obtaining their written consent. Title to and the right to determine the disposition of any copyrights and copyrightable materials first produced by the Charter School as a result of performance of this Charter shall remain with the Charter School.

O.    **School Advisory Council**.

1.    The Charter School acknowledges that to facilitate community involvement in the Renaissance Schools Initiative turnaround process, a School Advisory Council ("SAC") was formed as part of the Renaissance Charter Schools Initiative. The Charter School shall maintain a SAC and acknowledges that SAC members will serve as liaisons between the School District, communities, and the Charter School to ensure that Renaissance Schools offer high quality educational options that are aligned with the community's needs and interests. The SAC shall serve only in an advisory capacity in providing input and feedback to the Charter School and to the School District.

2.    The Charter School agrees to work with, and address the concerns of, the SAC for the Charter School during the Term of Charter. The Charter School acknowledges and agrees that if the SAC, no later than January 15, 2022, provides to the Charter Schools Office a written recommendation by a majority vote of the members of the SAC that the SAC is not satisfied with the performance of the Charter School, the SRC may consider this recommendation, among other factors, when making a determination about whether to renew, not renew, or revoke the Charter. The SAC recommendation shall articulate the reasons for such dissatisfaction.

3.    The SAC and the Charter School shall submit written reports to the Charter Schools Office regarding SAC involvement during the charter Term, pursuant to Charter Schools Office procedures.

4.    The Charter School shall consider using the required one percent of the Charter School's Title I allocation for parental involvement activities for purposes of SAC engagement.

5.    The Charter School acknowledges that the Charter Schools Office and/or the School District may offer training and support or engage with the SAC independently of the Charter School during the Term of this Charter to ensure the sustainability and effectiveness of the SAC.

**ARTICLE V.**
**CURRICULUM, SPECIAL EDUCATION AND**
**ENGLISH LANGUAGE LEARNERS**

A.    **Education and Curriculum Plan**.

    1.    The Charter School shall implement a complete educational program and curriculum ("Educational Plan") consistent with that which is described generally in the Application.

    2.    The Charter School shall provide for the management, administrative services and professional staff training and technology to implement the Educational Plan, and shall have the discretion to determine textbooks, supplies, equipment and technology necessary therefor.

    3.    The Charter School shall be solely responsible for the costs of providing textbooks, supplies, equipment, technology and the like.

    4.    The Educational Plan may be amended from time to time by the Parties upon agreement in writing.  Any fundamental change to the Educational Plan as presented in the original application constitutes a material change to the Charter (see Exhibit G).

    5.    The Educational Plan shall prepare students at the Charter School for participation in the Pennsylvania System of School Assessment (the "PSSA") and on the Keystone Exams as provided for in 22 Pa. Code Ch. 4, or subsequent regulations promulgated to replace or amend 22 Pa. Code Ch. 4, in the manner in which the School District or any designated LEA is scheduled to participate, in accordance with the ESEA or other subsequent federal regulation. The Charter School is solely responsible for ensuring that at all times, the curriculum used to fulfill the educational program is fully aligned to Pennsylvania Core Standards or other subsequent state standards for public school curriculum.

    6.    The Charter School shall provide student support services, including without limitation, counseling, health services, and behavioral interventions, in compliance with Applicable Laws.

B.    **Special Education**.

    1.    The Charter School, as a LEA, shall provide appropriate special education services in accordance with Applicable Laws and consistent with the requirements of each student's Individualized Education Plan ("IEP"), to all students enrolled in the Charter School.

    2.    The Charter School will ensure that appropriate policies, staffing and processes for screening, identification and referral for students potentially eligible for an IEP and associated services is in place prior to the start of each school year.

3.     The Charter School shall comply with the "Provision of Special Education Services to Charter School Students: Guidelines," a copy of which is attached hereto as Exhibit C-1 and incorporated as if fully set forth herein.

4.     The Charter Schools agrees to provide, upon written request, to the School District a list of any students with an IEP who have been removed from the primary educational setting for a period of 10 or more cumulative days during any given school year and/or students with an IEP who have been expelled from the Charter School for any reason.

5.     Regional Program(s) -- Autistic Support

       a.     The Charter School agrees to work with the School District to serve Philadelphia public school students in need of Autistic Support services ("AS Program") whether or not such students live in the Attendance Zone (as defined in Paragraph VI.B.1). The Charter School acknowledges and agrees that in considering a placement for a student in need of an AS Program, the School District considers factors such as: least restrictive environment, appropriateness of program, caseload limits, and transportation time. The Charter School agrees that if such factors support the School District providing the Charter School as an option for parent/guardian consideration, the School District (i) may provide the Charter School as an option to the student's parents or guardians; (ii) shall inform the parent or guardian that the Charter School is a Renaissance charter school with a neighborhood admissions policy pursuant to the Renaissance Schools Policy and the Charter, but that the student may enroll even if he or she does not live in the Attendance Zone (as defined in Paragraph VI.B.1); and (iii) shall request that the parent or guardian agree in writing to accept or reject the Charter School as an option to provide Autistic Support services to the student.

       b.     If a parent or guardian decides to enroll the student in the Charter School, the Charter School agrees to enroll the student and to keep the student enrolled even if the student's level of services changes, unless the parent or guardian withdraws the student. The Charter School shall treat all students in need of an Autistic Support Services Program as students living within the Attendance Zone (as defined in Paragraph VI.B.1) for accountability purposes.

       c.     Pursuant to Department of Education regulations, notwithstanding Paragraph V.B.5.a., at no point in time during the Term shall the Charter School enroll more than the following in the AS Program:

              (i)     Autistic Support: 12 Itinerant and 8 Supplemental

       d.     If a student who resides in the Attendance Zone and is enrolled in the Charter School, or plans to enroll through the Early Intervention process, is identified as needing Emotional Support ("ES Program"), Life Skills Support ("LSS Program") or Multiple Disabilities Support ("MDS Program") services, with an IEP that would qualify the student to enroll in a School District-run or

charter school-run ES Program, LSS Program, or MDS Program, and if the School District's Office of Specialized Services ("OSS") first confirms that there is capacity for the student in such School District-run program, the Charter School may offer as an option for parent consideration enrollment of the student in a School District-run Program, provided an alternative option from the Charter School remains available and that the parent or guardian shall make the final determination as to the appropriate school to provide services to the student.

e.      If the Charter School, or an affiliated Charter School, operates an ES Program, LSS Program or MDS Program at another location, the Charter School may contract with such public school entity to offer as an option for parent consideration enrollment of the student. If the student enrolls in an ES Program, LSS Program or MDS Program at another location, the student will remain enrolled at the Charter School as the home school.

f.      The Charter School shall be responsible for all costs associated with any APS placement, including all transportation costs. The Charter School further acknowledges that if a student is in the highest grade at the Charter School, and the Charter School is recommending a more restrictive environment for the student, the School District may request the opportunity to meet and discuss the potential out-of-School District placement recommendation with the Charter School and the student's parent/guardian prior to any such recommendation being made or memorialized in an IEP.

6.      The Charter Schools agrees to provide, upon written request, to the School District a list of any students with an IEP who have been removed from the primary educational setting for a period of 10 or more cumulative days during any given school year and/or students with an IEP who have been expelled from the Charter School for any reason.

7.      In accordance with Applicable Laws, the Charter School will be responsible for managing and funding litigation and compensatory education for special education claims of students related to their enrollment at the Charter School during such time period as the school operated as a Charter School. Furthermore, the Charter School shall notify the School District if any such special education claim includes an agreement for the student to withdraw from the Charter School.

E.   **English Education of English Learners.**

1.      The Charter School will ensure that policies and processes for screening, identification and referral for English as a Second Language ("ESL") services in accordance with the Applicable Laws are in place prior to the start of each school year. Further, the Charter School will ensure that staffing consistent with Applicable Laws is in place prior to any student eligible to receive ESL services attending the Charter School.

2.      The Charter School shall provide ESL services in accordance with the Applicable Laws for eligible students. This includes maintaining a process for post-exit monitoring

of English Learners ("ELs") for such periods as are required by the Applicable Laws. The Charter School shall ensure that a Language Instruction Education Program ("LIEP") is in place at all times and is communicated to all parents/guardians in compliance with Applicable Laws.

3.      The Charter School shall administer the ACCESS assessment, or any subsequent replacement, in accordance with the Applicable Laws, which as of the Effective Date of this Charter require annual assessment for each EL.

4.      During the Term of the Charter, the Charter School will ensure that any student receiving ESL services or designated as an EL is reported to the School District's student information system, currently Infinite Campus, at least annually, but no less than thirty (30) calendar days after identification of the student as an EL. In addition, each EL will be accurately identified by the Charter School as part of the annual data packet submission to the Charter Schools Office as long as this category of annual reporting remains in force.

## ARTICLE VI.   STUDENT ENROLLMENT

A.      **Student Enrollment.**

1.      The School District and the Charter School acknowledge and agree that the Charter School will enroll students only in Kindergarten through Grade 8 with a maximum of 880 students during the Term of the Charter, unless the parties agree in writing to other terms. Under no circumstances will the Charter School request payment from the School District or the Commonwealth of Pennsylvania for more students than set forth herein nor enroll students in different grades including Kindergarten, without SRC approval by resolution.

2.      The Charter School acknowledges and agrees that it may not operate a daycare, early childhood or pre-Kindergarten program under this Charter and that Charter School funds may not be used to pay for or to provide employees, resources, facilities or other expenses related to a daycare, early childhood or pre-Kindergarten program except in accordance with Applicable Laws.

B.      **Student Admissions.**

1.      Pursuant to the Renaissance Schools Policy and the Application, and subject to the maximum enrollment set forth above, that the Charter School shall only enroll first time entering students who reside in or attend approved feeder schools in the Attendance Zone, as may be revised by the School District during the Term of the Charter and as delineated on the map attached hereto Exhibit H and made a part hereof, and siblings of presently enrolled students at the Charter School if implementing sibling preference as outlined in the Charter School Law. The Charter School may not enroll any first time entering students who live outside the Attendance Zone or do not attend any approved feeder schools identified in the Attendance Zone except for siblings of presently enrolled

students at the Charter School, if implementing sibling preference as outlined in the Charter School Law.

2.      Once a student has enrolled in the Charter School, such student may remain enrolled in the Charter School even if such student moves to a residence in the City of Philadelphia, which is outside the Attendance Zone.

3.      The Charter School shall enroll students in accordance with Applicable Laws and may not exclude students based on race, color, familial status, religious creed, ancestry, sex, national origin, handicap or disability.

4.      The Charter School shall implement an admissions policy that complies with its Application, this Charter, the Charter School Performance Framework and Applicable Laws. The Charter School is responsible to ensure that the application and enrollment forms request only that information which is permissible to request under Applicable Laws and that the required forms for enrollment are consistent with, and do not extend beyond, those permitted by Applicable Laws.

