**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MEMPHIS STREET ACADEMY** | : | **CIVIL ACTION** |
| **CHARTER SCHOOL AT J.P. JONES** | : | |
| *et al*, | : | |
| *Plaintiffs,* | : | |
| | : | |
| **v.** | : | **No.    22-02760** |
| **THE SCHOOL DISTRICT OF** | : | |
| **PHILADELPHIA** | : | |
| *Defendant.* | : | |

**MEMORANDUM**

**Kenney, J.**                                                                                                            **July 14, 2025**

Memphis Street Academy ("MSA") was granted a charter under the Renaissance Schools Initiative to convert the John Paul Jones Middle School to a charter school. Under the Renaissance Schools Initiative, the conversion was a fundamental change meant to facilitate a transformation of the learning environment in an underperforming school. MSA was given increased autonomy in exchange for increased accountability. After its first five years of operating, however, MSA missed the academic marks set by the School District of Philadelphia. Instead of pursuing nonrenewal of MSA's charter, the Charter Schools Office and MSA worked together to negotiate a new charter with academic conditions. MSA agreed that it could and would meet these conditions.

Early into its second charter, MSA did not meet the mutually agreed upon academic conditions. Instead of summarily closing the school at the first instance of deficient performance, the School District of Philadelphia waited until the end of the charter term and completed a thorough review of MSA's performance and compared it to the agreed upon metrics. The complete picture of MSA's performance was bleak: MSA met **none** of the mutually agreed-upon academic

conditions. The School District of Philadelphia then exercised its contractual right to force MSA to surrender its charter and close.

Rather than accept the consequences, MSA continues to operate and refuses to give up its charter. MSA points to the demographic make-up of its students and blames the School District of Philadelphia for targeting charter schools with predominantly Black and Hispanic student bodies for closure through a renewal framework applied to every charter school. The School District has not renewed the charters of only two out of the ninety-eight charter schools, the majority of which serve predominantly Black and Hispanic student bodies, that were evaluated under the racially neutral renewal framework.

The Court holds MSA to the promises it made to the School District of Philadelphia. The conditions MSA agreed to be held to—and failed to meet—were guardrails to provide adequate education for its students. Instead of uplifting its students, MSA blames their demographic backgrounds for its own shortcomings. These excuses deprive MSA's students of the education they deserve. MSA must surrender its charter and close.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    INTRODUCTION

Plaintiffs, MSA and seven sets of individual plaintiffs (*i.e.,* seven parents and their minor children), brought four claims against Defendant the School District of Philadelphia ("SDP" or "Defendant") in their Second Amended Complaint. ECF No. 32 ("Second Amended Complaint"). The Court dismissed Counts II and IV of the Second Amended Complaint. ECF Nos. 40–41. The remaining claims of the individual Plaintiffs (collectively, "Plaintiffs") seek (1) injunctive relief

to prohibit racially discriminatory treatment of MSA and its students (Count I) and (2) declaratory relief regarding the illegality of SDP's Charter School Performance Framework (Count III).[1]

Before the Court are Plaintiffs' and Defendant's cross motions for summary judgment (ECF Nos. 89–90) ("Plaintiffs' Motion" and "Defendant's Motion," together, the "Motions"). The Parties each filed their responses (ECF Nos. 93–94), replies (ECF Nos. 97, 99), and sur-replies (ECF No. 102–103). Accordingly, the Motions are now fully briefed and ripe for determination. For the reasons discussed below, Defendant's Motion is **GRANTED,** and Plaintiffs' Motion is **DENIED**. An appropriate Order will follow.

### B.    FACTUAL BACKGROUND

#### 1.    The Parties: Individual Plaintiffs, Memphis Street Academy, and the School District of Philadelphia

Plaintiffs are the parents of children who are or were enrolled at MSA and bring suit on behalf of themselves and their children. Second Amended Complaint ¶¶ 11–17. Plaintiffs all identify as either "African American," "Hispanic," or "Hispanic American," and each parent states that they want their child or children "to continue to be educated at MSA because MSA provides a higher quality of education in a safer and more orderly environment than that which would otherwise be provided by the School District of Philadelphia or other available educational options." *Id.*

MSA is a Grade 5–8 charter school which operates in Philadelphia pursuant to a written charter agreement with SDP. ECF No. 89-2 ("Plaintiffs' Stipulated Facts") ¶ 1.[2] MSA's student

---

[1] While MSA's claims were dismissed, *see* ECF Nos. 40–41, MSA remains in the suit as a counterclaim defendant, *see* ECF Nos. 43, 47. In the filings, however, the parties continue to refer to MSA as a plaintiff. *See, e.g.*, ECF Nos. 89–90.

[2] The Parties stipulate to the accuracy of the facts in the Plaintiffs' Stipulated Facts, but Defendant does not stipulate to the materiality of the facts or the accuracy of facts referenced in the deposition testimony. Plaintiffs' Stipulated Facts at 1.

population consisted of approximately 86% to 90% Black and Hispanic students during the school years relevant to this dispute. *Id.* ¶ 21. SDP is a public school district, organized and existing under the Pennsylvania Public School Code, 24 P.S. §§ 1-101 *et seq.*, and the Philadelphia Home Rule Charter, that receives federal funds. *Id.* ¶ 2. In the 2021–2022 school year, approximately 71% of SDP's student population consisted of Black and Hispanic students. *Id.* ¶ 22.

SDP's Board of Education (the "Board") is the charter authorizer of all brick-and-mortar charter schools that operate within Philadelphia. The Board retains statutory authority to renew charters, oversee and evaluate charter schools, and to take action to close charter schools through nonrenewal or revocation if cause arises. *See* 24 P.S. §§ 17-1701-A, et seq. ("Charter School Law"); Plaintiffs' Stipulated Facts ¶ 4. A school charter is valid for a term of years and is evaluated for renewal, nonrenewal, or revocation at the end of its term. Plaintiffs' Stipulated Facts ¶¶ 4–5. The Board may, by majority vote, approve a charter renewal, issue notice of nonrenewal or notice of revocation, or deny renewal or revoke a charter after public hearings and a comment period. ECF. No. 88-5 at 3 ("Board Policy 401")*.* These decisions are guided by the Board's commitment "to a charter school performance framework that establishes clear and transparent standards for charter school academic performance, financial health, governance, and operations." *Id.*; Plaintiffs' Stipulated Facts ¶ 9. Comprehensive review of a charter school is required by Pennsylvania law prior to the renewal of the charter school's charter. Plaintiffs' Stipulated Facts ¶ 11. Under the Charter School Law, a local board of school directors may revoke or decline to renew a charter school's charter if cause arises. *Id.* ¶ 12.

### 2. The Charter School Performance Framework and Academic Success Domain

The Board delegated responsibility to the Charter Schools Office ("CSO") to develop administrative procedures to implement and enforce Board Policy 401. ECF No. 88-5 at 4;

Plaintiffs' Stipulated Facts ¶ 14. The CSO monitors charter schools annually and evaluates performance during the charter term and when a charter school applies for a charter renewal. *Id.*

### a) *The Charter School Performance Framework*

To that end, SDP developed the Charter School Performance Framework ("Framework") to "annually monitor charter school performance and evaluate performance [of charter schools] during the charter term and when a charter school applies for charter renewal." *Id.* ¶ 5; *see* Board Policy 401 at 4. The current Framework, revised during the 2017–2018 school year and implemented in the spring of 2018, Plaintiffs' Stipulated Facts ¶ 33, evaluates three areas of charter school performance referred to as "domains": (1) Academic Success, (2) Organizational Compliance and Viability, and (3) Financial Health and Sustainability, *Id.* ¶ 6; ECF No. 88-28 ("Framework") at 1.

The CSO issues an Annual Charter Evaluation - Renewal ("ACE-R") report for each charter school evaluated for renewal under the Framework.[3] Plaintiffs' Stipulated Facts ¶ 15. The ACE-R applies the Framework to evaluate a charter school's performance. *Id.* The CSO then communicates a recommendation as to whether the school's charter should be renewed based on

---

[3] The CSO website describes the review as follows:

> The Charter Schools Office (CSO), on behalf of the Board of Education (Board), conducts a comprehensive review of each charter school seeking renewal, and then presents a formal evaluation and renewal report (ACE-R) to the Board.

> The comprehensive review are [sic] based on the Charter School Performance Framework and consider [sic] evidence of outcomes-based performance during the current charter term. The Charter School Performance Framework incorporates three domains:
> - Academic Success
> - Organizational Compliance and Viability
> - Financial Health and Sustainability

Plaintiffs' Stipulated Facts ¶ 13.

an assessment of the charter school's cumulative academic performance, operational compliance and financial health over the charter term. *Id.* The director of the CSO from 2018–2021, Christina Grant, testified that ACE-R reports represented the totality of information that was communicated to SDP's board for its consideration of charter renewals, unless Board members asked for additional information. *Id.* ¶ 17.

> According to the Framework:
>
> The domain ratings and supporting evidence are the main driver of renewal recommendations. Generally, charter schools that approach or meet the standard in the three domains will be recommended for a five-year renewal with or without conditions. Charter schools that do not meet the standard in one or more domains may be considered for nonrenewal. If the CSO renders a renewal recommendation, it will be based on a comprehensive review and evaluation of outcomes and compliance in relation to standards.

*Id.* ¶ 18. No charter school that has approached or met standards in all three domains on the ACE-R has been recommended for nonrenewal since the current Framework has been in use. *Id.* ¶ 19. In total, only two out of ninety-eight schools that have been evaluated under the Framework have been nonrenewed. *See* ECF No. 88-30.

### b) *The Academic Success Domain*

The Academic Success Domain ("ASD"), the only domain at issue in this litigation, is made up of three components for kindergarten through eighth grade schools: proficiency (40 points possible), growth (40 points possible), and attendance (20 points possible).[4] Framework at 2–4, 6. The standards for obtaining points and the points available are described in the following table:

---

[4] The ASD for high schools includes "Post Secondary Readiness" which adjusts the points available in each individual category. Framework at 5–6.

| Category | Standard | Points Available |
|---|---|---|
| Proficiency | PSSA[5] proficiency rates in ELA, Math, and Science at or above the District average | 20 |
| | PSSA proficiency rates in ELA, Math, and Science at or above the Similar Schools Group average | 20 |
| Attendance | Percentage of students attending 95% or more instructional days is at or above the District average or at or above the similar schools average | 10 |
| | Percentage of students attending fewer than 90% of instructional days is at or below the District average and at or below the similar schools average | 10 |
| Growth | Overall annual growth | 30 |
| | Lowest performing student annual growth | 10 |

Plaintiffs' Stipulated Facts ¶ 30.

The Similar Schools Group ("SSG") for the average comparison is determined as follows:

School performance will be compared against its similar schools group, a unique set of schools (minimum n=5) whose student demographics in rate of poverty, special education, and English Learners are similar to the subject school. Generally speaking, the similar schools comparison group will be comprised of all schools (for District operated schools, only those without academic admission criteria) that fall in the following range relative to the subject school: +/-10 percentage points poverty, +/-5 percentage points special education, and +/-7.5 percentage points English Learners. If fewer than five schools meet the criteria, the similar schools comparison group will include the next nearest demographically similar school(s) to reach a set of five schools for comparison to the subject school.