5.      The admissions policy shall reflect the requirements set forth in VI.B.1 and VI.B.2 above, and shall describe how the Charter School will address the situation of eligible students attempting to enroll when the school does not have capacity because it is already at its maximum enrollment.

6.      When a student attempts to register at the Charter School and is unable to enroll because the school is at its maximum enrollment or there are school-implemented grade and space limitations, the Charter School must provide the student with documentation of his/her attempted registration, date of placement on the waiting list, and number on the waiting list. If the student is referred to the School District for placement, a copy of this documentation shall accompany the student and be provided to the School District.

7.      The Charter School shall fill opening seats throughout the school year.  When a seat becomes available at the Charter School, the Charter School shall fill such seat based on waiting list order by grade.

8.      Upon request, the Charter School shall share both student-specific and aggregate information about its waiting list with the Charter Schools Office.

9.      If the Charter School fails to maintain student enrollment data timely in the School District's student information system, currently Infinite Campus, and/or is under a Notice of Concern or Deficiency related to failure to enter student enrollment data timely, the Charter School shall be required to submit Enrollment Forms to the School District for each student enrolled in the Charter School within ten (10) days after receipt by the Charter School.  Each Enrollment Form shall be signed by the student's parent(s) or legal guardian(s).

10.     The Charter School acknowledges and agrees that the School District and the Commonwealth of Pennsylvania shall provide no more than the per-pupil funding

required by all Applicable Laws for all students enrolled at or below the enrollment cap set forth in Paragraph VI.A. contained in this Charter.

11.     The Charter School shall provide the School District's Charter Schools Office notice of the date, time and location of any and all admissions lotteries at least thirty (30) days prior to the scheduled date of each admissions lottery. If the Charter School maintains a website, the date, time and location of the lottery shall also be posted there in a manner that is accessible to the general public no fewer than fourteen (14) calendar days prior to the date of the lottery and until the lottery is concluded. The lottery must be held in a location that is generally accessible to the public and if not at the primary location of the Charter School, at a location that is accessible without barriers including that of distance or transportation to a majority of the applicants. The School District reserves the right to observe the admissions lottery process. Paragraph VI.B.11 is applicable only if the Charter School holds a random enrollment process in any school year during the Term of this Charter.

C.     **Accounting for and Recording Student Enrollment and Attendance.**

1.     The Charter School shall be responsible for accounting and enrollment and disenrollment, including withdrawals and expulsions, and shall report such data to the School District via Infinite Campus or other School District identified student information system. Entries into Infinite Campus shall be made timely within ten (10) calendar days after the date of confirmation or finality of the enrollment event (enrollment, withdrawal, expulsion, etc.) or in accordance with final and approved School District policy, whichever is longer. Subject to Section 1729-A of the Charter School Law, repeated and consistent failure to provide timely and accurate student enrollment data may be grounds for revocation of this Charter.

2.     All Enrollment Reports will be disaggregated such that the School District will be able to determine enrollment by factors such as race, family income (to the extent practicable), ELL status and special education exceptionality as well as any subgroups as identified in provisions of federal law including Title I requirements and ESEA or subsequent federal regulations or applicable state law as possible in Infinite Campus or other School District identified student information system.

3.     The Charter School shall enter into Infinite Campus the names and addresses of all students who voluntarily or involuntarily transfer out of the Charter School within ten (10) calendar days after the date of the transfer.

4.     The Charter School acknowledges and agrees that it will not charge any fees or costs associated with or in connection to student admissions or enrollment to the School District, any parent or family, any student or any other person or entity. The Charter School further acknowledges and agrees that it cannot create any barriers to enrollment, daily attendance or full and equitable participation in the stated educational program due to fees, for example, for uniforms, student activity fees, or academic course field trips.

5.      The Charter School must participate in the School District's enrollment verification and validation process, if such process is in existence at any time during the charter Term, and adhere to the timelines established therein within to ensure timely and appropriate charter payments. As of the 2016-17 school year, this process requires that the Charter School shall provide to the School District verified attendance information through Infinite Campus or in another electronic form via email on a monthly basis on or before the 15th of each month for the prior month.

D.      **Truancy.** The Charter School shall comply with truancy elimination procedures developed by the Philadelphia Court of Common Pleas Family Court, the Department of Human Services, the Mayor's Office of the City of Philadelphia, and the School District and with Applicable Laws regarding truancy, including without limitation Act 138 of 2016. The Charter School shall adopt a truancy elimination program including provisions for truancy intervention plans for Charter School students with more than three (3) unexcused absences and submit the adopted policy and plan to the Charter Schools Office, pursuant to Charter Schools Office guidelines. The Charter School shall provide information for students with greater than three (3) days of unexcused absences to the School District's Office of Attendance and Truancy, in accordance with Applicable Laws.  The Charter School shall terminate any student from enrollment after ten (10) consecutive days of unexcused absence.

E.      **Student Withdrawals, Suspensions and Expulsions**.

1.      The Charter School shall adopt a Student Code of Conduct with suspension and expulsion provisions in compliance with Applicable Laws.  The Charter School acknowledges and agrees that it will adopt a Student Code of Conduct that is aligned with the intent of the School District's Code of Student Conduct as in force during any year of the charter term.

2.      The Charter School shall provide annually, pursuant to Charter Schools Office guidelines, a list of students recommended for expulsion, the reason for such expulsion, and whether the student withdrew prior to expulsion.

3.      If any student was expelled or withdrew from the Charter School as a result of an Act 26 weapons violation, pursuant to 24 P.S. § 13-1317.2, the Charter School shall provide to the School District the student's name and documentation related to the violation within two (2) business days after the student is expelled or withdraws.

## ARTICLE VII.  PERSONNEL

A.      **Personnel.**

1.      The Charter Board shall be responsible for hiring, firing, supervising and disciplining Charter School staff and shall be responsible for employee relations.

2.      The Charter School shall employ all professional instructional staff, including the Principal, teachers, and other professional instructional staff, in accordance with Applicable Laws.

3.    Charter School staff shall be subject to the terms and conditions of employment as established by the Charter Board, including the determination of wages, hours and other conditions of employment.

4.    In accordance with Section 1714-A(h)(1) of the Charter School Law, in the event the Charter School dismisses a teacher who is on an approved leave of absence from the School District for the purpose of teaching in the Charter School, the Charter Board shall provide the School District's Office of Talent with the following: (1) a written explanation detailing the reasons for the dismissal at the time the dismissal occurs; and (2) a copy of any public record developed at any dismissal proceeding conducted by the Charter School.

5.    The Charter School or Charter Board shall notify the Charter Schools Office via email within 5 business days of any change in primary school leadership team members including but not limited to school Chief Executive Officer, school Executive Director, Principal or Academy Director.

B.    **Licensure and Qualifications of Staff.**

1.    The Charter School shall ensure that all professional and support staff utilized in providing educational services at the Charter School have all necessary licenses, certifications, qualifications, and credentials required by this Charter and Applicable Laws, including without limitation, the seventy-five percent (75%) certification requirement in accordance with the Charter School Law.

2.    The Charter School shall ensure that all personnel of the Charter School who provide special education or related services to children with disabilities shall have appropriate certification as required by Applicable Laws.

3.    The Charter School shall ensure that all personnel of the Charter School who provide direct instruction services to students who are English Language Learners shall have appropriate certification as required by Applicable Laws.

4.    The Charter School also shall ensure that any person holding the title of Principal, or performing any duties of a Principal as defined in PDE's Certification and Staffing Policy Guidelines, shall hold a Pennsylvania–issued principal's certificate. The Charter School must maintain an appropriately certified school leader at each campus operated under this Charter.

C.    **Background Clearance and Criminal History Checks**.

1.    The Charter School shall ensure that any personnel who may have direct contact with students shall be required to submit Pennsylvania State Police and federal criminal history record information prior to being employed by the Charter School, in accordance with 24 P.S. §1-111.  This provision shall also apply to individuals who volunteer to work at the Charter School on a part time or full time basis.

2.      The Charter School shall ensure that all applicants for a position shall be required to submit the official clearance statement regarding child injury or abuse from the Department of Public Welfare prior to being employed by the Charter School, in accordance with 23 Pa. C.S. Ch. 63 Subch. C.2.   This provision shall also apply to all others to the extent required by Applicable Laws.

3.      The requirements for appropriate employee clearances as set forth in Article VII, Section C, Subsections 1 and 2 above shall apply for the duration of the Charter Term. The Charter School is expected to have a procedure for managing the current clearance status and any change in clearance status of existing employees to ensure that the Charter School is in compliance with Applicable Laws. If at any time during an employee's employment such employee does not have current clearances or no longer has clearances that allow for his or her work assignment, the Charter School shall ensure that the employee is not permitted to return to work at any Charter School facility until such time that current and complete clearances are obtained and are on file at the Charter School.

## ARTICLE VIII.  STUDENT RECORDS

A.      Except as limited by Applicable Laws, and as required under 17-1728-A of the Charter School Law, the Charter School shall, with respect to each student enrolled in the Charter School, maintain and make available to the School District within ten (10) days after receipt of a request (which need not take the form of notice under Article XVIII., Section M. below)therefore, or such shorter period as may be provided under Applicable Laws, all information requested by the School District for the purposes of the Charter School Performance Framework and monitoring the Charter School's operations in accordance with this Charter.

B.      Except to the extent expressly waived by the School District and, as applicable, state or federal authorities, the Charter School shall comply with all Applicable Laws concerning the maintenance and disclosure of student records.

C.      The Charter School shall adopt a policy for the collection, maintenance, and dissemination of student records as required by 22 Pa. Code Chapter 12. Such policy shall include provisions (i) on the disposition of student records in the event the Charter School's charter is surrendered, is not renewed or is revoked and (ii) on the maintenance of student records after a student graduates from the Charter School. Additionally, such policy shall provide that upon transfer of a student from the Charter School to another school within the School District or public school within the City of Philadelphia, the Charter School will forward such student's records expeditiously and in accordance with the School District's reasonable instructions.

D.      The Charter School shall comply with all federal student record requirements as outlined in 20 U.S.C. 1232g and the regulations promulgated there under, 34 C.F.R. Part 99 et seq. (commonly known as the Family Educational Rights and Privacy Act or "FERPA"), and in the IDEA regulations, 34 C.F.R. Part 300 et seq. The School District hereby designates employees of the Charter School as having a legitimate educational interest such that they are entitled access to education records of certain School District students pursuant to FERPA. The Charter School, its officers and employees, shall comply with FERPA at all times.