---

[5] In Pennsylvania, students in Grades 3 to 8 are administered Pennsylvania System of School Assessment ("PSSA") standardized testing in the subjects of English Language Arts ("ELA") and Math. Students in Grades 4 and 8 are also administered PSSA standardized testing in the subject of Science. Plaintiffs' Stipulated Facts ¶ 64.

*Id.* ¶ 31. Race is not a demographic factor considered in the SSG.[6] *Id.* The Growth category is based on the Pennsylvania Value-Added Assessment System ("PVAAS"), a value-added growth measure employed by the Pennsylvania Department of Education. *Id.* ¶ 32.

A domain rating is determined based on the percentage of points earned in total for the domain: greater than 75% – "Meets Standard," 45–75% – "Approaches Standard," and less than 45% – "Does Not Meet Standard." Framework at 6. For example, a charter school serving some combination of grades 3–8 could theoretically earn 0% of points in proficiency and still earn an "Approaches Standard" rating in the ASD by earning points for attendance and growth. ECF No. 90-1 ¶ 202 ("SDP Stipulated Facts").[7]

### c) *Development of the Academic Success Domain*

The ASD was revised during the 2017–2018 school year and implemented in the spring of 2018. Plaintiffs' Stipulated Facts ¶ 33. The CSO developed the SSG model as part of the revisions to the ASD. *Id.* ¶ 35. One of the purposes of the SSG model was to help mitigate the potential impact that demographics might have on school performance on the ASD. *Id.* ¶ 47.

On September 18, 2017, Roger Kligerman ("Kligerman"), the CSO's Program Manager for Data, emailed Dawnlynne Kacer ("Kacer"), the CSO's Executive Director, a PowerPoint presentation entitled, "Refining comparison groups for understanding charter performance." *Id.* ¶ 36. The PowerPoint presentation explained that one of the purposes of including comparison

---

[6] Several reasons were provided by CSO officials as to why race was not included as a demographic factor in the SSG. Marvin Barnes, a CSO data analyst who helped create the regression models that were used to develop the Framework, "testified that his understanding as to why race was not included as a demographic variable for determining the SSG was 'I believe it was because it was not as consistent across all of the different outcomes that we were looking at' from a statistical point across PSSA, Keystones, etc." SDP Stipulated Facts ¶ 166. In addition to ISP (poverty) being the "most consistent and reliable" variable that could be used in the SSG, the data on race could not be verified in the same way other variables could be verified. *Id.* ¶ 169. Student race is entered at the school level and many times is entered on site or not at all. *Id.*

[7] The Parties stipulate to the accuracy of the facts in the SDP Stipulated Facts, but Plaintiffs do not stipulate to the materiality of the facts or the accuracy of facts referenced in the testimony. SDP Stipulated Facts at 1.

groups in the Framework was to align the Framework with CSO principles of accountability and equity: "Accountability – Comparison averages recognize whether school performance is better, worse, or on par with schools serving similar students; Equity – The framework both accounts for and acknowledges the challenges that schools serving historically underperforming students . . . ." *Id.* ¶ 37. The PowerPoint presentation included color-coded tables which reported upon the adjusted R-squared values from several regression analyses performed by the CSO related to Keystone Exam outcomes, graduation rates, and PSSA outcomes. *Id.* ¶ 38. Each of the color-coded tables provided adjusted R-squared values that resulted from adding a given student demographic variable to the model. *Id.* The variables were: ISP (poverty), special education, English Learner, and Black/Hispanic. *Id.*

According to the PowerPoint presentation, the "'Adjusted R-squared' explains the extent to which an outcome can be explained by a combination of input variables. [It i]s on a 0–100% scale, with 100% being that all variation can be explained by the variable[.]" *Id.* ¶ 39 (alterations in original). Nine tables in the presentation reported the adjusted R-squared values regarding various demographic variables on PSSA outcomes. *Id.* ¶ 40. Columns A–C of each table reported the adjusted R-squared value resulting from testing ISP (poverty) percentage, special education percentage, and English Language Learner percentage as variables in the regression models. *Id.* Column D reflected the results of a statistical analysis including Black and Hispanic as variables. *Id.* According to the tables, the combination of ISP (poverty) percentage, special education percentage, English language learner percentage, and race accounted for variance between 62% and 87% in PSSA outcomes depending on the grade span and subject area. *Id.* In all nine of the color-coded tables, "Black" as a demographic factor was coded green as a "reliable predictor." *Id.* ¶ 41. In seven of nine color-coded tables, "Hispanic" as a demographic factor was coded green,

meaning that "the variable is a reliable predictor." *Id.* ¶ 42. At the high school level, "Black" and "Hispanic" as variables were not a reliable predictor of outcomes for Algebra I or Literature Keystone Exams. SDP Stipulated Facts ¶ 159. The adjusted R-squared results found in the presentation do not indicate whether or how the results account for students who may fall in multiple categories. *Id.* ¶ 158.

Kligerman testified that "there was the desire to ensure that any revisions to the framework would not inherently lead groups of schools serving high populations or higher populations of students in poverty to automatically kind of not meet the threshold for renewal." Plaintiffs' Stipulated Facts ¶ 45. "If we were to only compare schools to the [SDP] average, schools with more than 80% of students living in poverty will almost always fail the proficiency category within the framework." SDP Stipulated Facts ¶ 173.

In a May 30, 2018 document entitled "Form of Charter – Talking Points," the CSO described the "Intent" of the Framework, in part, as measuring "a school's academic achievement as compared to District averages and as compared to the averages of schools serving a similar population of students called a 'similar schools group'" in light of the "great diversity of schools across Philadelphia." *Id.* ¶ 49.

On October 25, 2018, after the current version of the ASD was developed, an explanation of SSGs was added to the SDP's website on a webpage related to the CSO:

> SSGs provide a fair and realistic way of measuring schools' Academic Success in context. We know that schools across a city as large and varied as ours can have populations that differ in ways that make direct comparisons for decision-making purposes illogical and unfair. Additionally, we know that even though great schools and great teaching can help level the playing field, non-school factors have significant impacts on student achievement, and should be considered when assessing the quality of the school . . .

> To evaluate a charter school's Academic Success, in addition to comparing it to the District, we also compare the school to its SSG, for an apples-to-apples comparison.

*Id.* ¶ 52.

### d)    *Demographic Achievement Challenges*

The Parties agree there is a racial achievement gap in which Black and Hispanic students have, in the aggregate, underperformed their peers with respect to measures of academic performance. SDP Stipulated Facts ¶ 62. This gap is the result of multiple complex factors and not the result of inherent racial differences. *Id.* ¶ 211.

For example, in an April 2021 report from the SDP's Office of Research and Evaluation, which evaluated PSSA math performance trends from 2015–2016 to 2018–2019 in SDP operated schools, "there were wide differences in performance levels across students of different races/ethnicities." Plaintiffs' Stipulated Facts ¶ 66. The report noted that "[o]ver half of Asian students scored either Proficient or Advanced (51.9%), compared with 10.2% of Black/African American students and 12.5% of Hispanic/Latino students."[8] *Id.* Other reports recognized similar achievement gaps for Black and Hispanic students. *See, e.g.*, *id.* ¶ 68.

In 2021, the SDP publicly committed itself to anti-racism and pledged to disrupt systemic racism. *Id.* ¶ 69. Through an open letter to the entire SDP Community, SDP's former superintendent, Dr. William R. Hite, expressed the SDP's commitment to "taking aggressive actions to eradicate [racism's] existence from our school system" and stressed that the approach taken must not be passive or disjointed in dismantling racism within the system. *Id* (alteration in original).

In August of 2022, the SDP's Office of Research and Evaluation reported the results of the statistical analysis it performed to assess the relationship between various factors and student

---

[8] For each of the PSSA subjects, a student receives a score ranging from (in order from lowest to highest): below basic, basic, proficient, to advanced. *Id.* ¶ 65.

performance. *Id.* ¶ 53. Three of the factors evaluated were the percent of students in special education programs, percent of students classified as economically disadvantaged, and percent of English Learners. *Id.* ¶ 54. The report also stated, "[a]s a result of hundreds of years of systemic and structural inequities in the United States of America, we know that schools vary in ways that are directly related to the demographics of the enrolled student population, so we always look at the difference in outcomes for different student groups." *Id.* ¶ 55.

The Office of Research and Evaluation examined data from 166 SDP-operated schools serving PSSA testing grades and conducted an ordinary least square regression analysis to assess which set of predictor variables best predict student performance on the PSSA. *Id.* ¶ 56. The predictor variables were the combined demographic variables (poverty, special education status, and English language learner status) as well as school climate and staffing. *Id.* Race was not considered as a variable for this analysis. *Id.* The Office of Research and Evaluation determined that the three combined demographic factors under review accounted for 50.1% of variance in ELA performance and 53.5% of Math performance, *id.* ¶ 57, the demographic factors had a large effect size, *id.* ¶ 59, and the report concluded that the demographic variables "are strongly related to student ELA and Math performance," *id.* ¶ 60.

### 3. MSA is Chosen as a Renaissance School But Fails to Meet Standards

The School District of Philadelphia as a whole has faced performance challenges. From December 21, 2001, until June 30, 2018, the SDP was declared a distressed school district and was governed by the School Reform Commission. SDP Stipulated Facts ¶ 7. The School Reform Commission launched the Renaissance School Initiative in response to the existence of chronically underperforming SDP schools that were not "serving the needs of students and families and ha[d] not made adequate yearly progress as defined by state and federal laws." *Id.* ¶¶ 44–45. A

Renaissance School is a public school that serves students in a surrounding neighborhood that can take one of three forms, including a charter school. *Id.* ¶ 46. As part of the request for proposals, the application stated that applicants awarded a school for Renaissance conversion would be expected to demonstrate marked improvement in student achievement and attendance, among other areas. *Id.* ¶ 62. Further, "[t]he Renaissance Schools initiative [sought] to achieve dramatic improvements in schools by offering increased autonomy in exchange for increased accountability. As a result of the autonomy granted to the Renaissance Schools, the School District expect[ed] to see dramatic gains in student achievement." *Id.* ¶ 63.

The SDP solicited third-party proposals to operate Renaissance Schools. *Id.* ¶ 48. American Paradigm Schools, MSA's Charter Management Organization, applied to operate a Renaissance School. *See* ECF 88-11 at 5; *see generally* ECF No. 88-9 ("2012 Charter"). American Paradigm Schools' application for MSA touted PSSA scores for one of its other schools highlighting the improvement of those scores over time. 2012 Charter at 123–26. In the application, American Paradigm Schools broke down PSSA scores by subject and various demographic groups—including White, Black, Lat/Hisp, IEP, and Economically Disadvantaged. *Id.* The application also highlighted the attendance rates of American Paradigm Schools' other Philadelphia school. *Id.* at 130. The SDP granted MSA an initial charter of five years to operate John Paul Jones Middle School as a Renaissance Charter School. Plaintiffs' Stipulated Facts ¶¶ 66–67; 2012 Charter at 2, 6.