E.      The Charter School recognizes that the School District and the Charter Schools Office, as authorizer of charter schools in Philadelphia, and pursuant to the Applicable Laws, have legitimate educational interests in the education records of the Charter School's students. The Charter School hereby designates employees of the Charter Schools Office and of the School District as having legitimate educational interests under FERPA and agrees that such individuals may have access to the education records of the Charter School's students, in accordance with FERPA. During the Term of the Charter, the School District and the Charter Schools Office shall comply with FERPA and the regulations promulgated thereunder.

## ARTICLE IX.  TESTING, REPORTS AND SURVEYS

A.      **Standardized Tests.**  The Charter School shall administer all required federal, state and local standardized tests in compliance with all Applicable Laws. The Charter School shall provide classroom instruction which shall include, but not be limited to, instruction on the essential knowledge and skills necessary to achieve course completion or course credit, including end of course examinations (if required by the School District), and scores on the PSSA, PASA (Pennsylvania Alternative State Assessment), and Keystone Exams, if applicable, and all other tests and exams required by Applicable Laws. Should the Public School Code provide for local assessments in lieu of state or federal assessments for any grade level, the use of these assessments to supplant state assessments (the PSSA, PASA, Keystones or subsequent replacements) must be approved in writing prior to the start of the school year change is to take effect by the Charter Schools Office however such approval, if approved by PDE, shall not be reasonably withheld.

B.      **Charter School Annual Reports**.  By August 1st of each year, the Charter School shall certify and submit through the PDE website or such other means required by PDE, the Charter School's complete Annual Report in accordance with Applicable Laws, including but not limited to 24 P.S. §17-1728-A and 22 Pa. Code §711.6, in the form prescribed by the Secretary. The Charter School also shall submit a complete and certified Annual Report to the Charter Schools Office. The Charter Schools Office shall specify a uniform method for all charter schools to make these submissions.

## ARTICLE X.   ACCOUNTABILITY

A.      **Charter School Performance Framework.**

1.      The Charter School agrees to participate in the School District's Charter School Performance Framework. The Charter School Performance Framework includes an annual assessment of the Charter School's academic, financial, and organizational performance as well as compliance with Applicable Laws. Organizational performance includes, but is not limited to, a review of the Charter School's admissions and enrollment policies and practices, student discipline practices, special education programming, ELL programming, and Board of Trustees governance in order to assess compliance with the Charter and Applicable Laws, federal, state and local guidance, policies, and Charter Schools Office procedures. Financial performance includes, but is not limited to, a

review of the Charter School's financial health and long-term sustainability, and generally accepted standards of fiscal management.

2.      The Charter School agrees to provide or allow to be provided to the School District and the Charter Schools Office all records, including student level academic performance, necessary to properly assess the academic success, organizational compliance and viability, and financial health and sustainability of the Charter School under the Charter School Performance Framework, timely and pursuant to Charter Schools Office procedures.

3.      The Charter School acknowledges that achieving the performance objectives identified in the Charter School Performance Framework is critical to meeting the needs of public school students in Philadelphia. The Charter School shall actively monitor its own progress towards achieving objectives identified in the Charter School Performance Framework. The Charter Schools Office may also evaluate any or all of the performance domains – academic, organizational and financial – on an annual basis formally. If the Charter School continues to fail to meet standards for academic success, organizational compliance and viability, and/or financial health and sustainability, the Charter Schools Office may recommend that the SRC commence revocation or nonrenewal proceedings against the Charter School.

4.      During the Term of the Charter, the Charter Schools Office will limit changes to the Charter School Performance Framework applicable to the Charter School to those required by changes in Applicable Laws or by changes to charter school data availability. The Charter Schools Office will provide notice to charter schools in Philadelphia of any change to the Charter School Performance Framework prior to implementation of such change.  The Charter Schools Office would use its best efforts to solicit feedback on changes from Philadelphia charter schools in advance of implementation of changes.

B.      **Academic Accountability**.

1.      The Charter School agrees to adopt and administer the most current version of the PSSA assessments and the Keystone exams or other state-level identified or locally-approved assessment for student performance for grades and students as required by Applicable Laws, including without limitation the ESEA or subsequent laws.

2.      The Charter School agrees to timely submit to, or grant permission for release pursuant to a memorandum of understanding or other document, to the School District all student level data required for assessment of academic performance as part of the Charter School Performance Framework.

3.      Data sources used by the Charter Schools Office to evaluate academic success may include, but are not limited to, student level data received from (i) the Charter School or from another entity under agreement with the Charter School, (ii) the School District's School Progress Report ("SPR") or its replacement, (iii) the Commonwealth's School Performance Profile ("SPP") or its replacement, (iv) the federal accountability

SEA report card prepared by PDE, or its replacement; and (v) the National Student Clearinghouse.

4.      For each year during the Term of this Charter, the Charter School shall achieve academic success as defined in the Charter School Performance Framework.

5.      To the extent that the Charter School must under the provisions of ESEA, ESSA or subsequent law, or any other Applicable Laws, submit to any Commonwealth or federal agency an accountability plan (any such plan, a "School Level Plan"), then, not later than the date which is thirty (30) days after the submission of said School Level Plan to the agency requiring it, the Charter Board shall submit to the Charter Schools Office a true, correct and complete copy of its School Level Plan. The Charter School is required to comply with ESEA, ESSA and any other federal or state accountability requirements and must submit to the Charter Schools Office any and all school level plans, comprehensive plans and any other improvement plans.

C.    **Charter Board Governance and Management.**

1.      During the Term of the Charter, the Charter Board shall implement the provisions for publication of Board members names and the current year regular meeting dates as specified in Art. IV, Sec. K.

2.      The Charter Board agrees to maintain Board minutes and records of its meetings, decisions, and resolutions consistent with the Sunshine Act and the Pennsylvania Nonprofit Law.

3.      The Charter Board shall adopt policies regarding petty cash management and other internal controls, employment of relatives, admissions procedures, promotion and graduation criteria, due process procedures for student expulsions, parent/family and public engagement, and procedures for staff terminations.

4.      The Charter Board shall adopt policies mandating: (i) that the health benefits for employees will be the comparable to those of School District employees and (ii) that all employees shall be enrolled in PSERS, in accordance with 24 P.S. § 17-1724-A, or an alternative retirement plan approved by PSERS.

D.    **Charter School Financial Accountability.**

1.      The Charter School agrees to cooperate fully with all School District audits of the Charter School in accordance with the Charter School Law.

2.      The Charter School agrees to provide annually to the Charter Schools Office, pursuant to submission guidelines provided, a final and complete independent audit of the Charter School's financial operations by December 31 after the close of each of its fiscal years. This audit shall include a review of personnel files to identify compliance with requirements for employee clearances on an annual basis.

3.      The Charter School agrees to complete Addendum B (Preliminary Statement of Revenues, Expenditures and Fund Balances) as a part of the Annual Report.

4.      The Charter School agrees to submit, consistent with the reporting guidelines established by the Charter Schools Office, the Board approved annual budget for the Charter School. If the annual reporting requirement submission deadline is after the first day of the school year for the Charter School, the annual Board approved budget shall be submitted no later than the first day of the school year.

5.      The Charter School agrees to seek health services reimbursements as well as non-resident student reimbursements consistent with PDE guidance.

6.      The Charter School agrees that it shall pay to the School District, within sixty (60) days after receipt of written notice from the School District, all monies paid to the Charter School by the School District for resident and for non-resident students who (i) have left the school but who have been carried on the school rolls for longer than ten (10) days, (ii) who reside outside of Philadelphia, or (iii) who are identified in Infinite Campus or other similar student information system as special education students but who do not have a legally sufficient, appropriately dated and signed IEP or NOREP. If the Charter School remits any overpayment in full to the School District prior to any written notice from the School District, no action of non-compliance will be initiated by the Charter Schools Office related to overbilling or violation of this Charter.

E.      The Charter School acknowledges and agrees that failure to meet the accountability criteria specified in this Charter constitutes grounds for nonrenewal or revocation of this Charter.

## ARTICLE XI.
## BOOKS, RECORDS, AUDITS AND ACCESS

A.      **Maintenance of Books and Records**. The Charter School shall keep accurate and complete books and records of all funds received hereunder in accordance with generally accepted accounting principles, government accounting standards, or in such other format and under such other generally applicable standards as may be duly designated by PDE and the United States Department of Education, subject to the limitations of the Charter School Law. The Charter School shall maintain its records at one central location and shall maintain and preserve the records and all other documentation relating to this Charter for a period of six (6) years from the end of the Term. The Charter School shall cooperate with the School District in supplying information and or documentation based on specific issues communicated to the Charter School in advance to the School District or its representatives, in the form and format used by the School District, when needed in order for the School District to meet its reporting obligations under Applicable Laws.

B.      **Audit**. The Charter School shall conduct an annual independent financial audit in accordance with the requirements of Article 24 of the Public School Code. This stated audit must be complete and submitted to the Charter Schools Office no later than December 31st after the close of the respective fiscal year.

C.     **School District Access**.  The Charter School shall provide to the School District and the Charter Schools Office ongoing access to the records and facilities of the Charter School to ensure that the Charter School is in compliance with this Charter and Applicable Laws and that requirements for student assessment and testing, civil rights and health and safety are being met. The School District reserves the right to audit the Charter School's books, records, facilities and operations at any time. The School District and the Charter Schools Office shall provide reasonable notice to the Charter School prior to visiting the Charter School facility, except in the event of a health or safety concern when no prior notice would be necessary.

## ARTICLE XII.  FUNDING

A.     **Payments**.  The School District shall make monthly payments to the Charter School in accordance with the funding method described in 24 P.S. §17-1725-A.  Infinite Campus or its equivalent shall be the system of record for making monthly payments.  Should this electronic system record process for student enrollment not be maintained or provided by the School District, then the Charter School shall be responsible for completing and providing student enrollment records via Enrollment Forms within ten (10) days of a student's enrollment to the School District.

B.     **School District Withholdings from Charter School's Per-Pupil Payments**

1.     If during the Term of the Charter, the School District determines that: (i) payments have been made to the Charter School for days a student did not attend the Charter School or for days a student is misidentified as a special education student; (ii) the School District has paid for the costs of modifications or accommodations above and beyond the normal costs of transportation for special education students enrolled in the Charter School; (iii) the Charter School owes the School District for the amount of the Charter School's PSERS contributions which had been withheld from the School District's State subsidy; or (iv) the Charter School owes the Schools District for another charge, the School District shall provide  the Charter School with a memorandum describing the nature and amount of the charge at least twenty (20) days prior to withholding the amount of the charge from the Charter School's monthly per-pupil payment.

2.     If the Charter School disputes the amount of the charge on a memorandum, the Charter School must submit a written response to the memorandum to the Chief Financial Officer of the School District within ten (10) days after receipt of the memorandum by the Charter School.  The Chief Financial  Officer or his/her designee shall discuss the dispute with the Charter School's designee, use best efforts to resolve the dispute and shall provide a written response to the Charter School prior to making a withholding related to the amount of the memorandum from the Charter School's per-pupil payments.