During its initial charter period, Antoinette Powell ("Powell"), MSA's CEO and Principal, presented MSA's board with "ambitious, but . . . achievable" academic goals for the 2016–2017 school year that included "increasing the number of students scoring advance[d] or proficient on

the PSSA exam by 7% [to] 19% in ELA, 9% in math [and] 17% in science." SDP Stipulated Facts ¶ 74 (alterations in original).

During the 2016–2017 school year, the CSO conducted a review of MSA's performance and operations during this initial five-year charter term. *Id.* ¶ 75. In April of 2017, the CSO issued a report that applied an earlier renewal framework[9] to MSA's performance from 2012 through 2016 and found the school had failed to meet the "Academic Success Renaissance" domain standard, receiving the score of "Does Not Meet Standard."[10] *Id.* ¶¶ 76–79; ECF No. 88-11 at 10. "Academic Success – MS Renaissance" did not include comparisons to the SDP average, instead it compared MSA to peer schools."[11] *See* ECF No. 88-11 at 11. The report included a narrative that laid out the areas where MSA did not meet the standard for academic success, including, *inter alia*, failing to meet academic proficiency trend improvement, failing to exceed the peer school proficiency average in any year, and failing to meet the attendance standard. SDP Stipulated Facts ¶ 78.

---

[9] This earlier framework is not the Framework referred to in the Complaint. *Id.* ¶ 80.

[10] The previous Academic Success domain was evaluated in a Renewal Recommendation Report asking the following Guiding Questions:

> Trend: Did the charter school's proficiency outcomes increase from pre-Renaissance values and over the term of the charter? (Renaissance Charter Standard)

> Proficiency: Were the charter school's proficiency outcomes higher than School Progress Report (SPR) peer group averages? (Renaissance Charter term standard)

> Growth: Did the charter school meet or exceed the statewide growth standard throughout the charter term?

> Attendance: Was the charter school's attendance at or above the median of similar type schools? Did attendance rates increase over the charter term?

SDP Stipulated Facts ¶ 79; ECF No. 88-11 at 2.

[11] "Peer schools include Alternative Middle Years at James Martin, Aspira Charter School at Stetson, Austin Meehan School, Feltonville School of Arts and Sciences, Grover Washington, Jr. School, [MSA], Middle Years Alternative School, Penn Treaty High School, Roberto Clemente School, Russell H. Conwell School, Universal Charter School at Vare, Warren G. Harding School, William T. Tilden School and Woodrow Wilson School." ECF No. 88-11 at 10 n.7.

As a result, the CSO recommended that the School Reform Commission not renew MSA's charter. *Id.* ¶ 76. However, the School Reform Commission tabled MSA's notice of nonrenewal at its May 1, 2017 meeting. *Id.* ¶ 82. MSA continued to operate after June 30, 2017. *Id.* ¶ 81.

In August of 2017, Powell sent her self-evaluation and school goals to American Paradigm School's CEO, Richard Trzaska ("Trzaska"). *Id.* ¶ 83. These goals were tied to PSSA proficiency increases, PVAAS goals, and Star Benchmark goals. *Id.* The goals included increasing proficiency scores on PSSA testing by 3% in each subject. *Id.* Powell believed these goals were achievable. *Id.* Trzaska thought these goals were "fair," "could be obtained," and were "appropriate" and "achievable" even though some of them were tied to PSSA gains. *Id.* ¶ 84.

On January 18, 2018, the School Reform Commission directed the CSO to negotiate with MSA on the terms of a renewal charter. *Id.* ¶ 85–86. The CSO then engaged in negotiations with MSA regarding the charter and its language. *Id.* ¶ 87. Powell, Trzaska, and MSA employee Ryan Scallon exchanged emails and met with CSO employee Lauren Iannuccilli ("Iannuccilli") and Kacer to discuss the charter renewal, and Trzaska felt the meeting was "collaborative and positive." *Id.* ¶ 89, 92. Kacer, Powell, and Trzaska exchanged more emails, and Powell sent the "Draft Terms and Conditions" on March 12, 2018, to receive feedback. *Id.* ¶¶ 93–94. The Draft Terms and Conditions, shared and discussed by MSA's board and leadership team, included PSSA proficiency and attendance goals that Trzaska believed to be "viable goals" that were "appropriate" and "achievable." *Id.* ¶¶ 94–96. After a series of emails, Kacer provided feedback to Powell suggesting that many of the academic success conditions, namely those tied to PSSA score improvement, were too aggressive and that they could be tied instead to the averages of similar schools. *Id.* ¶ 98. Conversely, Kacer suggested changes to the attendance metrics that were more rigorous than the Draft Terms and Conditions. *Id.* Powell sent an updated draft to CSO officials

on March 23, 2018 which included lower PSSA score targets and slightly more rigorous attendance conditions. *Id.* ¶ 99.

### 4.     The Negotiated 2018 Charter Agreement and Surrender Clause

On June 15, 2018, Kacer emailed Gerald Santilli, Powell, and Sandra Farmer the Framework, effective July 2018, and the proposed charter agreement for MSA. *Id.* ¶ 101. After deliberation from the Board of Trustees of MSA, SDP and MSA representatives signed the charter ("2018 Charter"). *Id.* ¶¶ 103, 109. The 2018 Charter included various conditions for renewal, including annual proficiency rates exceeding the SSG, aggregate increases in PSSA math scores, and certain attendance requirements.[12] *Id.* ¶ 105. In the 2018 Charter, the parties agreed to a "Surrender Clause" in which MSA "acknowledged and agreed":

---

[12] The 2018 Charter provides:

> **I. Conditions for Renewal.** Pursuant to the Resolution [SRC-10], the Charter School must comply with certain conditions for renewal ("Conditions for Renewal") based on the comprehensive renewal review as set forth in this Paragraph. Failure to comply with the conditions for Renewal as set forth below may be a basis for revocation or nonrenewal of the Charter School's Charter.
>
> 1. PSSA proficiency shall be higher than the annual proficiency rate average of the Charter School's Similar Schools Group in at least 2 of 3 tested subjects in the 2017-2018 school year (year 1 of the Charter Term) and in 3 of 3 tested subjects in year 2 (2018-2019 school year), year 3 (2019-2020 school year) and year 4 (2020-2021 school year) of the Charter Term. The Charter School shall seek to close the proficiency gap with School District averages annually (increasing proficiency trend) by the end of the 2020-2021 school year, year 4 of the Charter Term, in Science and English Language Arts. ("Condition 1")
>
> 2. The Charter School shall have minimally a three (3) percentage point increase in PSSA Math proficiency from both the baseline proficiency rate of 6.43% (2016-17 school year) by the 2018-2019 school year and also from the Charter School's 2018-2019 school year proficiency rate by the end of the 2020-2021 school year; a total of a minimum of six (6) percentage point proficiency rate increase in PSSA math. ("Condition 2")
>
> 3. The percentage of students attending 95% or more instructional days shall be higher than Similar Schools Group averages in all instances during the first four year of the Charter Term. Additionally, the Charter School will close the gap in attendance with the School District so that the Charter School's percent of students attending 95% or more days of school exceeds the School District average by the 2020-2021 school year. ("Condition 3")
>
> 4. The percentage of students attending fewer than 90% of instructional days (chronic absenteeism) shall have minimally a four (4) percentage point decrease from both the baseline chronic absenteeism rate of 34% (2016-2017 school year) by the 2018-2019 school year and also from the Charter School's 2018-2019 school year chronic absenteeism rate by the end of the 2020-2021 school year; a total of a minimum of eight (8) percentage point decrease in chronic absenteeism . . . ("Condition 4").

*Id.* ¶ 105.

**that if any of the academic conditions** including specific performance targets, set forth in Article I, Section I **are not met fully by [MSA], [MSA] will surrender and forfeit its charter and will close on or before June 30, 2022**. The Charter School will dissolve without protest and without recourse to the State Charter School Appeal Board or to any court of competent jurisdiction. The [CSO] will make a determination on whether any of the academic targets set forth above are not met fully by [MSA] once data for 2020-21 school year are available and made public.

*Id.* ¶ 106 (emphasis added). The School Reform Commission approved MSA's 2018 Charter by resolution on June 21, 2018. *Id.* ¶ 110.

### 5.    2022 Review of the 2018 Charter and Decision to Close MSA for Failure to Satisfy the Agreed Conditions

In May of 2022, the CSO issued a 2021–2022 ACE-R Report ("Report") through which it applied the Framework to MSA's charter renewal request and evaluated MSA's performance on the conditions. Plaintiffs' Stipulated Facts ¶ 24. The Report stated that MSA failed to meet Conditions 1 and 2 in its 2018 Charter for the 2018–19 school year and Conditions 3 and 4 throughout the charter term. SDP Stipulated Facts ¶ 119; *see* ECF No. 88-19 ("Report") at 27.

The Report provides that "[t]hese ratings and the substance of the evidence within each domain guide the overall renewal recommendation. If a charter school receives a 'Does Not Meet Standard' rating in one or more domains, the CSO will review all evidence and data underlying the ratings to determine whether it will recommend a charter school for non-renewal." Report at 1. The Report included that MSA earned a "Does Not Meet Standard" rating for the Academic Success Domain. SDP Stipulated Facts ¶ 120. MSA obtained the following scores in the ASD: 15% of points possible in PSSA Proficiency, 93% of points possible in PSSA Growth, and 0% of

points possible in attendance and chronic absenteeism. Report at 7–8. The Report did not contain any written renewal recommendation by the CSO.[13] SDP Stipulated Facts ¶ 121.

The PSSA data in the Report is as follows:

| PSSA Proficiency Rates | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | ELA Grades 3-8 | | | Math Grades 3-8 | | | Science Grades 4 & 8 | | |
| Points Possible: | 4 per year | | | 4 per year | | | 2 per year | | |
| School Year | This School | Similar Schools | District Schools | This School | Similar Schools | District Schools | This School | Similar Schools | District Schools |
| 2017-18 | 22% | 21% | 38% | 6% | 8% | 21% | 18% | 10% | 27% |
| 2018-19 | 20% | 21% | 38% | 5% | 9% | 22% | 9% | 18% | 33% |
| 2019-20 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 2020-21 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |

| PSSA Average Growth Indexes | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | ELA Grades 4-8 | | Math Grades 4-8 | | Science Grade 4 | | Science Grade 8 | |
| Points Possible: | 2.5 per year | 1 per year | 2.5 per year | 1 per year | 1.25 per year | 0.25 per year | 1.25 per year | 0.25 per year |
| School Year | All Students | Lowest Performing | All Students | Lowest Performing | All Students | Lowest Performing | All Students | Lowest Performing |
| 2017-18 | 3.61 | 1.41 | 2.71 | 0.29 | N/A | N/A | 0.77 | 1.94 |
| 2018-19 | 1.74 | 0.75 | 0.86 | -0.72 | N/A | N/A | -1.91 | 0.91 |
| 2019-20 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 2020-21 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |

Report at 7 (red text in original).