3.     The Charter School agrees that it shall not dispute with the School District the amount of the charge on a memorandum related to PSERS contributions withheld from the School District's State subsidy, and the School District shall withhold from the

Charter School's per-pupil payments the amount in any memorandum related to PSERS contributions previously withheld from the School District's State subsidy.

C.      All payment obligations by the School District hereunder shall be unsecured obligations of the School District and the Charter School shall have no lien, security interest, claim or right to any revenues, receipts, accounts or income of the School District whether paid or payable to the School District.  Pursuant to Section 1727 of the Charter School Law, 24 P.S. §17–1727-A, the SRC shall not be held liable for any activity or operation related to the program of the Charter School. The Charter School shall adopt procedures that comply with the "Required Financial Procedures" attached hereto as <u>Exhibit F</u> and incorporated as if fully set forth herein. The Charter School acknowledges and agrees that it shall not use per-pupil revenues to guaranty financial obligations of the Charter School's charter management company, services provider or a related entity that is not for the purpose of securing a lease or mortgage for the benefit of the Charter School.

D.      The Charter School shall adopt procedures that comply with the "Required Financial Procedures" attached hereto as <u>Exhibit F</u> and incorporated as if fully set forth herein

E.      If the School District implements a fee-based extracurricular participation system, to the extent any Charter School student desires to participate in an extracurricular activity offered by the School District, pursuant to 24 P.S. § 17-1719-A(14), the Charter Board shall pay to the School District an amount for each Charter School student's participation in the School District's extra-curricular activities, in accordance with a fee schedule to be established from time to time by the School District.

## <u>ARTICLE XIII.  TECHNOLOGY</u>

A.      The School District will provide all necessary software ("Technology") and training to permit the Charter School to have access to Infinite Campus, the School District's student information system. The School District will also provide technology and training as well as reasonable access for any system implemented by the School District to replace Infinite Campus.

B.      The Charter School shall take all necessary steps and precautions to safeguard the Technology from damage, destruction, misuse and theft, and shall maintain appropriate insurance protecting the Technology against damage, destruction, misuse and theft. The Charter School is responsible for notifying the School District of staffing or personnel changes that would require disabling of or changes to user ID or role based access to School District systems including but not limited to Infinite Campus, COMPASS and the charter payments application.

C.      The Charter School shall use Infinite Campus or an equivalent system implemented by the School District to provide all relevant information and data for the Charter School Performance Framework as well as for federal accountability purposes related to student subgroups. The Charter School shall take all necessary steps to ensure that data and information shared through Infinite Campus or its equivalent is accurate and consistent with information contained within the Charter School's own student information systems.  Information in Infinite Campus or its equivalent is the system of record for purposes of reconciling payments to the Charter School and for validation of student enrollment. As such, information shall be

maintained timely in Infinite Campus or its equivalent in accordance with School District or Charter Schools Office guidance.

## ARTICLE XIV.  INSURANCE

A.  **Insurance Requirements**.

1.  All insurance policies required hereunder shall be maintained in full force and effect for the Term of this Charter.  Each policy shall contain the provision that there is to be thirty (30) days prior written notice given to the Charter Schools Office in the event of cancellation, non-renewal, or material change to the insurance coverages.  A Certificate of Insurance evidencing all insurance coverages as outlined below, shall be provided to the Charter Schools Office for review, prior to the execution of this Charter. The insurance companies indicated as the carriers on the Certificates of Insurance, shall be authorized to do business in the Commonwealth of Pennsylvania, shall have an A.M. Best rating of no less than "A:VIII," and the carriers shall be acceptable to the School District.  The School District and the SRC shall be named as Additional Insureds, ATIMA, with respect to all coverages, except Workers' Compensation. The Charter School's liability insurance coverage shall be endorsed to state that its coverage will be primary to any other coverage available to the SRC and School District and its officers, employees and agents, that no act or omission of the School District will invalidate the coverage, and that the insurance company waives subrogation against the School District, and any of the School District's officers, employees and agents and the SRC and any of its members.

2.  The Charter School shall maintain the following insurance policies in full force during the Term of this Charter:

    a.  **Commercial General Liability**:

        Commercial General Liability coverage, on an occurrence basis, including Contractual Liability, with limits not less than the following:  (a) $2,000,000 General Aggregate (including bodily injury, or property damage or both); (b) $2,000,000 Products – Completed Operations Aggregate; (c) $1,000,000 Per Occurrence; (d) $1,000,000 Personal and Advertising Injury; (e) $1,000,000 Fire Damage or Fire Legal Liability; and $10,000 Medical Expense (any one person).

    b.  **Automobile Liability**:

        Automobile coverage with limits not less than the following:  $1,000,000 Combined Single Limit for bodily injury and property damage for all owned autos and/or hired / non-owned autos.

    c.  **Workers' Compensation and Employers Liability**:

    (i)    Workers' Compensation coverage for its employees with limits not less than the statutory limits for the Commonwealth of Pennsylvania.

    (ii)   Employer's Liability: $500,000 Each Accident–Bodily Injury by Accident; $500,000 Each Employee-Bodily Injury by Disease; and $500,000 Policy Limit-Bodily Injury by Disease. Other states insurance including Pennsylvania.

   **d.**   **Excess /Umbrella Liability**:

The Charter School shall maintain Excess / Umbrella Liability coverage in an amount not less than $5,000,000 per occurrence. The Excess/Umbrella Policy shall schedule all underlying liability coverages required under the Charter unless a separate $5,000,000 limit is maintained for Professional Liability.

   **e.**   **Professional Liability/Educators Liability/ Malpractice/Errors and Omissions Insurance.**

Professional Liability/Educators Liability / Malpractice/Errors and Omissions Insurance with limits not less than the following: (a) $1,000,000 General Aggregate; (b) $1,000,000 Per Occurrence. The Charter School shall obtain a Sexual Molestation and Child Abuse Endorsement.

   **f.**   **Directors and Officers Liability and Employment Practices Liability**:

The Charter School shall maintain Directors and Officers Liability and Employment Practices Liability Insurance in an amount not less than $1,000,000.

3.    <u>No effect on Indemnity Obligations</u>. The insurance requirements set forth in this Charter are not intended and shall not be construed to modify, limit or reduce the indemnification obligations set forth below or limit the Charter School's liability to the limits of the policies of insurance required to be maintained hereunder.

## ARTICLE XV.  TERMINATION

A.   <u>**Termination, Nonrenewal or Revocation of Charter**</u>.

1.    <u>Revocation or Nonrenewal</u>. The School District reserves the right to not renew this Charter at the end of the Term or to revoke this Charter at any time during the Term in accordance with 24 P.S. §17-1729-A and Applicable Laws.

2.    <u>Mutual Written Agreement</u>. This Charter may be terminated or surrendered by mutual written agreement prior to the expiration of the Term, which agreement shall state the effective date of termination. The Charter School and the School District agree that

unless the safety and health of the students and or staff is otherwise threatened, the effective date of termination by mutual agreement will be at the end of a semester or academic year.

B.    **Disposition of Assets upon Revocation or Termination**:  After the disposition of any liabilities and obligations of the Charter School, any remaining assets of the Charter School shall be distributed on a proportional basis to the school entities (as defined in 24 P.S. § 17-1703-A) with students enrolled in the Charter School for the last full or partial school year of the Charter School. The Charter School acknowledges and agrees that it is responsible for submitting an independent financial audit for each fiscal year of operation and shall submit a complete and accurate financial audit for its terminal year of operation prior to the release of any funds held in escrow by the School District.  The School District reserves the right to escrow up to $50,000 for future PSERS payments after notice of closure of the Charter School.

## ARTICLE XVI.   INDEMNIFICATION

A.    **Indemnification**.

1.    The Charter School hereby agrees to indemnify and hold harmless the School District, the Board of Education, the SRC, and any governing body authorized to carry out the terms, supervise, or have any control over this Charter, and their respective members, designees, agents, directors, employees and representatives ("the Indemnified Parties") and, at the option of the School District, defend by counsel approved by the School District in its sole discretion (provided that the cost to the Charter School of such School District counsel shall not exceed the rates then generally paid by the School District to its outside counsel handling comparable matters on behalf of the School District) from and against any and all claims, liabilities, demands, costs, charges, liens, expenses, actions, causes of action, lawsuits, administrative proceedings, (including informal proceedings), investigations, audits, demands, assessments, adjustments, settlement payments, deficiencies, penalties, fines, interests, judgments and or executions, (including without limitation reasonable expenses of investigation, legal fees, and court costs) past and present, known, and unknown, suspected or unsuspected, asserted, or unasserted, in contract, tort, statutory, constitutional, equity or common law, whether or not ascertainable at the time of the execution of this Charter which arise out of the willful or negligent act or omission of the Charter Board, the Charter School or any member, officer, director, employee or agent thereof, or out of any misfeasance, malfeasance or nonfeasance of the Charter School, the Charter Board or its or their members, officers, directors, employees or agents.

2.    The Charter School, for itself, the Charter Board, and the Charter School's members, officers, directors, employees and agents, hereby irrevocably waives and releases any right of or claim for contribution or in recoupment from the SRC or the School District with respect to any claims, liabilities, demands, etc. covered by subparagraph XVI.A.1 above.

3.    The Charter School agrees that the indemnification obligation in this Charter shall survive any termination, expiration or revocation of this Charter.

35

4.    The Parties agree to cooperate fully with one another in responding to any allegation, claim, lawsuit, administrative action, investigation, audit or demand arising out of this Charter. This obligation shall survive the termination of this Charter and revocation of the Charter. The Charter School and School District agree to notify one another if either Party receives notice of such a matter by providing a copy of the relevant document to the other Party.

B.    **School District Statutory Immunity**. Any other provision of this Charter to the contrary notwithstanding, the School District, its officers, employees and agents and the members of the School Reform Commission and the Board of Education retain their statutory governmental, official and any other immunity provided pursuant to the laws of the Commonwealth of Pennsylvania, including under 42 Pa. C.S.A. §§ 8501 and 8541 et seq., and do not waive the defenses of governmental and official immunity derived from such laws. The School District does not waive for itself or for its officers, employees, agents and the members of the School Reform Commission and Board of Education any other defenses or immunities available to it or any of them.

## ARTICLE XVII.
## CERTIFICATION REGARDING DEBARMENT, SUSPENSION AND INELIGIBILITY

A.    **Certification**. By signing this Charter, in addition to binding itself to the terms and conditions of this Charter, the Charter Board and the Charter School hereby certify for themselves, their principals and including, without limitation, their affiliates, if any, that none of them have been convicted of or plead guilty to fraud related to their activities, directly or indirectly, related to the Charter School, or are presently debarred, suspended, proposed for debarment, declared ineligible, or voluntarily excluded from performing services under any contract, bid, request for proposals or other governmental contracting opportunity by any federal government department, agency or instrumentality, or any Commonwealth of Pennsylvania department, agency or instrumentality, including any other School District in the Commonwealth of Pennsylvania, or by The City of Philadelphia.