The attendance data in the Report is as follows:

---

[13] The coversheet for the SDP's Board resolution that invoked the Surrender Clause stated as follows: "A renewal evaluation of Memphis Street was completed by the Charter Schools Office in 2021-22 and the latest Annual Charter Evaluation *with nonrenewal recommendation* was completed in 2022 (ACE-R Report)." Plaintiffs' Stipulated Facts ¶ 80 (emphasis added).

| 95%+ Attendance Rates | | | |
|---|---|---|---|
| School Year | This School | Similar Schools | District Schools |
| 2017-18 | 31% | 41% | 49% |
| 2018-19 | 28% | 53% | 52% |
| 2019-20 | 40% | 48% | 60% |
| 2020-21 | 24% | 50% | 57% |

| Chronic Absenteeism Rates | | | |
|---|---|---|---|
| School Year | This School | Similar Schools | District Schools |
| 2017-18 | 38% | 33% | 26% |
| 2018-19 | 44% | 23% | 23% |
| 2019-20 | 33% | 36% | 19% |
| 2020-21 | 61% | 33% | 29% |

Report at 8 (red text in original).

On June 23, 2022, SDP's Board adopted Action Item No. 89, which found MSA to be in violation of the academic "Conditions for Renewal" referenced in the Charter that trigger the Surrender Clause and formally invoked the Surrender Clause to demand that MSA surrender its Charter and close by June 30, 2023. SDP Stipulated Facts ¶ 122. The Board voted to approve Action Item No. 89. *Id.* ¶ 123. The action item did not mention the MSA rating of "Does Not Meet Standards" in the ASD as a basis for its decision. *Id.* ¶ 124. Board Member Lisa Salley and Board President Reginald Streater both testified their decision to vote "yes" to exercise the Surrender Clause was based on the agreements made in the 2018 Charter. *Id.* ¶¶ 125–26.

### C.    PROCEDURAL BACKGROUND

On February 8, 2023, Plaintiffs and MSA filed their Second Amended Complaint. ECF No. 32. Defendant filed a Motion to Dismiss on March 8, 2023, ECF No. 36, and the Court dismissed Counts II and IV of the Second Amended Complaint, ECF No. 41. On July 10, 2023, Plaintiffs (including MSA) filed an interlocutory appeal, ECF No. 42, and Defendants filed their Answer to the remaining claims of the Second Amended Complaint, which included a counterclaim that the SDP was entitled to declaratory judgment regarding the Surrender Clause of MSA's 2018 Charter, ECF No. 43 at 52–61. Plaintiffs and MSA answered the counterclaim. ECF No. 47. After extensive motion practice in discovery, *see, e.g.*, ECF Nos. 46–71, 78–85, and dismissal of the interlocutory appeal for lack of appellate jurisdiction, ECF No. 76, the parties provided stipulated joint exhibits and filed their respective Motions on December 6, 2024, ECF Nos. 88–90. Each party filed a response, reply, and sur-reply pursuant to an extended briefing schedule. ECF Nos. 93–103. Accordingly, the Motions are ripe for consideration.

## II.    <u>LEGAL STANDARD</u>[14]

A district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Therefore, "[s]ummary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Wright v. Owens Corning*, 679 F.3d 101, 105 (3d Cir. 2012) (quoting *Orsatti*

---

[14] To the extent the Legal Standard and Discussion sections of this Memorandum use the same or similar language as Defendant's Motion, the Court notes the language is derived from its recent opinion in *Sargent v. School District of Philadelphia*, No. CV 22-1509, 2024 WL 4476555 (E.D. Pa. Oct. 11, 2024).

*v. New Jersey State Police*, 71 F.3d 480, 482 (3d Cir. 1995)). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). There is a genuine issue of material fact if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The party moving for summary judgment bears the initial burden "of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). Once the moving party has met this burden, the non-moving party must counter with "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis removed) (internal quotations omitted); *see also* Fed. R. Civ. P. 56(c)(1). The non-movant must show more than the "mere existence of a scintilla of evidence" for elements on which the non-movant bears the burden of production, *Anderson*, 477 U.S. at 252, and may not "rely merely upon bare assertions, conclusory allegations or suspicions," *see Fireman's Ins. Co. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982), or arguments made in briefs, as those "are not evidence," *Jersey Cent. Power & Light Co. v. Lacey Twp.*, 772 F.2d 1103, 1109–10 (3d Cir. 1985).

When determining the existence of a genuine issue of material fact, a court must "examine the evidence of record in the light most favorable to the party opposing summary judgment[] and resolve all reasonable inferences in that party's favor." *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). The court need only decide whether "a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson*, 477 U.S. at 252. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine

issue for trial'" and the court should grant summary judgment in favor of the moving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (citation omitted).

III.   **DISCUSSION**

MSA was granted a charter under the Renaissance Schools Initiative for the purpose of dramatically improving outcomes of the students it serves. SDP Stipulated Facts ¶ 63; Plaintiffs' Stipulated Facts ¶¶ 66–67. American Paradigm Schools touted the attendance and PSSA scores of the various demographic groups in its application for a Renaissance School conversion. 2012 Charter at 123–26. MSA was given increased autonomy in exchange for increased accountability. SDP Stipulated Facts. ¶ 63. After its first five years of operation MSA did not meet the academic standards in the renewal framework used at the time. SDP Stipulated Facts ¶¶ 76–79. When those metrics were not met, MSA and the SDP agreed to certain conditions in MSA's 2018 Charter. *See id.* ¶¶ 103, 109. MSA's leadership described the PSSA and attendance metrics as "achievable" and "fair." *Id.* ¶ 84. When reviewed again in 2022, MSA failed to meet the conditions it agreed to in its 2018 Charter. *Id.*  ¶ 119; *see* Report at 27. The Board held MSA accountable and voted to exercise the Surrender Clause. *Id.* ¶ 122. Instead of surrendering its charter and closing, MSA continues to operate. ECF No. 90 at 13.

As discussed below, Defendant has established in the record an appropriate exercise of the valid Surrender Clause. MSA, as counterclaim defendant, has not pointed to evidence in the record that shows a dispute of material fact as to any of its affirmative defenses. Accordingly, the Court grants Defendant's counterclaim.

Plaintiffs allege that the Framework is unlawful because it is based (in part) on PSSA scores and attendance, two metrics on which minority students historically underperform. Amended Complaint ¶¶ 38–47, 54. Count I alleges the SDP's closure of MSA through the exercise of the Surrender Clause violates 42 U.S.C. § 2000d, Title VI of the Civil Rights Act of 1964 ("Title VI"),

and Article I, Section 29 of the Pennsylvania Constitution ("Section 29"), by depriving MSA's students access to MSA's educational program on the basis of the racial demographics of MSA's student population. Amended Complaint ¶¶ 206–15. Count III alleges the Framework unlawfully discriminates against predominantly Black and/or Hispanic charter schools and their students by putting such schools at a heightened risk of closure by using the ASD which relies on measures that are heavily biased against Black and/or Hispanic students in violation of Title VI and Section 29. *Id.* ¶¶ 206–215.

Plaintiffs have not pointed to evidence in the record that shows the exercise of the Surrender Clause or continued use of the ASD as part of the Framework are racially discriminatory under Title VI or Section 29. Accordingly, the Court grants Defendant's Motion and denies Plaintiffs' Motion.

## A.    DEFENDANT'S DECLARATORY JUDGMENT COUNTERCLAIM

SDP moves for summary judgment on its counterclaim that it is entitled to declaratory judgment on the following issues: (1) MSA failed to meet its academic conditions under the 2018 Charter, (2) the SDP Board properly exercised the Surrender Clause of the 2018 Charter, and (3) MSA refused to surrender the charter or close. ECF No. 90 at 13. After reviewing the record in the light most favorable to MSA, MSA has not shown that there is a genuine dispute of material fact that SDP's exercise of the Surrender Clause was improper. The Court therefore grants summary judgment on SDP's declaratory judgment counterclaim, finding that the Surrender Clause in the 2018 Charter is valid and was properly exercised by the SDP.

### 1.    The 2018 Charter and Proper Exercise of the Surrender Clause

As part of its Renaissance Charter Initiative application, MSA's application included that it would be expected to demonstrate significant improvement in student achievement and

23

attendance. SDP Stipulated Facts ¶ 62; ECF No. 88-9 at 37. Further, "[t]he Renaissance Schools Initiative seeks to achieve dramatic improvements in schools by offering increased autonomy in exchange for increased accountability. As a result of the autonomy granted to the Renaissance Schools, the School District expects to see dramatic gains in student achievement." SDP Stipulated Facts. ¶ 63.

The CSO evaluated MSA in the 2016–2017 school year. *Id.* ¶ 75. The 2016–2017 review of MSA was based on a previous framework and did not compare MSA's PSSA scores or attendance with the SDP average. *See* ECF No. 88-11. The CSO found that MSA failed to meet its academic performance expectations and recommended MSA's charter be nonrenewed. SDP Stipulated Facts ¶ 76. Instead of proceeding with the nonrenewal recommendation, the School Reform Commission directed the CSO to negotiate a renewal charter with MSA. *Id.* ¶ 82. The CSO and MSA negotiated and executed the 2018 Charter, which was approved by the School Reform Commission on June 21, 2018. *Id.* ¶¶ 103, 109–10. These negotiations included the CSO suggesting that MSA set more realistic goals for its anticipated improvement in PSSA scores. *Id.* ¶ 99. The 2018 Charter contained various conditions—including academic conditions. *Id.* ¶ 105. It also included the agreed upon Surrender Clause in which MSA agreed to surrender and forfeit its charter if it did not meet any of the academic conditions. *Id.* ¶ 106. The Surrender Clause stated the CSO "will make a determination on whether any of the academic targets set forth [in the 2018 Charter] are not met fully by [MSA] once data for the 2020-21 school year are available and made public." *Id.* With signed charter in hand, MSA continued operation. *Id.* ¶ 115.

Data for the 2020–2021 school year became available during the 2021–2022 school year— the same year that MSA's 2018 Charter was being evaluated for renewal. Plaintiffs' Stipulated Facts ¶ 75. On May 23, 2022, the CSO issued MSA's Report. ECF No. 88-19. The Report

evaluated the extent to which MSA met the conditions outlined in the 2018 Charter and also applied the Framework. *See id.* at 27. The Report's summary provides that MSA failed to meet the PSSA proficiency conditions (Conditions 1 and 2) in 2018–2019[15] and did not meet the requirements of the attendance conditions (Conditions 3 and 4) throughout the charter term. *Id.* at 27.