B.    **Notices**. In the event the Charter School is unable to certify to any of the statements in the above certification, the Charter School shall provide **an immediate written explanation** to the School District representative named in Article XVIII, Paragraph M (Notices) of this Charter. The Charter School shall provide **immediate written notice** to the School District representative named in Article XVIII, Paragraph M of this Charter if at any time, during the Term of this Charter, the Charter School learns that the above certification was erroneous when the Charter School signed this Charter or subsequently became erroneous by reason of changed circumstances.

C.    **Reimbursement of Costs**. If the Charter School is unable to certify to any statements in the above certification, or has falsely certified, then in that event the Charter School shall reimburse the School District for any and all reasonable costs incurred by the School District as a result of any investigation by the School District, City of Philadelphia, the federal government or

the Commonwealth of Pennsylvania concerning the Charter School's compliance with the terms and conditions of this Charter that results in the debarment or suspension of the Charter School.

D.      **Survival**.  This Article XVII shall survive termination of this Charter.

## ARTICLE XVIII.  MISCELLANEOUS

A.      **Applicable Laws**.  This Charter shall be governed by, and construed in accordance with the laws of the Commonwealth of Pennsylvania notwithstanding any conflict-of-law doctrines of said jurisdiction to the contrary and without aid of any canon, custom or rule of law requiring construction against the draftsman.

B.      **No Waiver.**  No waiver of any provision of this Charter shall be construed to be a waiver of any breach of any other provision and no delay in acting with any regard to any breach of any provision shall be construed to be a waiver of any such breach.

C.      **Venue.**  The Charter School and the School District agree that with respect to any suit, claim, action or proceeding relating to this Charter, other than a proceeding involving the State Charter School Appeal Board (24 P.S. § 17-1703-A), each irrevocably submits to the exclusive jurisdiction of the courts of the Commonwealth of Pennsylvania and the United States District Court sitting in Philadelphia, Pennsylvania.  With respect to any suit, action or proceeding related to this Charter, the Charter School (i) waives any objection it may have to the laying of venue in such proceeding brought in any such court; (ii) waives any claim that such proceeding has been brought in an inconvenient forum and (iii) further waives the right to object with respect to such proceeding that such court does not have jurisdiction over the Charter School.

D.      **Assignment.**  This Charter may not be transferred or assigned by the Charter School.

E.      **Illegal Activities/Conflict of Interest.**  Neither the Charter School nor the Charter Board shall share with or pay to any School District official or employee, and no School District official or employee shall accept, any portion of the funding to the Charter School paid by the School District in connection with this Charter, or any other payment of whatever kind from the School District, except in accordance with the law and School District policy.  The Charter School shall disclose to the School District the name(s) of any School District official or employee sharing in the compensation or fee, or otherwise receiving payment of whatever kind with funds received from the School District.  Any fees or compensation shared by the Charter School and a School District officer or employee in violation of the law or School District policy shall be recoverable from the Charter School as damages.  The Charter School, its staff and members of the Charter Board shall not at any time accept or receive any form of payment, fee, compensation or benefit of any kind whatsoever, including but not limited to, referral or finder's fees, goods or services offered by hospitals, physicians, psychologists or any other healthcare provider for a recommendation or referral of a student to another agency or healthcare provider. The Charter Board and the Charter School hereby represent and warrant that there is no conflict of interest between any other contracts or any other employment or work and its rights and duties under this Charter.  The Charter School shall advise the School District if such a conflict of interest arises during the Term of this Charter.

F.      **Public Official and Employee Ethics Act**.  The Charter School acknowledges that all Charter School trustees and administrators must comply with the Public Official and Employee Ethics Act and that all Charter School trustees and administrators shall submit their completed Statement of Financial Interests forms by May 1st to the Charter School, with copies to the School District by the deadline established in the annual calendar of reporting requirements established by the Charter Schools Office.

G.      **No Third Party Beneficiary Rights.**  No third party, whether a constituent of the School District or otherwise, may enforce or rely upon any obligation of or the exercise of or the failure to exercise any right of the School District or the Charter School in this Charter.  This Charter is not intended to create any rights of a third party beneficiary; except, however, the SRC and its respective members are intended beneficiaries of the indemnification provisions, sovereign, governmental and official immunity, as each may apply, and limitation of liability provisions of this Charter.

H.      **No Personal Recourse.**

1.      Any other provision of this Charter or any Addendum or Exhibit to the contrary notwithstanding, the SRC and the School District retain their respective statutory immunity as provided pursuant to the laws of the Commonwealth of Pennsylvania, 42 Pa. C. S. A. §§8501 and 8541.  The Charter School acknowledges that the School District is a local agency, as defined in 42 Pa. C. S. A. §§8501 and 8541 and that the School District does not waive its defense of statutory immunity derived therefrom.

2.      No personal recourse shall be had for any claim based on this Charter against any member, official, officer, director, employee or agent, past, present or future of the SRC, Board of Education, the School District or any successor body as such, under any constitutional provision, statute, rule or law or by enforcement of any assessment or penalty or otherwise.

I.      **Appendices and Exhibits.**  The parties agree to the terms and conditions of this Charter and the Exhibits that are attached hereto and incorporated herein by reference.

J.      **Entire Agreement and Modification.**  This Charter supersedes all negotiations and all prior agreements, oral or written, between the Parties and their respective representatives and constitutes the entire agreement between the Parties with respect to the matters set forth herein. This Charter may not be amended, modified, supplemented or changed in any respect except by written agreement duly executed and signed by all Parties to this Charter.  The recitals set forth in this Charter are hereby incorporated by reference.

K.      **Severability**.  The terms of this Charter are severable.  In the event of the unenforceability or invalidity of any one of more of the terms, covenants, conditions or provisions of this Charter under federal, state or other applicable law, such unenforceability or invalidity shall not render any other term, covenant, condition or provision hereunder unenforceable or invalid.

L.      **Force Majeure**.  Neither party shall be liable if the performance of any part or all of this Charter is prevented, delayed, hindered or otherwise made impractical or impossible by reason of

any strike, flood, riot, fire, explosion, war, act of God, sabotage, accident or any other casualty or cause beyond either party's control and which cannot be overcome by reasonable diligence or without unusual expense.

M.   **Notices.**  When notices are required under this Charter, they shall be sent by: (a) registered mail or certified mail, return receipt requested; (b) hand delivery; (c) nationally recognized overnight courier service, or (d) email with an original copy delivered by one of methods specified in (a) – (c) above, to the parties at the address set forth below.  All notices shall be effective upon receipt, facsimile notice as evidenced by the confirmation thereof provided by the transmitter's machine.   All notices shall be addressed as follows:

To the School District:

Charter Schools Office
The School District of Philadelphia
440 North Broad Street, Suite 102
Philadelphia, PA  19130

With a courtesy copy to:

School Reform Commission/
Board of Education
The School District of Philadelphia
440 North Broad Street, 1st Floor
Philadelphia, PA  19130
Attn: Chair

With a required copy to:

Office of General Counsel
The School District of Philadelphia
440 North Broad Street, Suite 313
Philadelphia, PA  19130
Attn: General Counsel

To the Charter School:

Memphis Street Academy Charter School at J.P. Jones
2950 Memphis St.
Philadelphia, PA 19124
Attn:  Chief Executive Officer

With a required copy to:

_____
_____
_____
_____

Each party hereto may change one or more of the addresses set forth above for receipt of notices under this Charter, by notice to the other party delivered in the manner set forth in this Section XVIII.M.

N.    **Survival.**  Any and all agreements set forth in this Charter which by its or their nature, would reasonably be performed after termination of this Charter, shall survive and be enforceable after such termination.  Any and all liabilities, actual or contingent, which shall have arisen in connection with this Charter shall survive any termination of this Charter.

O.    **Headings**.  The headings of the provisions and paragraphs contained herein are intended for convenience of reference only and in no way define, limit or describe the scope or intent of this Charter, nor in any way affect the interpretation of this Charter.

P.    **Counterparts.**  This Charter may be executed in counterparts, each of which shall be deemed an original and shall have full force and effect as an original, but all of which shall constitute one and the same instrument.

**IN WITNESS WHEREOF,** the undersigned have executed this Charter the day and year first written above.

THE SCHOOL DISTRICT OF PHILADELPHIA

APPROVED AS TO FORM:

By: _Joyce S. Wilkerson_
Joyce S. Wilkerson
President, Board of Education

Assistant General Counsel

MEMPHIS STREET ACADEMY
CHARTER SCHOOL AT J.P. JONES

ATTEST:

By: _Sandra Farmer_
Name: SANDRA FARMER
Chair
Board of Trustees

By: _Anita Vega Kaiser_
Name: Anita Vega Kaiser
Secretary
Board of Trustees

## TABLE OF EXHIBITS

Exhibit A       -       SRC Resolution No. SRC-10, dated June 21, 2018

Exhibit B       -       Required Management Organization of the
Board of Trustees and Requirement for Bylaws

Exhibit C       -       Statement of Assurances

Exhibit C-1       -       Provision of Special Education Services to
Charter School Student Guidelines

Exhibit D       -       Current Charter School Records

Exhibit E              School District Policies and Procedures Applicable to Charter
Schools

Exhibit F       -       Required Financial Procedures

Exhibit G       -       Mid-Term Material Charter Amendments

Exhibit H       -       Attendance Zone Map

**EXHIBIT A**

**SRC RESOLUTION**

SRC-10
June 21, 2018

RESOLUTION

Re:               Memphis Street Academy Charter School at J.P. Jones; Application for Charter
Renewal

WHEREAS, in January, 2010, the School Reform Commission ("SRC") adopted the
Renaissance Schools Initiative Policy, which authorized the SRC to grant Renaissance charters
as part of the Renaissance Schools Initiative of The School District of Philadelphia ("School
District"); and

WHEREAS, the John Paul Jones Middle School ("Jones School") had been identified as a
School District school which needed fundamental change through the Renaissance Schools
Initiative to facilitate a transformation of the learning environment; and

WHEREAS, the purpose of the Renaissance Schools Initiative was to dramatically improve the
learning environment in underperforming School District schools to create highly effective
schools that provide exceptional opportunities for student academic achievement and
preparedness for success in college and the workforce; and

WHEREAS, for charter schools participating in the Renaissance Schools Initiative, in order to
adhere to the mission of the Renaissance Schools Initiative and to maintain high levels of
accountability, academic requirements could exceed performance targets for non-Renaissance
charter schools; and