Specifically, MSA did not meet Condition 1 in 2018–2019 because, after exceeding the scores of the Similar Schools Group in 2017–2018 in ELA and Science, MSA's proficiency rates dropped in every subject, and none exceeded those of the Similar Schools Group.[16] *Id.* at 7. MSA did not meet Condition 2 in 2018–2019 since MSA's Math PSSA proficiency dropped to 5% in 2018–2019 rather than increasing proficiency by 3%. *Id.* MSA did not meet Condition 3 because at no point did its percentage of students attending 95% or more of the instructional dates exceed the SSG average nor did MSA's percentage exceed the SDP's average in 2020–2021. *Id.* at 8. Lastly, MSA did not meet Condition 4 because chronic absenteeism increased in 2018–2019 to 44% and then to 61% in 2020–2021. MSA failed to meet any of its conditions pertaining to academic success included in its 2018 Charter.

Beyond MSA's failure to meet any of the conditions it agreed to, the data in MSA's Report is bleak. For example, the ACE-R provides demographic and grade-level breakdown for Regular Attendance[17] and Chronic Absenteeism.[18] *Id.* at 22–23. In every demographic that is applicable to MSA, MSA scored well below the average of the SDP and SSG. *Id.* For example, only 15% of

---

[15] State tests were not administered during the 2019–2020 school year and participation was limited during the 2020–2021 school year due to the COVID-19 pandemic. Report at 7. Accordingly, the Report did not include PSSA scores from the 2019–2020 or 2020–2021 school years. *Id.*

[16] The academic conditions are quoted in full in note 9, *supra.*

[17] "Regular Attendance rates reflect the percentage of students that attended 95% or more school days. This is equivalent to having 9 or fewer days of absence during a 180-day school year." *Id.* at 22.

[18] "Chronic Absenteeism rates reflect the percentage of students that were not present for 10% or more school days. This is equivalent to missing at least one day of school every two weeks in a 180-day school year." *Id.* at 23.

MSA's white students regularly attended school and 74% were chronically absent. *Id.* These rates are starkly worse than the rates for white students at SSG schools. *Id.* At SSG schools, white students' regular attendance was approximately 50% and chronic absenteeism was approximately 45%. *Id.* Students in the fifth grade were MSA's **only** group of students that beat the SDP and SSG averages for Regular Attendance and Chronic Absenteeism. *Id.*

The Board determined MSA violated the specific academic conditions contained in the 2018 Charter. ECF No. 88-20 at 2–3. The SDP then adopted Action Item No. 89, which found MSA in violation of the 2018 Charter conditions and formally invoked the Surrender Clause. ECF No. 88-20; 88-51 at 2. Board Member Salley and Board President Streater both testified their decision to vote "yes" to exercise the Surrender Clause was based on the agreements made in the 2018 Charter. *Id.* ¶¶ 125–26.

### 2.    The Court's Previous Rulings and MSA's Affirmative Defenses

The Court previously held that the Surrender Clause of the 2018 Charter had not lapsed, it did not violate the Charter School Law or MSA's due process rights, and its inclusion did not void the 2018 Charter under a theory of coercion. ECF No. 40 at 7–9. The Court also held that the Education Clause of the Pennsylvania Constitution had not been violated. *Id.* at 10–12. In doing so, the Court dismissed Counts II and IV of the Second Amended Complaint. ECF No. 41.

Subsequently, MSA answered Defendant's Counterclaim and asserted a litany of affirmative defenses.[19] *See* ECF No. 47 at 10–51. Many of these affirmative defenses were

---

[19] The affirmative defenses are that the use of a Surrender Clause is part of a discriminatory scheme in violation of Title VI, ECF No. 47 at 10 ¶¶ 1–11, the Surrender Clause is inconsistent with the Charter School Law and due process, *id.* at 12 ¶¶ 12–70, the Surrender Clause violates the Education Clause of the Pennsylvania Constitution, *id.* at 26 ¶¶ 71–92, the SDP considered inapplicable conditions and/or the 2018 Charter is vague and ambiguous, *id.* 29 ¶¶ 93–102, the Surrender Clause is unconscionable, *id.* 31 ¶¶ 103–19, the right to exercise the Surrender Clause has lapsed or been waived, *id.* 34 ¶¶ 125–29, the statute of limitations has passed, *id.* 34 ¶¶ 125–29, there was a scrivener's error in the years being considered, *id.* 35 ¶¶ 130–39, the COVID-19 pandemic frustrated the purpose of the contract and made it impossible to complete triggering the force majeure provision of the 2018 Charter, *id.* 37 ¶¶ 140–57, laches,

rearticulations and renewed allegations of the claims previously ruled on by the Court. *See, e.g.,* *id.* at 12 ¶¶ 12, 120.

Defendant has shown that the 2018 Charter was a valid contract and the Surrender Clause was appropriately exercised. MSA must counter with "specific facts showing that there is a genuine issue for trial," *Matsushita,* 475 U.S. at 587, since it is incumbent on MSA to "plead and prove" its affirmative defenses, *Taylor v. Sturgell*, 553 U.S. 880, 907 (2008) (citing *Jones v. Bock*, 549 U.S. 199, 204 (2007)). MSA and Plaintiffs filed their own motion for summary judgment with subsequent reply as well as a response and sur-reply to Defendant's Motion. *See generally* ECF Nos. 89, 93, 99, 102. In each filing, MSA largely ignores the SDP's motion for summary judgment on its counterclaim that the Surrender Clause was properly exercised and MSA must surrender its charter. *See generally* ECF Nos. 89, 93, 99, 102.

Since the Court's ruling on the motion to dismiss, the SDP has developed an extensive record showing CSO and MSA worked together to execute the 2018 Charter. The CSO and MSA engaged in months of collaborative discussion to arrive at the 2018 Charter. SDP Stipulated Facts ¶¶ 85–100. MSA regularly had opportunity to discuss the process and particularities of the 2018 Charter with its leadership, board, and counsel. *Id.* ¶¶ 101–03. In fact, CSO Executive Director Kacer suggested more attainable goals than those presented by MSA CEO Powell. MSA's leadership thought the goals were attainable. *Id.* ¶¶ 94–96, 98. Both MSA and the School District signed the 2018 Charter, and MSA operated under the charter for years. *Id.* ¶ 113; ECF No. 89-1 Ex. A.

---

*id.* 47 ¶¶ 158–64, failure of condition precedent, *id.* 47 ¶¶ 165–66, and violations of the Fourteenth Amendment, *id.* 43 ¶¶ 1–38.

MSA, on the other hand, has not pointed to evidence in the record to show a dispute of material fact that supports their affirmative defenses. MSA must counter with specific facts that show a genuine dispute for trial in order to survive a motion for summary judgment.

### a)    *The record does not support MSA's race-based affirmative defenses*

The only affirmative defenses for which MSA makes a focused argument are tied to Plaintiffs' race-based claims, discussed in more detail below. Plaintiffs' race-based claims, however, are distinct from MSA's affirmative defense that the 2018 Charter and the Surrender Clause were part of a discriminatory scheme. Plaintiffs allege discrimination occurred as a result of comparing the PSSA scores and attendance of MSA, a school with a "high percentage" Black and Hispanic student body, to the SDP average, a school district with a student population of 71% Black and Hispanic students.[20] However, the framework applied to MSA's initial charter period, 2012–2017, did not compare MSA to the SDP average for PSSA scores or attendance in its academic review. Since the SDP did not use this comparison in the previous framework, there is no evidence in the record to suggest that the facially-neutral 2018 Charter, along with its academic conditions and Surrender Clause, are racially discriminatory. Similarly, there is no evidence in the record that shows the exercise of the Surrender Clause was racially discriminatory.

To start, the 2016–2017 Charter School Renewal Recommendation Report did not base its "Academic Success – MS Renaissance" evaluation on PSSA or attendance comparisons to the SDP average. *See* ECF No. 88-11 at 10. After five years in operation as a school that was intended to make significant improvements to its predecessor school, MSA did not meet the standard in its academic success "Trends," "Proficiency," or "Attendance." *Id.* at 10–12. From its pre-

---

[20] Plaintiffs use greater than or equal to 85% as a "high percentage" of Black and Hispanic students. Plaintiff's Motion at 3.

Renaissance conversion in 2011–2012 to the last year of its initial charter, MSA's PSSA Math proficiency dropped from 23.26% to 2.95% and ELA proficiency dropped from 16.52% to 12.84%. *Id.* at 11. The CSO recommended nonrenewal. *Id.* at 8.

Rather than proceeding with CSO's nonrenewal recommendation, the School Reform Commission approved Resolution SRC-5, which directed the CSO to negotiate with MSA on the terms of a renewal charter. SDP Stipulated Facts ¶ 85–86. The CSO and MSA's "collaborative and positive" efforts at negotiating a renewal charter, *id.* ¶ 89, 92, led to a draft goals provided by Powell, *id.* ¶¶ 93–94, and a final charter that was executed by the parties and then approved by the School Reform Commission, *id.* ¶¶ 103, 109–111. Trzaska believed the PSSA proficiency and attendance goals were "viable goals" that were "appropriate" and "achievable." *Id.* ¶¶ 94–96.

The 2018 Charter academic conditions are almost exclusively tied to comparisons to MSA's own prior performance or to the Similar Schools Group, not the School District average. For example, the only applicable provision in Condition 1 (due to lack of scores in subsequent years) compared MSA's PSSA scores to the SSG. Condition 2 was based only on MSA's percentage improvements in PSSA Math proficiency. Condition 3's regular attendance condition was tied to a comparison with the SSG for each year and the SDP in the final year. Condition 4 was based only on MSA's percentage improvements in chronic absenteeism. As discussed above, in Section III.A.1., the Report found that MSA violated each condition. The only condition tied to the SDP average, Condition 3, was also not met by MSA on SSG comparison grounds.

The conditions contained in the 2018 Charter reflect, in pertinent part, either expectations for improvement of MSA's own student performance or a comparison to a demographically similar set of schools. Plaintiffs' disproportionate impact arguments below depend on the racially distinct make-up of the schools that are part of the SDP average in the ASD. The disproportionate impact

arguments of the Plaintiffs against the Framework and ASD are inapplicable to MSA's affirmative defense since the conditions contained in the 2018 Charter compare MSA against itself similar schools.

The evidence also does not show a dispute of material fact that the Surrender Clause was invoked for reasons other than failing to meet the conditions contained in the 2018 Charter. MSA argues that the Surrender Clause was actually invoked because the Board relied on the ASD information in the Report. *See e.g.*, ECF No. 93 at 23. Two pieces of evidence support this argument: the Report the Board reviewed included the application of the Framework, *see* ECF No. 88-19, and the coversheet for the SDP's Board resolution that invoked the Surrender Clause stated, "[a] renewal evaluation of Memphis Street was completed by the Charter Schools Office in 2021-22 and the latest Annual Charter Evaluation *with nonrenewal recommendation* was completed in 2022 (ACE-R Report)." Plaintiffs' Stipulated Facts ¶ 80 (emphasis added). These shreds of evidence are not sufficient to show a dispute of material fact for an affirmative defense where MSA bears the burden of production.