WHEREAS, pursuant to the Charter School Law, 24 P.S. § 17-1701-A, *et seq.*, the SRC granted
a charter ("Charter") to the Board of Trustees of MEMPHIS STREET ACADEMY CHARTER
SCHOOL AT J.P. JONES ("Charter School") to operate the Jones School as a charter school for
a term of five years commencing in 2012; and

WHEREAS, the Charter School seeks renewal of its Charter and has submitted an Application
for Charter Renewal to the Charter Schools Office ("CSO"); and

WHEREAS, members of the CSO, beginning in late 2016 and continuing through April 2017,
had reviewed the academic performance, organizational compliance and viability, and fiscal
health and sustainability of the Charter School during the existence of the Charter School and
had recommended to the SRC that there were grounds for the SRC not to renew the Charter
under Section 1729-A of the Charter School Law; and

WHEREAS, by Resolution SRC-5, approved on January 18, 2018, the SRC directed the CSO to
negotiate with the Charter School on the terms of a renewal; and

WHEREAS, the Charter School has agreed to certain terms and conditions in connection with the renewal of the Charter and has submitted a charter agreement signed by the Charter School ("Charter Agreement") to the CSO setting forth the agreed terms and conditions of renewal; and

WHEREAS, the SRC has reviewed the Charter Agreement, the information received during the comprehensive renewal evaluation process, and the Renewal Recommendation Report for the Charter School; now be it

RESOLVED, that the SRC hereby ratifies the renewal of the Charter School's Charter, subject to the terms and conditions agreed to by the Charter School as set forth below, for a five-year term commencing on July 1, 2017 and ending on June 30, 2022, effective upon the full execution of the Charter Agreement by the School District and by the Chair of the Board of Trustees of the Charter School or another member of the Board duly designated by the Board; and be it

FURTHER RESOLVED, that the Charter School has agreed to comply with certain performance requirements ("Performance Requirements") as set forth below. Failure to comply with the Performance Requirements may be a basis for revocation or nonrenewal of the Charter School's Charter.

1.  The Board of Trustees shall ensure that all trustees, officers, administrators, and the immediate family of trustees, officers and administrators of the Charter School comply with the Ethics Act and the Pennsylvania Nonprofit Corporation Law of 1988 ("Nonprofit Law"). The Board of Trustees shall adopt a Conflicts of Interest policy that complies with the Ethics Act and the Nonprofit Law.

2.  The Board of Trustees shall elect Board officers, shall hold Board members to established term lengths and limits, shall ensure that the Board has the minimum required number of Board members, and shall fill open Board seats in a timely fashion, in accordance with the Charter School's Bylaws.

3.  The Board of Trustees shall use its best efforts to meet at least once during each full month when the Charter School is in session during the Term of the Charter. Notwithstanding the foregoing, the Board of Trustees shall meet to take action in a timely manner in accordance with the Charter, Applicable Laws (as defined in Article II, Section A.1 of the Charter), and the Charter School's Student Code of Conduct, but no less frequently than necessary to act on student discipline matters within forty-five (45) days after any infraction or hearing as required by Applicable Laws (as defined in Article II, Section A.1 of the Charter).

4.  The Board of Trustees shall adopt an Admissions Policy and Process which complies with the Public School Code and Charter School Law. Additionally, the Admissions Policy and Process:

    a.  shall include provisions on: (i) application deadlines; (ii) enrollment preferences, order and allocation of preferences, and methods by which preferences would be identified; (iii) student recruitment procedures and

communications, including details on methods to be used to recruit students Citywide or in an applicable attendance zone, and to monitor any specified enrollment targets; (iv) lottery dates, and (v) communication of lottery results, in a form and with provisions that are acceptable to the Charter Schools Office;

b.     shall provide that the application will be made clearly and plainly available on the Charter School's website in English, Spanish, and any additional language the Charter School deems appropriate without any barriers to enrollment requiring technology;

c.     shall provide that families have at least four (4) weeks to complete and return enrollment packets post-lottery acceptance; with exceptions made for extenuating circumstances for families with language barriers;

d.     shall provide that an ordered, up-to-date waitlist be continuously maintained, reflecting at any given time the next eligible student to be offered admission in each grade served by the Charter School, identifying any applicable preference(s) for each student, and indicating the date any student is removed from the waitlist with the reason for removal;

e.     shall provide that if seats open during the school year for any grade served by the school or between school years for grades served other than the initial grade, the Charter School shall accept new students from the waiting list in appropriate order for particular grades or new applicants if there are no applicants for that grade on the waiting list; and

f.     shall provide that the Charter School shall provide a copy of its current waiting list at any time during the Term of the Charter within ten (10) business days after request by the Charter Schools Office.

5.     The Board of Trustees shall submit to the School District by August 1st of each year during the Term of the Charter as part of the Charter School's Annual Report, or separately if not included in the Charter School's Annual Report, evidence that all professional staff providing educational services at the Charter School have all necessary licenses, certifications, qualifications and credentials required by the Charter and Applicable Laws, including without limitation the seventy-five percent (75%) certification requirement in accordance with the Charter School Law, and identify the number of all certified special education and English as a Second Language personnel with direct instruction responsibilities.

6.     The Board of Trustees shall ensure that (i) all employees have required federal and state criminal and child abuse background checks during the Term of the Charter; and (ii) copies of such background checks are kept in each employee's personnel file. Preferably, the Charter School's annual financial audit will include an annual review of a sample of employee files for appropriate clearances and background checks.

3

7.     The Board of Trustees shall ensure that required payments to the Public School Employees' Retirement System ("PSERS") are made timely.  If the Charter School fails to make timely payments to PSERS and that results in a reduction of the School District's basic education subsidy, the School District shall withhold such reduction in a future monthly per-pupil payment to the Charter School. Additionally, any failure to make required PSERS payments above a threshold established by the Charter Schools Office or in any amount repeatedly shall result in the issuance of a Notice of Deficiency to the Charter School.

8.     The Board of Trustees shall submit to the Charter Schools Office signed, complete Statements of Financial Interest, pursuant to guidelines established by the Charter Schools Office. These documents are required by the Ethics Act and the Charter School Law to be completed annually for each trustee on the Board's roster for that school year.

9.     The Board of Trustees shall ensure that the dates, times, and locations of scheduled Board meetings are posted on the Charter School's website and that any updates to the Board meeting schedule are posted timely.  Furthermore, minutes from Board meetings shall be posted on the Charter School's website within two weeks of approval by the Board of Trustees, but not later than after the conclusion of a second consecutive board meeting after each meeting, and shall remain posted for a minimum of one year from date of Board meeting.

10.    The Board of Trustees agree that the Charter School shall participate in the School District's charter school performance framework and monitoring system ("Charter School Performance Framework") as set forth in Article X of the Charter.

11.    The Board of Trustees acknowledges and agrees that through the Renaissance Schools Initiative, the Jones School had been identified as a School District school which needed fundamental change to facilitate a transformation of the learning environment. As the board of a Renaissance charter school, the Board of Trustees is committed to achieving high levels of academic achievement, sound and compliant operations, fiscal responsibility and stewardship, and strong parent, family and community engagement. Therefore, the Board of Trustees acknowledges and agrees that if during the Term of the Charter, the Board of Education approves by resolution the revocation or nonrenewal of the Charter after holding a public hearing on the nonrenewal or revocation of the Charter School's Charter and after completion of a 30-day public comment period pursuant to Section 1729-A(c) of the Charter School Law, the Board of Trustees shall use its best efforts to expedite (i) any appeal of the Board of Education decision to nonrenew or revoke the Charter to the Charter School Appeal Board, to any administrative agency or to any court and (ii) any court actions related to the nonrenewal or revocation of the Charter School's charter or to the charter renewal or revocation process;

and be it

4

FURTHER RESOLVED, that the Charter School has agreed to comply with certain conditions for renewal ("Conditions for Renewal") based on the comprehensive renewal review by the CSO as set forth below.  Failure to comply with the Conditions for Renewal as set forth below may be a basis for revocation or nonrenewal of the Charter School's Charter.

1.      PSSA proficiency shall be higher than the annual proficiency rate average of the Charter School's Similar Schools Group in at least 2 of 3 tested subjects in the 2017-2018 school year (year 1 of the Charter Term) and in 3 of 3 tested subjects in year 2 (2018-2019 school year), year 3 (2019-2020 school year) and year 4 (2020-2021 school year) of the Charter Term.  The Charter School shall seek to close the proficiency gap with School District averages annually (increasing proficiency trend) by the end of the 2020-2021 school year, year 4 of the Charter Term, in Science and English Language Arts.

2.      The Charter School shall have minimally a three (3) percentage point increase in PSSA Math proficiency from both the baseline proficiency rate of 6.43% (2016-17 school year) by the 2018-2019 school year and also from the Charter School's 2018-2019 school year proficiency rate by the end of the 2020-2021 school year; a total of a minimum of six (6) percentage point proficiency rate increase in PSSA Math.

3.      The percentage of students attending 95% or more instructional days shall be higher than Similar Schools Group averages in all instances during the first four years of the Charter Term.  Additionally, the Charter School will close the gap in attendance with the School District so that the Charter School's percent of students attending 95% or more days of school exceeds the School District average by the 2020-2021 school year.

4.      The percentage of students attending fewer than 90% of instructional days (chronic absenteeism) shall have minimally a four (4) percentage point decrease from both the baseline chronic absenteeism rate of 34% (2016-2017 school year) by the 2018-2019 school year and also from the Charter School's 2018-2019 school year chronic absenteeism rate by the end of the 2020-2021 school year; a total of a minimum of eight (8) percentage point decrease in chronic absenteeism.

5.      The Charter School shall submit to the Charter Schools Office evidence of Board approval of the Charter School's revised educational plan priorities and focal areas not later than September 15, 2018 or the first day of the 2018-2019 school year, whichever is earlier. This revised educational plan document shall also contain performance targets and measurable and time bound educational plan goals for the Charter School. These goals and targets for performance shall be aligned with the Conditions as set forth in the Charter but will also be evaluated as part of the comprehensive renewal evaluation during the 2021-2022 school year.

6.      The Charter School shall submit to the Charter Schools Office by October 19, 2018 a fully compliant enrollment packet for enrollment in the 2019-2020 school year that clearly outlines the five required documents to enroll and clearly identifies anything that can be optionally requested from families. Additionally, if the Charter School ceases to only use the Philadelphia Standard Application or subsequent online replacement for

5

student applications, any application form must be submitted to the Charter Schools Office at least 45 days in advance of use for approval as to form and substance by the Charter Schools Office.

7.      The Charter School's percent of newly enrolled students residing in the catchment shall not fall below 90% in any year of the Charter Term.