Defendant has shown in the record that the Surrender Clause was invoked because MSA did not meet its academic conditions. SDP Stipulated Facts ¶¶ 125–26. MSA does not point to evidence to the contrary. Even if MSA pointed to evidence in the record that the SDP invoked the Surrender Clause because of the Framework, MSA's arguments would fail for the same reasons described in Section III.B., *infra*. MSA, as crossclaim defendant asserting affirmative defenses, has not pointed to a material dispute of fact that the 2018 Charter, the conditions, the Surrender Clause, nor the exercise of the Surrender Clause were racially discriminatory.

**b)      The record does not support MSA's other affirmative defenses**

MSA makes little argument in support of its affirmative defenses that are not tied to Plaintiffs' race-based discrimination claims. At most, MSA disputes that Conditions 3 and 4 of the 2018 Charter—related to attendance—were not "academic performance requirements" referenced in the Surrender Clause. ECF No. 93-1 at 6 ¶ 49. MSA does not direct the Court to the record to support this conclusory argument. *Id.* In any event, this argument is unavailing, since attendance has been part of the academic domain in every framework under which MSA has been reviewed. *See* ECF Nos. 88-11, 88-19. [21] MSA also provides a brief argument that the Surrender Clause should have been invoked in 2020 rather than 2022.[22] ECF No. 93 at 23–24. The Court previously held, "[t]he Surrender Clause does not require that SDP determine whether the academic targets were met by a specific date." ECF No. 40 at 7. SDP's decision to wait until all relevant data through the 2021–2022 school year was received to invoke the Surrender Clause—as anticipated in the Surrender Clause[23]—is not evidence supporting the timing-based affirmative defenses.

MSA agreed to surrender its charter if it did not meet certain conditions. It ratified and operated under the 2018 Charter for years, seeking only to invalidate the provisions of the 2018 Charter when the terms no longer benefited MSA. MSA has not pointed to any evidence in the record to show a dispute of material fact that support its affirmative defenses. The 2018 Charter is

---

[21] Under the previous framework, attendance was part of the "**Academic** Success - Renaissance" domain. ECF No. 88-11 at 10, 12 (emphasis added). Under the current Framework, attendance is part of the "**Academic** Success Domain." ECF No. 88-19 7–8 (emphasis added).

[22] Plaintiff's argue: "If SDP's aim was to hold MSA accountable to the Surrender Clause conditions, then SDP should have invoked the Surrender Clause and/or taken action to revoke MSA's charter in 2020. Instead, SDP waited two years, conducted a comprehensive renewal evaluation, and evaluated MSA's performance under the ASD before the CSO recommended MSA's nonrenewal and SDP's board finally decided in June 2022 to close MSA." ECF No. 93 at 23–24.

[23] "The [CSO] will make a determination on whether any of the academic targets set forth above are not met fully by the [MSA] once data for 2020-21 school year are available and made public." SDP Stipulated Facts ¶ 106.

a valid contract that is being validly enforced. Accordingly, the Court grants SDP's declaratory judgment counterclaim.

**B.      INDIVIDUAL PLAINTIFFS' RACE DISCRIMINATION CLAIMS: COUNT I AND COUNT III**

The individual Plaintiffs' remaining claims assert two counts of racial discrimination by Defendant in violation of Title VI and Section 29. Amended Complaint ¶¶ 206–15, 228–33; ECF Nos. 40–41 (dismissing other counts). Specifically, the individual Plaintiffs allege that closure of MSA through the enforcement of the Surrender Clause deprives MSA's students access to MSA's educational program on the basis of race (Count I) and the use of the Framework to evaluate charter schools discriminates against predominantly Black and/or Hispanic charter schools and their students by placing such schools at a heightened risk of closure (Count III). Amended Complaint ¶¶ 210, 229. Since Plaintiffs, and not MSA, challenge MSA's closure and the continued use of the Framework through Counts I and III, the Court will review the Title VI and Section 29 challenges.

The children at MSA took the PSSA—a facially neutral exam, and had their attendance recorded—a facially neutral metric. The Framework—a facially neutral review tool, is used by the CSO to evaluate all charter renewal applications. The ASD—a facially neutral domain within the Framework, considers PSSA scores and attendance. Thirty percent of the points available in the ASD,[24] 20% within "Proficiency" (PSSA scores) and 10% within "Attendance," are obtained through a direct comparison to the SDP's averages. That comparison, Plaintiffs argue, is intentional race discrimination. Plaintiff's Motion at 6.

---

[24] The complaint alleges 60% of the ASD "consists of measures that are heavily biased against Black and/or Hispanic students." Amended Complaint ¶¶ 209, 229. For the purposes of Plaintiffs' Motion, they only challenge 30% which involves comparison against the SDP average. Plaintiff's Motion at 6. The remaining 70% of the points available in the ASD are obtained through the growth category (40%) and through comparisons to the SSG (30%). Plaintiff's Stipulated Facts ¶ 30.

1.    **Title VI of the Civil Rights Act**

Plaintiffs and Defendant provide two different legal standards for the Court to analyze Plaintiffs' Title VI claims. However, under either standard, the Defendant is entitled to judgment on Counts I and III under Title VI.

a)    *Prohibitions of the Equal Protection Clause and Title VI are co-extensive*

Defendant directs the Court to the body of caselaw that analyzes the prohibitions of Title VI under the same standards as a federal Equal Protection claim. *See* ECF No. 90 at 21–48; ECF No. 98 at 2–3, ECF No. 94 at 14–41. Defendant's focus on the Equal Protection framework and *Doe ex rel. Doe v. Lower Merion School District*, 665 F.3d 524 (3d Cir. 2011) ("*Lower Merion*") is reasonable based on Plaintiffs' pleadings. Plaintiffs allege that the use of PSSA and attendance in the Framework to evaluate charter schools, while facially neutral, is based on a desire to target charter schools with student populations that are majority Black and/or Hispanic with potential closure. *See* Second Amended Complaint at ¶ 163. Plaintiffs' Second Amended Complaint explicitly lays out the "Discriminatory Impact," *id.* at 24–26, ¶¶ 108–121, and "Discriminatory Intent," *id.* at 31–39, ¶¶ 150–205, of the facts alleged. A plaintiff's challenge of a facially-neutral policy on the basis of "discriminatory impact" and "discriminatory intent" would suggest a challenge under the coextensive Equal Protection framework.

The question of whether claims challenging a race-neutral policy with alleged racist intent and impact survive turns on the same analysis and standards used to evaluate federal Equal Protection claims. *See Grutter v. Bollinger*, 539 U.S. 306, 343 (2003) (indicating that the prohibitions of the Equal Protection Clause and Title VI are co-extensive); *see also Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 287 (1978) (Powell, J.) ("Title VI must be held to proscribe

only those racial classifications that would violate the Equal Protection Clause."); *Lower Merion*, 665 F.3d at 557 (explaining same).

The Equal Protection Clause of the Fourteenth Amendment ("Equal Protection Clause") provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV § 1. When considering claims of racial discrimination, "[p]roof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Lower Merion*, 665 F.3d at 543 (citation omitted) (alteration in original). If a government action is motivated by a racially discriminatory intent or purpose, strict scrutiny applies. *See id.* at 543–56. Absent a racially discriminatory intent or purpose, the challenged government action "is subject only to rational basis review." *Id.* at 551 (quoting *United States v. Frazier*, 981 F.2d 92, 95 (3d Cir. 1992)).

Here, no fair-minded jury could find that the use of PSSA scores and attendance in the Framework were implemented with a racially discriminatory intent or purpose. Therefore, strict scrutiny does not apply; rational basis review does. Under rational basis review, the use of the ASD in the current Framework must be upheld because it is rationally related to a legitimate government interest: the Board fulfilling its mandatory responsibilities to evaluate the performance of charter schools to ensure all students are being provided with the level of education they deserve. Accordingly, Defendant is entitled to summary judgment on Plaintiffs' claims.

          i.     *Strict scrutiny does not apply because the SDP's use of the ASD is not done with racially discriminatory intent or for a racially discriminatory purpose*

The Supreme Court has recognized three circumstances that show racially discriminatory intent. First, racially discriminatory intent can be shown when "a law or policy explicitly classifies citizens on the basis of race." *Id.* at 543 (citing *Antonelli v. New Jersey*, 419 F.3d 267, 274 (3d Cir. 2005)). Second, intentional racial discrimination can also be shown when a "facially neutral law

or policy is applied differently on the basis of race." *Id.* (citing *Antonelli*, 419 F.3d at 274). Lastly, "a facially neutral law or policy that is applied evenhandedly" can still demonstrate intentional racial discrimination if it (1) has "a racially discriminatory impact" and (2) is "motivated by discriminatory intent." *Id.* (citing *Antonelli*, 419 F.3d at 274). A government action has a "racially discriminatory purpose" under the third category if (1) it is an explicit racial classification imposed by the government, *id.* (citing *Grutter*, 539 U.S. at 327); (2) it is applied differently on the basis of race, *id.* at 544 (citation omitted); or (3) "a plaintiff establishes a discriminatory purpose based on race," whether "explicit or inferable," *id.* (citation omitted).

Here, Plaintiffs argue that comparing a charter school's PSSA scores and attendance against the SDP average in the Framework is racially discriminatory. There is no evidence that the Framework classifies charter schools on the basis of race or that it is applied differently depending on race. Instead, the use of the Framework is a facially race neutral policy that is allegedly used to target charter schools with high percentages of Black and Hispanic students for closure. Plaintiffs claim this invidious motivation is apparent from (1) data evidencing a racially discriminatory impact, i.e., the threatened closure of certain schools with large percentages of Black and Hispanic students and/or academic conditions added to their charters, and (2) circumstantial evidence showing a racially discriminatory purpose. *See, e.g.*, Response at 29–36.

As further detailed below, there is no genuine dispute regarding the "purpose" prong. *See Lower Merion*, 665 F.3d at 549 ("To establish government action within the third alternative, a plaintiff is 'required to prove that the actions of . . . officials (1) had a discriminatory effect [or impact] and (2) were motivated by a discriminatory purpose.'" (alteration in original) (citation omitted)). Therefore, strict scrutiny does not apply.

_There is a genuine dispute of material fact on the "impact" prong._

"To establish discriminatory impact in a racial discrimination case, [Plaintiffs] must show that similarly situated individuals of a different race were treated differently." _Id._ at 550. In other words, a plaintiff must prove that the challenged state action results in a "racially disproportionate impact": that it "bears more heavily on one race than another." _Arlington Heights_, 429 U.S. at 265–66 (citation omitted).

Plaintiffs point to statistical evidence that children who are Black and Hispanic score, on average, consistently lower than students of other races on the metrics of standardized test scores and attendance. ECF No. 89-24 at 6–10. Since 71% of SDP's students are Black or Hispanic, schools with more Black and Hispanic students than the SDP average are at a structural disadvantage when their scores are compared to the SDP average. ECF No. 93 at 35. This structural bias places schools with more Black and Hispanic students at a greater chance than the average SDP school of obtaining a Does Not Meet standards rating on the ASD.