8.      The Charter School will submit to the Charter Schools Office a revised Code of Conduct that is compliant with Applicable Laws and reflects full alignment to the intent of the School District's Code of Conduct including proportionality of consequence to occurrence and reasons for suspension and expulsion by August 3, 2018. The Charter School will update annually, as necessary, its Code of Conduct to ensure continued alignment to the School District's Code of Conduct. Annual revisions to the Charter School's Code of Conduct, if any, will be submitted to the Charter Schools Office by August 15th of each school year.

9.      The Charter School will within five (5) business days of any Board approved expulsion submit to the Charter Schools Office information regarding the expulsion including the reason for expulsion, the date of the incident, the date of expulsion hearing, the date of final Board action and charges as approved by the Board, an indication as to whether or not the student had an IEP or was in a process for evaluation that could result in an IEP at the time of the alleged offense, and if appropriate, information regarding any manifestation determination.

10.     The Charter School shall reduce the number of students with at least one out-of-school suspension by 10 percent annually from the baseline year (2016-2017 school year) rate of 152 out-of-school suspensions until the total number of students in any school year with at least one out-of-school suspension is fewer than 100.

11.     The Charter School shall submit evidence of staffing and/or contracted services sufficient to provide required annual health screenings and services to all enrolled students in compliance with Chapter 23 of the Pennsylvania Code by August 15, 2018 for the projected enrollment for the 2018-2019 school year.

12.     The Charter School shall submit evidence annually to the Charter Schools Office by June 30th of each prior school year during the charter term that all required student health exams and screenings as outlined in Chapter 23 of the Pennsylvania Code are provided to students in eligible grades.  Annually, the Charter School will ensure that at least 85% of eligible students receive vision screenings, hearing exams, height and weight measurements, and scoliosis screenings.  Annually, the Charter School will increase by 15 percentage points from the baseline rate of 31% (2016-2017 school year) the percent of eligible students receiving a physical exam until an annual rate of 75% or more is reached. Annually, the Charter School will increase by 20 percentage points from the baseline rate of 16% (2016-2017 school year) the percent of eligible students receiving a dental exam until an annual rate of 75% or more is reached.

6

13.    Beginning in FY19, the Charter School shall not add any funds received from local revenues to the Charter School's fund balance in any year of the Charter Term. Further, beginning in FY19, the Charter School shall not have the sum of the Charter School's committed, assigned and unassigned fund balances be higher than the sum of the same fund balances for FY18. Committed, assigned and unassigned fund balances are defined by GASB 54.

14.    The Charter School annually shall submit to the Charter Schools Office no later than June 30th of each year, a Board approved rolling five-year budget that reflects the educational plan investments and goals approved by the Board and identifies any prior year variance from budget;

and be it

FURTHER RESOLVED, that the Charter School acknowledges and agrees that if any of the academic conditions, including specific performance targets, set forth in Article I, Section I of the Charter are not met fully by the Charter School, the Charter School will surrender and forfeit its charter and will close on or before June 30, 2022. The Charter School will dissolve without protest and without recourse to the State Charter School Appeal Board or to any court of competent jurisdiction. The Charter Schools Office will make a determination on whether any of the academic or financial conditions set forth in Article I, Section I of the Charter are not met fully by the Charter School once data for the 2020-2021 school year are available and are made public; and be it

FURTHER RESOLVED, that the School District and the Charter School have acknowledged and agreed that the Charter School will enroll students only in Grade 5 through Grade 8 with a maximum of 880 students during the Term of the Charter, unless the parties agree in writing to other terms. Under no circumstances will the Charter School request payment from the School District or the Commonwealth of Pennsylvania for more students than set forth herein nor enroll students in different grades including Kindergarten, without SRC approval by resolution; and be it

FURTHER RESOLVED, that the Charter School acknowledges and agrees that it may not operate a daycare, early childhood or pre-Kindergarten program under the Charter and that Charter School funds may not be used to pay for or to provide employees, resources, facilities or other expenses related to a daycare, early childhood or pre-Kindergarten program except in accordance with Applicable Laws (as defined in the Charter); and be it

FURTHER RESOLVED, that the Charter School has agreed that pursuant to the Renaissance Schools Policy and the Application, and subject to the maximum enrollment set forth in the Charter, that the Charter School shall only enroll first time entering students who reside in or attend approved feeder schools in the Attendance Zone, as may be revised by the School District during the Term of the Charter and as delineated on the map attached to the Charter in Exhibit H and made a part thereof, and siblings of presently enrolled students at the Charter School if implementing sibling preference as outlined in the Charter School Law. The Charter School may not enroll any first time entering students who live outside the Attendance Zone or do not attend any approved feeder schools identified in the Attendance Zone except for siblings of presently

7

enrolled students at the Charter School, if implementing sibling preference as outlined in the Charter School Law; and be it

FURTHER RESOLVED, that the Charter School has agreed to the following provisions related to the School District's Charter School Performance Framework:

    1.    The Charter School agrees to participate in the School District's Charter School Performance Framework. The Charter School Performance Framework includes an annual assessment of the Charter School's academic, financial, and organizational performance as well as compliance with Applicable Laws. Organizational performance includes, but is not limited to, a review of the Charter School's admissions and enrollment policies and practices, student discipline practices, special education programming, ELL programming, and Board of Trustees governance in order to assess compliance with the Charter and Applicable Laws, federal, state and local guidance, policies, and Charter Schools Office procedures. Financial performance includes, but is not limited to, a review of the Charter School's financial health and long-term sustainability, and generally accepted standards of fiscal management.

    2.    The Charter School agrees to provide or allow to be provided to the School District and the Charter Schools Office all records, including student level academic performance, necessary to properly assess the academic success, organizational compliance and viability, and financial health and sustainability of the Charter School under the Charter School Performance Framework, timely and pursuant to Charter Schools Office procedures.

    3.    The Charter School acknowledges that achieving the performance objectives identified in the Charter School Performance Framework is critical to meeting the needs of public school students in Philadelphia. The Charter School shall actively monitor its own progress towards achieving objectives identified in the Charter School Performance Framework. The Charter Schools Office may also evaluate any or all of the performance domains – academic, organizational and financial – on an annual basis formally. If the Charter School continues to fail to meet standards for academic success, organizational compliance and viability, and/or financial health and sustainability, the Charter Schools Office may recommend that the SRC commence revocation or nonrenewal proceedings against the Charter School.

    4.    During the Term of the Charter, the Charter Schools Office will limit changes to the Charter School Performance Framework applicable to the Charter School to those required by changes in Applicable Laws or by changes to charter school data availability. The Charter Schools Office will provide notice to charter schools in Philadelphia of any change to the Charter School Performance Framework prior to implementation of such change. The Charter Schools Office would use its best efforts to solicit feedback on changes from Philadelphia charter schools in advance of implementation of changes.

## EXHIBIT B

### REQUIRED MANAGEMENT ORGANIZATION
### OF
### THE BOARD OF TRUSTEES
### AND
### REQUIREMENTS FOR BYLAWS

**An affirmative vote of a majority of the members of the Board of Trustees of the Charter School, duly recorded, ("Board of Trustees" or "Board") showing how each member voted, shall be used in order to take action on the following subjects:**

    \*      School calendar (must include 990 hours or 180 days of instruction for secondary students [grades 7 – 12] and 900 hours or 180 days for elementary students [grades 1 – 6]. School cannot be kept open for students or staff on Sundays, Fourth of July, Memorial Day or Christmas).

    \*      Adopting textbooks.

    \*      Appointing or dismissing charter school administrators.

    \*      Adopting the annual budget.

    \*      Purchasing or selling of land.

    \*      Locating new buildings or changing the location.

    \*      Creating or increasing any indebtedness.

    \*      Adopting courses of study.

    \*      Designating depositories for school funds.

    \*      Fixing salaries or compensation of administrators, teachers, or other employees of the charter school.

    \*      Entering into contracts with and making appropriations to an intermediate unit, school district or Area Vocational/Technical School for the charter's proportionate share of the cost of services provided or to be provided by the foregoing entitles.

**Requirements for the bylaws:**

1.      The bylaws must contain a provision for "failure to organize or neglect of duty." Specifically, the bylaws must outline a removal procedure for the failure of a board member to perform his or her duties as outlined in the Charter School Law.

2.      No board member shall as a private person engage in any business transaction with the charter school of which he or she is a trustee, be employed in any capacity by the charter school of which he or she is a trustee, or receive from such charter school any pay for services rendered to the charter school.

3.      A charter school board of trustees shall have a designated treasurer or other officer reporting to the treasurer and authorized by the Charter School Board who shall receive all funds including local, state and federal funds and privately donated funds.  The treasurer shall also make payments out of the same on proper orders approved by the board of trustees, signed by the president or vice-president of the board.  The treasurer may pay out such funds on orders which have been properly signed without the approval of the board first having been secured for the payment of amounts owing under any contracts which shall previously have been approved by the board, and by which prompt payment the charter will receive discount or other advantage.

4.      Procedures for dismissal of an employee must be contained in the bylaws.

5.      The Bylaws shall state the required number of Board members and the method for replacing Board members and officers, shall specify term limits for Board members, and shall specify the minimum required number of regular Board meetings each fiscal year.

## EXHIBIT C

### STATEMENT OF ASSURANCES

### The School District of Philadelphia

### Statement of Assurances for
### Charter Schools With Charters Commencing July 1, 2017

By duly authorized signature below, **MEMPHIS STREET ACADEMY CHARTER SCHOOL AT J.P. JONES** ("Charter School") hereby agrees to the following terms and conditions in connection with its Charter and acknowledges and understands that any material deviation from any of these terms and conditions is cause for revocation or nonrenewal of its Charter during the Term of such Charter:

1) The Charter School shall comply with all applicable federal, state and local laws.

2) The Charter School shall be nonsectarian in all operations.

3) The Board of Trustees of the Charter School ("Charter Board") shall be authorized to sign a written Charter with the School District of Philadelphia ("School District"). The Charter School shall submit to the School District the formal resolution adopted by the Charter Board.

4) The Charter School shall provide a minimum of one-hundred eighty (180) days of instruction or nine hundred (900) hours per year of instruction at the elementary level, or nine hundred ninety (990) hours per year of instruction at the secondary level.

5) Prior to employing any individual or engaging any contractor and contractor's employees who shall have direct contact with students, the Charter School shall ensure that criminal history and child abuse/injury records are obtained and reviewed in compliance with §1-111 of the Public School Code and 23 Pa. C.S.A. subchapter C2, regarding background checks.

6) The Charter School shall provide the School District with access to all of its records and facilities to ensure that the Charter School is in compliance with its written Charter.

7) The Charter School shall utilize a management structure that is consistent with Exhibit B to the Charter, entitled: *Required Management Organization of the Board of Trustees and Requirements for Bylaws*.

8) The Charter School shall enroll and disenroll each student using the School District's Infinite Campus student information system or its equivalent.