Plaintiffs argue the ASD performs a "critical gatekeeping function with respect to charter nonrenewal decisions," since the Framework "expressly states that a charter school will be considered for nonrenewal if it fails any of the domains, while it will not be considered for nonrenewal if it passes all three domains." _Id._ at 9. Accordingly, "failing one of the domains constitutes a tangible harm and an obvious risk to be avoided." _Id._ at 10. Further, Plaintiffs assert academic charter conditions tied to the ASD, even when a school obtains a score greater than Does Not Meet standards, are also discriminatory harms. _Id_. Plaintiffs point the Court to Table 19 of their Exhibit 31 to show that academic conditions are tied to low (though not always failing) ASD scores. ECF No. 93-4.

Defendant counters that Plaintiffs have not produced any record of discriminatory impact since an actual school closure or nonrenewal is the relevant harm, not a school receiving a Does Not Meet standards on the ASD. ECF No. 98 at 10. Further, since conditions are an agreement between a school and the SDP and cannot be unilaterally imposed, they are not a harm to a charter school. *Id.* at 11. Defendant also clarifies that the Framework does not set up a mandatory consideration for nonrenewal,[25] ECF No. 90 at 35, and Defendant attacks the accuracy and reliability of Table 19. ECF No. 98 at 11.

After examining the record in the light most favorable to the party opposing summary judgment and resolving all reasonable inferences in that party's favor, the Court holds that there is a dispute of material fact regarding the discriminatory impact of the ASD. A fair-minded jury could determine an academic condition imposed because of a Does Not Meet standards ASD score is a discriminatory impact based on the evidence in Table 19 of Plaintiffs Exhibit 31, the "Report Purpose" page of the ACE-R, and the data highlighted by Plaintiffs' experts. ECF No. 93-4; ECF No. 89-24. The multiple critiques of the veracity of Table 19 would be disputes of fact for a trier of fact to decide.

### *There is no genuine dispute of material fact on the discriminatory "purpose" prong.*

Even though Plaintiffs have put forward enough evidence to create a dispute of material fact on discriminatory impact, the "Supreme Court held in in *Washington v. Davis,* 426 U.S. 229 (1976), that '[p]roof of racially discriminatory intent or purpose is required to show a violation of

---

[25] The mandatory language appears to come from the "Report Purpose" page of the Report rather than the Framework: "These ratings and the substance of the evidence within each domain guide the overall renewal recommendation. If a charter school receives a "Does Not Meet Standard" rating in one or more domains, the CSO **will review** all evidence and data underlying the ratings to determine whether it will recommend a charter school for non-renewal." Report at 1 (emphasis added).

the Equal Protection Clause.'" *Lower Merion,* 665 F.3d at 551 (citing *Arlington Heights,* 429 U.S. at 266). Courts apply strict scrutiny "when there is a proof that a discriminatory purpose has been a motivating factor in the decision." *Id* (citing *Arlington Heights*, 429 U.S. at 266–67). However, without a racially discriminatory purpose on the part of decisionmaker, the distinction would only be subject to rational basis review. *Frazier,* 981 F.2d at 95 (first citing *Feeney,* 442 U.S. 256; and then citing *Davis,* 426 U.S. 229). "In *Arlington Heights*, the Supreme Court outlined how courts should determine whether a discriminatory purpose was a motivating factor." *Lower Merion*, 665 F.3d 552 (citing 429 U.S. at 266–68). "The determination requires a 'sensitive inquiry' into the available 'circumstantial and direct evidence of intent,' including: (1) whether the official action has a racially disproportionate impact; (2) the historical background of the decision; and (3) the legislative or administrative history of the decision." *Id.* (citing *Arlington Heights*, 429 U.S. at 266–68). "Proof put forth to demonstrate discriminatory intent must necessarily usually rely on objective factors." *Id.* (citing *Feeney,* 442 U.S. at 278 n. 24). In showing an invidious discriminatory purpose, "disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination forbidden by the Constitution." *Washington*, 426 U.S. at 242. There are also cases where the "noninvidious purposes of a law cannot be missed." *Lower Merion,* 665 F.3d at 552 (citing *Feeney* 442 U.S. at 275).

Here, even assuming there is a discriminatory impact based on disproportionate impact, the SDP has extensively explained any such impact on neutral grounds. The historical background of the Renaissance Schools Initiative and the administrative history do not show that discriminatory purpose was a motivating factor. Evident in the Renaissance Schools Initiative, Board Policies 400 and 401, and the Framework itself, the SDP was and is motivated by trying to guarantee a high-quality charter school learning environment for all students regardless of race

and meet its own obligations under the Charter School Law. SDP Stipulated Facts ¶¶ 33–40, 43–48, 129–30, 133, 170–90. The Renaissance Schools were formed to raise up all children, not to benefit the operators or for the operators to use the demographics of their schools as cover when they continue to fail their students.

The record shows a history of struggling SDP schools and a radical plan—the Renaissance Schools Initiative—implemented by the School Reform Commission to serve the needs of students and families of schools that had not made adequate yearly progress as defined by state and federal laws. SDP Stipulated Facts ¶¶ 44–45. The increased autonomy of these schools came with increased accountability. *Id.* ¶ 63

The record also shows a laborious process of developing the Framework. The Framework, both in its earlier and current form, was developed to improve the quality, clarity, transparency, and consistency of its charter school authorizing policies and practices. *Id.* ¶ 129. Defendant provides a list of the goals of the Framework, as testified by Kacer and corroborated by assorted presentations included in the record:

> The goals of the Framework . . . were to allow charter schools to understand and improve performance; that all charter schools operating in Philadelphia would have the same framework against which they could see how they performed comparatively; that the feedback to the charter school on that performance would be regular, annual; that the framework would provide charter schools with building blocks to improve if improvement was necessary based on their comparative performance, whether it be financial, operational or academic, and to then engage with others that might be performing differently; and to inform the [School Reform Commission], the sector and stakeholders like parents, families and students to understand the performance of the charter school sector. SDP Stipulated Facts ¶ 138; ECF No. 88-46, at 43:16–45:16.

ECF No. 90 at 26; *see also* ECF No. 88-26 (presentation regarding Framework); ECF No. 88-27 at 4–38 (same).

The Framework was developed with input and discussion from the charter sector. *See e.g.,* SDP Stipulated Facts ¶¶ 129–30, 132–35, 138, 140, 176–77. The development also took into consideration State Charter School Appeal Board and Commonwealth Court decisions near in time to the Framework's finalization, namely *New Hope Academy Charter School v. School District of the City of York*, 89 A.3d 731 (Pa. Cmwlth. Ct. 2014), and *Delaware Valley Charter High School v. School District of Philadelphia and School Reform Commission*, CAB Docket No., 2016-06. SDP Stipulated Facts ¶¶ 131, 142.

Recognizing the demographic challenges facing many of the city charter schools, SSG comparison was added to the ASD. *Id.* ¶ 195–196. Plaintiffs seek to use the SDP's attempted mitigation of the demographic challenges facing charter schools as a "direct acknowledgement" of devoting "30% of the ASD to an 'illogical and unfair' comparison to the District average [which] is absurd, indefensible, and unequivocally establishes a knowing disregard for racial bias." ECF No. 93 at 18. The addition of the SSG, however, is exactly the kind of affirmative effort taken in *Washington v. Davis* that negated any inference that the department at issue acted with a discriminatory purpose. *See* 426 U.S. at 246.

Here, Plaintiffs do not show a dispute of material fact that the SDP developed or continues to use ASD because of a discriminatory purpose. It is a race-neutral policy aimed at guaranteeing a high-quality charter school learning environment for all students while fulfilling the obligations of the SDP under the Charter School Law. Accordingly, strict scrutiny does not apply.

ii.    *The use of the ASD in the Framework passes rational basis review*

"Under rational basis review, the challenged classification must be upheld if it is 'rationally related to a legitimate state interest.'" *Lower Merion*, 665 F.3d at 556 (citing *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976)). The challenged conduct "is rationally related to a legitimate

interest 'if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.'" *Id.* (citation omitted). Rational basis review is a "highly deferential" standard. *Id.*

Applying this "highly deferential" standard here, the Court holds that the use of the ASD in the Framework passes rational basis review. SDP's interest—the Board fulfilling its mandatory responsibilities to evaluate charter schools under the Charter School Law in order to provide all students with a quality education—is legitimate. Therefore, use of the ASD in evaluating charter schools has a rational basis and does not violate the Equal Protection Clause. Accordingly, the use of the ASD does not violate Title VI.

### b)    *Title VI Deliberate Indifference*

Plaintiffs direct the Court to Title VI deliberate indifference caselaw as the standard to analyze SDP's actions, namely *S.H. v. Lower Merion School District* and *Blunt v. Lower Merion School District*. ECF No. 89 at 9–10; ECF No. 93 at 4–6. A plaintiff may establish intentional discrimination through a showing that the defendant acted with "deliberate indifference." *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 272–73 (3d Cir. 2014). To satisfy the deliberate indifference standard, Plaintiffs must present evidence that shows that the defendant (1) knew that harm to a federally protected right was substantially likely and (2) failed to act. *See S.H. ex rel. Durrell v. Lower Merion Sch. Dist.*, 729 F.3d 248, 263 (3d Cir. 2013) (deliberate indifference adopted in Title VI context by *Blunt*, 767 F.3d at 272).

Deliberate indifference requires a "deliberate choice, rather than negligence or bureaucratic inaction." *Id.* (citation omitted). Moreover, the deliberate indifference standard requires actual knowledge rather than constructive knowledge. *Blunt*, 767 F.3d at 273; *see also S.H.*, 729 F.3d at 263 n.23. However, considering the remedial goals of Title VI and because "individuals who

violate the law based on discriminatory motives sometimes do not leave a trail of direct evidence," circumstantial evidence can support a Title VI deliberate indifference claim. *See Blunt*, 767 F.3d. at 273–75.

Plaintiffs provide little analogous caselaw in the Title VI deliberate indifference context to compare of this case. *See, e.g.*, Plaintiffs' Motion at 9 (citing *SEPTA v. Gilead Scis., Inc.*, 102 F. Supp. 3d 688, 701 (E.D. Pa. 2015) (holding plaintiffs failed to state a viable cause of action under the Affordable Care Act on the basis of Title VI)); Plaintiff's Motion at 9 (citing *S.H.*, 729 F.3d at 263 (holding the school district had no knowledge that S.H. had been misidentified as having a learning disability, defeating the first prong of deliberate indifference)); Plaintiff's Motion at 30 (citing *McCleskey v. Kemp*, 481 U.S. 279, 293–94 (1987) (summarizing the two accepted avenues for statistical disparities as proof of an equal protection violation while rejecting an individual's reliance on a complex statistical study in challenging the litigant's capital sentencing)); ECF No. 93 at 18 (citing *Beers-Capitol v. Whetzel*, 256 F.3d 120, 131 (3d Cir. 2001) (Eighth Amendment case)); *id.* at 34 (citing *Columbus Bd. of Educ. v. Penick*, 443 U.S. 449, 464–65 (1979) (holding that foreseeable and anticipated disparate impact were relevant to prove forbidden purpose where the historical backdrop was an enclave of five intentionally designed "black schools")).