9) The Charter School agrees to adopt and administer the most current version of the PSSA assessments and the Keystone exams or other such statewide accountability assessments as required of the School District by the Commonwealth of Pennsylvania during the charter term.

10) For each year during the Term of this Charter, the Charter School shall achieve academic success as defined in the Charter School Performance Framework.

11) The Charter School shall adopt an admissions policy in accordance with the Charter School Law Sections 1723-A and 1730-A. In the event of a surplus of applicants, the Charter School immediately shall notify the School District if it intends to conduct an admissions "lottery" so that the School District may place an observer at the Charter School to monitor such a lottery. The Charter School shall develop a wait list policy consistent with Applicable Laws.

12) The Charter School shall submit the following legal documentation to the School District:

   a) A copy of a signed lease or recorded deed for each facility serving the Charter School's students.

   b) Evidence that the Charter School itself has been organized as a public nonprofit corporation in accordance with Section 1714-A of the Charter School Law and is exempt from federal taxes under Section 501(c)(3) of the Internal Revenue Code.

   c) Valid occupancy certificates for each facility serving the Charter School's students.

   d) Fire and health and safety regulation compliance as set forth by the City of Philadelphia.

13) The Charter School shall submit the following to the School District:

   a) Employment Verification forms indicating that a sufficient staff with complete and appropriate criminal and child abuse records checks have been hired to serve the actual enrollment of the Charter School;

   b) Evidence that the Charter School has obtained the insurance coverages required by the Charter.

14) The Charter School shall comply with the ***Provision of Special Education Services to Charter School Students: Guidelines***, attached hereto as <u>Exhibit C-1</u> and made a part hereof.

15) The Charter School shall adopt detailed procedures for suspension and expulsion that comply with the Public School Code, including providing every student with due process.

16) The Charter School shall meet the legal, professional and ethical standards and applicable laws for maintaining school records and confidential student records, and for disseminating information.

17) The Charter School shall follow State child accounting procedures (24 PS § 13-1332).

18) If the Charter School plans to offer food services, the Charter Shall follow all federal, state and local regulations for student participation.

19) The Charter School shall adopt a plan for providing school health services that complies with Article XIV of the Public School Code and shall maintain student health and immunization records in compliance with Applicable Laws.

20) The Charter School's insurance coverage plans, including general and excess liability, professional and educators liability, workers' compensation and employers liability, property, and director's and officer's liability coverage is in compliance with Section 1724-A of the Charter School Law. The Charter School shall offer a health benefits package the same as the local school district's package as required in Section 1724-A of the Charter School Law.

21) The Charter School shall develop a purchasing procedure that addresses a competitive way to purchase goods and services and shall have appropriate board oversight of all spending in the Charter School's bylaws.

22) The Charter School shall follow the financial procedures outlined in Exhibit E to the Charter, entitled: ***Required Financial Procedures***.

23) The Charter School shall have a plan for regular financial reviews and audits in accordance with Section 1719-A of the Charter School Law. The Charter School shall submit annual reports to PDE and to the Charter Schools Office by August 1st of every year.

24) The Charter School shall provide copies of any amendments to the Charter School's Articles of Incorporation or Bylaws to the Charter Schools Office within thirty (30) days after such amendments have been approved by the Charter Board.

_____            6-18-2018
Signature                                            Date

_____
Chair, Board of Trustees

3

**EXHIBIT C-1**

The School District of Philadelphia
Provision of Special Education Services to Charter School Students
Guidelines

The following duties shall apply to charter schools:

1) Each charter school is responsible for providing a free appropriate public education to students with disabilities enrolled in that charter school who have been determined by an Individualized Education Program (IEP) team to require specially designed instruction. The cost of implementing the specially designed instruction shall be borne by the Charter School. Students provided such services by the Charter School and with a valid NOREP, ER and IEP shall be considered eligible for additional special education payment to the Charter School. Charter schools are required to input relevant data in Infinite Campus or its equivalent (valid dates of NOREP, ER and IEP) and submit the first page of the IEP to the School District. Assuming valid NOREP and ER, payments are effective as of the date listed on the IEP.

2) Each charter school must ensure full compliance with the Individuals with Disabilities Education Act (IDEA). This includes, but is not limited to child find, identification, and procedural safeguards, including: access to records, appointment of surrogate parents, notice, opportunity for mediation of disputes, the right to a due process hearing, and assurance of the Free and Appropriate Public Education (FAPE).

3) Each charter school must ensure that students who are suspected of having disabilities are properly evaluated and re-evaluated at established intervals required by IDEA, by properly certified personnel, adhering to required timelines, and providing required notification to parents.

4) When a student enrolled in a charter school presents a valid and current IEP, and/or the charter school IEP team determines that a student with disabilities requires specially designed instruction, the charter school must ensure that the IEP is implemented in accordance with the IDEA, and reviewed at least annually.

5) Charter schools must maintain the confidentiality of personally identifiable information regarding students with disabilities as per the Family Educational Rights and Privacy Act (FERPA) and IDEA.

6) The charter school is responsible for providing the names of all students eligible for special education services provided by the charter school along with all other data required for the federal child count. This data is to be submitted electronically through the School District's

Infinite Campus student information system or its equivalent no later than November 30 of each year.

7) Continuation of the additional special education payment is contingent on the Charter School maintaining valid IEP, NOREP and ER documentation. As stated in Section 1728-A of the Charter School Law, the Charter School shall provide to the School District "ongoing access to records and facilities of the Charter School to ensure that the Charter School is in compliance with its charter and this Act and that requirements for testing, civil rights, and student health and safety are being met."

8) Verification of students' eligibility for the additional special education funding shall be based on the Charter School's performance of necessary procedures relative to the evaluation and re-evaluation for special education services in accordance with the timelines and criteria specified by law.

## EXHIBIT D

### CURRENT CHARTER SCHOOL RECORDS

Every charter school must maintain the following records ("Current Charter School Records") on-site at the charter school's facility and make such Current Charter School records available for inspection by the School District:

1.  Valid Clearances for Every Employee and Volunteer of the Charter School:

    - Child Abuse Clearances
    - Criminal Record Checks by the Pennsylvania State Police and FBI
    - Act 168 Documentation

2.  Student Immunization Records

3.  Home Language Survey Results

4.  Parent/Student Handbook

5.  Statements of Financial Interests for Members of the Charter Board of Trustees and for all administrators (due May 1 of each year)

6.  Posted Charter Board of Trustees Meeting Dates, Times and Locations

7.  Charter Board of Trustees Meeting Minutes

8.  Charter School Bylaws

9.  Charter Enrollment Forms for all students enrolled in the Charter School as of the date of enrollment.

10. Charter School wait list, if any, as well as current roster of enrolled students (manual or electronic).

11. All applications for enrollment to the Charter School received for the most recent three year period.

**EXHIBIT E**

**SCHOOL DISTRICT PROLICIES AND PROCEDURES
APPLICABLE TO CHARTER SCHOOLS**

Policy 122 – Extracurricular Activities (When the Charter School participates in School District Extracurricular Activities)

Policy 123 – Interscholastic Athletics (When the Charter School participates in School District Interscholastic Athletics)

Policy 123.1 – Concussion Management Athletics (When the Charter School participates in School District Interscholastic Athletics)

Policy 123.2 – Sudden Cardiac Arrest Athletics (When the Charter School participates in School District Interscholastic Athletics)

Policy 141 -- Renaissance Schools Initiative

Policy 204 – Attendance

Policy 216 – Student Records

Policy 808 – Food Services (When the Charter School uses School District food services)

Policy 810 – Transportation (When the Charter School uses School District transportation)

Policy 815 – Acceptable Use of Internet, Technology and Network Resources (When the Charter School uses School District technology)

Policy 830 – Breach of Computerized Personal Information (When the Charter School uses School District technology)

## EXHIBIT F

## REQUIRED FINANCIAL PROCEDURES

The treasurer of the charter shall deposit the funds belonging to the charter school in a depository approved by the board and shall at the end of each month make a report to the charter board of trustees of the amount of funds received and disbursed by him or her during the month. All deposits of charter school funds by the charter treasurer shall be made in the name of the charter school. The charter school board of trustees may delegate by resolution the duties and responsibilities of treasurer in this paragraph to the charter school's third-party business manager or financial manager.

The board of trustees of a charter school shall invest charter school funds consistent with sound business practice. Authorized types of investments for charter schools shall be:

*     United States Treasury bills

*     Short-term obligations of the United States Government or its agencies or instrumentalities

*     Deposits in savings accounts or time deposits or share account of institutions insured by the Federal Deposit Insurance Corporation or the Federal Savings and Loan Insurance Corporation or the National Credit Union Share Insurance Fund to the extent that such accounts are so insured, and for any amounts above the insured maximum, provided that approved collateral as provided bylaw therefor shall be pledged by the depository.

*     Obligations of the United States of America or any of its agencies or instrumentalities backed by the full faith and credit of the United States of America, the Commonwealth of Pennsylvania and any of its agencies or instrumentalities backed by the full faith of the Commonwealth, or of any political subdivision of the Commonwealth of Pennsylvania of any of its agencies or instrumentalities backed by the full faith and credit of the political subdivision.

*     Shares of an investment company registered under the Investment Company of America Act of 1940 (54 Stat. 789, 15 U.S.C. § 80a-1 *et seq.*) as defined in 24 P.S. § 4-440.1 of the Public School Code.

NOTE:     **All investments shall be subject to the standards set forth in 24 P.S. § 4-440.1 of the Pennsylvania Public School Code.**

The school treasurer shall settle annually at the end of the Charter School's regular fiscal year, with the School Reform Commission or its designee, each account that the school may have open with the School District for such fiscal year.

An annual school audit shall be conducted according to the requirements of Article 24 of the Public School Code of 1949 as amended.  Charter school boards of trustees shall follow requirements set forth for school boards in this section.

## EXHIBIT G

### MID-TERM MATERIAL CHARTER AMENDMENTS

A charter school must request to amend its Charter in the following instances ("Material Charter Amendments"):

1.  Enrollment expansion of 10% or fewer of the current maximum authorized enrollment or 100 seats, whichever is less

2.  Change to grade levels served

3.  Significant change to mission, or fundamental change to educational plan

4.  Name change of Renaissance charter schools due to business-need or legal requirement[2]

5.  Change in building location or addition of new facility due to business-need, unavailability of current facility and/or emergency

6.  Change in charter management organization

---

[2] Name changes for traditional charter schools only require review and confirmation of submitted documents by the Charter Schools Office and a signed amendment to the Charter prior to being finalized.

## EXHIBIT H

### ATTENDANCE ZONE MAP



# THE SCHOOL DISTRICT OF PHILADELPHIA

## Memphis St. Charter @ Jp Jones Boundary