The most factually analogous case is *Blunt*. The facts and holding of *Blunt* caution against the outcome Plaintiffs seek. The plaintiffs in *Blunt* brought a challenge under Title VI and the Equal Protection Clause for what they claimed was a "disproportionate placement of African American students in remedial classes" for a discriminatory purpose and which "was the result of racial bias." 767 F.3d at 256–57. The district court held, and the Third Circuit affirmed, that each individual student's educational needs were assessed and satisfied through a thorough and individualized process. *Id.* at 294. There was no evidence to show that educators or administrators

intended to discriminate against Black students because of their race. *Id.* When discussing the statistics of students in special education classes based on race, the Third Circuit stated: "it is critical to recognize that there was no evidence presented in the District Court that the [school district] applied different evaluation procedures for determining placement of African American students than for Caucasian students. After all, if the same evaluation procedures are used for all students regardless of their race there simply is no discrimination." *Id.* at 300. The Third Circuit held that plaintiffs did not point to a genuine issue of material fact that the school district engaged in intentional discrimination against Black students. *Id.* at 301.

The evidence the Third Circuit Considered in *Blunt* tracks this case in important respects. In *Blunt*, plaintiffs presented "statistical evidence that [Black] students were overrepresented in special education classes," testimony that educators "had discussed different learning styles, and an email from a [school district board] member expressing concern about putting extra stress" on Black students. *Id.* This evidence was insufficient to show a genuine issue of material fact that the school district engaged in intentional discrimination since the record showed each student's needs were assessed and satisfied through a thorough individual process, and there was no evidence that educators and administrators responsible for placing students intended to discriminate against them because of their race. *Id.*

Here, Plaintiffs present statistical evidence that schools with high percentages of Black and Hispanic students are more likely to earn a failing score on the ASD than schools whose student bodies are less than 71% Black and Hispanic students. *See, e.g.,* ECF No. 93 at 8. Plaintiffs also point to a regression analysis conducted and sent by email that found a large percentage of the variance in PSSA scores was accounted for by demographic variables that included race, and that race was a "reliable predictor" of PSSA scores. ECF No. 93 at 17; Plaintiffs' Stipulated Facts ¶

38; ECF No. 88-25. Finally, Plaintiffs point to the use of the SSG as attempted remediation of "non-school factors" that impact performance. Plaintiffs' Stipulated Facts ¶ 52.

Defendant, however, points out the Framework is "merely a tool used to evaluate charter schools [that] does not dictate whether a charter school can or will gets its charter renewed." ECF No. 90 at 33. Receiving a Does Not Meet standard in any of the domains "may be considered for nonrenewal." SDP Stipulated Facts ¶ 204; ECF No. 88-28 at 19. "If the CSO renders a renewal recommendation, it will be based on a comprehensive review and evaluation of outcomes and compliance in relation to standards." SDP Stipulated Facts ¶ 204; ECF No. 88-28 at 19. Defendants also argue an actual school closure or nonrenewal is the relevant harm, not a school receiving a Does Not Meet standard on the ASD. Only two out of ninety-eight schools that have been evaluated under the framework have been nonrenewed or closed despite the majority of charter schools serving student bodies of over 85% Black and Hispanic students. *See* ECF No. 88-30.

Throughout the review process, the review of a charter school is standardized but is not mechanical in application. Individual students take the PSSA and have their attendance recorded. Those outcomes are reported on the ACE-R and domain scores are calculated. But an ACE-R is not just a document that solely states a binary recommendation or non-recommendation for charter renewal. The ACE-R is rich with demographic details, the underlying data of domain ratings, data related to the equity and climate of the school, and more. *See generally* Report. That information is then used by the Board to conduct an individualized review of the charter school.

In addition to the fact that SDP used a facially neutral, standardized evaluation of charter schools, there is no evidence that SDP officials intended to discriminate against Plaintiffs because of their race. Indeed, the record establishes that the evaluations were standardized to meet certain standards so that all students would receive an adequate education and not one that blamed the

demographics of the student body as an excuse for the deficiencies of the school itself. The record instead shows school district officials thinking critically about the demographic factors that impact student performance. When faced with knowledge that demographic factors impact PSSA scores, the SDP developed the SSG to mitigate those factors. While the ASD may not be perfect, the evidence in the record—even drawn out through the statistical analysis of Plaintiffs' expert, does not show that Defendant had actual knowledge of a likely harm to a federally protected right and failed to act.

Like in *Blunt*, taking the record as a whole and drawing all inferences in Plaintiffs' favor, there is no genuine issue of material fact that Defendant engaged in intentional discrimination.

## 2.    Article I, Section 29 of the Pennsylvania Constitution

Plaintiffs also assert Counts I and III under Article I, Section 29 of the Pennsylvania Constitution. Again, Plaintiffs and Defendant disagree on the legal standard the Court should apply to the Section 29 claims. *Compare* ECF No. 90 at 22–23 *with* ECF No. 93 at 37–38. Defendant argues that the analysis of and standards governing Section 29 are co-extensive to those regarding Article I, Section 26 of the Pennsylvania Constitution ("Section 26"). ECF No. 90 at 22-23. Plaintiffs argue that Section 29 should be interpreted consistent with Article I, Section 28 of the Pennsylvania Constitution ("Section 28"). ECF No. 93 at 37–38. Their disagreement is a distinction without a difference—the analytical framework of federal equal protection caselaw, though not necessarily its substance, is used to assess Section 28 and Section 29 claims.

Defendant argues the Court should construe claims arising under Sections 29 of the Pennsylvania Constitution to be co-extensive with the analysis and standards of the Article I, Section 26 of the Pennsylvania Constitution ("Section 26"), the equal protection clause. ECF No. 90 at 22-23. This approach would be consistent with the Court's previous analysis in *Sargent v.*

*School District of Philadelphia*. No. CV 22-1509, 2024 WL 4476555, at *8 n.5 (E.D. Pa. Oct. 11, 2024) ("The Court notes that Section 29 of the Pennsylvania Constitution (added May 18, 2021) has not yet been subject to any reported judicial construction, and that the Court finds no basis to find that Section 29—which expressly bars the denial or abridging of '[t]he equality of rights under the law' on the basis of 'race or ethnicity'—would be construed differently than the more generally worded Section 26, which does not mention race or ethnicity. Accordingly, the Court finds it appropriate, here, to also analyze Section 29 under the federal equal protection standards." (alteration in original) (citation omitted)). The framework used to assess a federal Equal Protection Clause challenge applies to Section 26. *Commonwealth v. Albert*, 758 A.2d 1149, 1151 (Pa. 2000) (finding that Article I, § 26 of the Pennsylvania Constitution is analyzed under the same standards that the Supreme Court uses in reviewing federal equal protection claims). Using the federal Equal Protection Clause framework, Plaintiffs' claims under Section 29 fail as a matter of law for the same reasons articulated for the claims under Title VI, described above. *See supra* Section III.B.1.

Plaintiffs argue that Section 29 should be interpreted to provide more protections than those guaranteed by Section 26, consistent with Pennsylvania's Equal Rights Amendment found in Article I, Section 28 of the Pennsylvania Constitution ("Section 28"). ECF No. 93 at 37–38. The text of Sections 28 and 29 mirror each other, changing only "sex" for "race or ethnicity."[26] In January of 2024, the Pennsylvania Supreme Court decided *Allegheny Reproductive Health Center v. Pennsylvania Department of Human Services*, in which it stated Section 28 "affords rights beyond those guaranteed by our equal protection provisions." 309 A.3d 808, 889 (Pa. 2024). In

---

[26] Section 28 provides, "Equality of rights under the law shall not be denied or abridged in the Commonwealth of Pennsylvania because of the sex of the individual." Pa. Const. Art. I, § 28. Section 29 provides, "Equality of rights under the law shall not be denied or abridged in the Commonwealth of Pennsylvania because of the race or ethnicity of the individual." Pa. Const. Art. I, § 29.

*Allegheny Reproductive Health Center*, the Pennsylvania Supreme Court overruled its previous interpretation of Section 28 in *Fischer v. Department of Public Welfare*, 502 A.2d 114 (Pa. 1985), holding that strict scrutiny applies to a sex-based distinction, *Allegheny Reprod. Health Ctr.*, 309 A.3d at 891, the Pennsylvania Constitution secures the fundamental right to reproductive autonomy, *id.* at 917, and that the "penalty" analysis of *Fischer* in the context of Section 26 is replaced with a "position of neutrality with regard to citizens' exercise of their constitutional rights," *id.* at 945.

Plaintiffs do not discuss the meaningful differences between gender- and race-based classifications in federal equal protection caselaw that necessitated *Allegheny Reproductive Health Center*. At the federal level, the Supreme Court applies an intermediate level of scrutiny to gender-based classifications. *Id.* at 891. Pennsylvania's Equal Rights Amendment diverges from federal equal protection caselaw and provides a "near absolute view of the protections." *Id.* Unlike federal equal protection caselaw, in Pennsylvania, "when a statute is challenged as violative of Section 28, a sex-based distinction is presumptively unconstitutional, and it is the government's burden to rebut the presumption with evidence of a compelling state interest in creating the classification and that no less intrusive methods are available to support the expressed policy." *Id.* However, race-based classifications, both before and after *Allegheny Reproductive Health Center*,[27] are subject to a strict scrutiny analysis under federal equal protection caselaw. *See Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 221 (1995). Plaintiffs also make no mention of the role *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022) had on the Pennsylvania

---

[27] In *Richmond v. J.A. Croson Co.*, 488 U.S. 469, 491– 498 (1989), the Supreme Court held the Fourteenth Amendment requires strict scrutiny of race-based actions taken by state and local governments.

Supreme Court's analysis of its earlier caselaw in the context of gender-based classifications and rights.

Applying only the federal equal protection framework, rather than assuming that Section 29 is substantively co-extensive with Section 26 and its federal counterpart, *see Allegheny Reprod. Health Ctr.*, 309 A.3d at 944, the Court still holds Plaintiffs' claims under Section 29 fail as a matter of law for the same reasons articulated for the claims under Title VI, described above.[28]

## IV.    <u>CONCLUSION</u>

For the reasons stated above, the Court grants Defendant's Motion for Summary Judgment (ECF No. 90) and denies Plaintiffs' Motion for Summary Judgment (ECF No. 89). An appropriate Order will follow.

**BY THE COURT:**

**/s/ Chad F. Kenney**

_____

**CHAD F. KENNEY, JUDGE**

---

[28] Plaintiffs point to Justice Wecht's concurrence in *Allegheny Reproductive Health Care* for the proposition that Section 29 provides for disparate impact protections. *See* ECF No. 93 at 38; ECF No. 102 at 11 n.8, 16. This Court will not extend disparate impact protections to Section 29 when the majority in *Allegheny Reproductive Health Center* did not do so in the context of Section 28.